# IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

JAMES SPRINGER,

*Plaintiff-Appellee/Cross-Appellant,*

v.

MICHELLE LUJAN GRISHAM, OFFICE OF THE GOVERNOR, PATRICK ALLEN, AND NEW MEXICO DEPARTMENT OF HEALTH,

*Defendants-Appellants/Cross-Appellees.*

On Appeal from the United States District Court for the District of New Mexico
(No. 1:23-cv-00781-KWR-LF) (Hon. Kea W. Riggs)

## MOTION OF DEFENDANTS-APPELLANTS TO STAY PRELIMINARY INJUNCTION PENDING APPEAL

Holly Agajanian
*Chief General Counsel to Gov. Lujan Grisham*
Kyle P. Duffy
*Deputy General Counsel to Gov. Lujan Grisham*
490 Old Santa Fe Trail, Suite 400
Santa Fe, NM 87501

Cody Rogers
Serpe Andrews
2540 El Paseo Road, Suite D
Las Cruces, NM 88001

Janet Carter
William J. Taylor, Jr.
Everytown Law
450 Lexington Ave, P.O. Box 4184
New York, NY 10163
(646) 324-8174
jcarter@everytown.org

**CORPORATE DISCLOSURE STATEMENT**

Because Defendants-Appellants/Cross-Appellees are all state officers and agencies, no corporate disclosure statement is required under Federal Rule of Appellate Procedure 26.1.

# TABLE OF CONTENTS

**INTRODUCTION AND BACKGROUND** ......................................... **1**

**JURISDICTION** ........................................................... **5**

**LEGAL STANDARD** ...................................................... **5**

**ARGUMENT** ............................................................. **6**

   I.  Defendants Are Likely to Succeed on Appeal ................................ 6

    A. The *Bruen* framework ............................................... 7

    B. The PHO's restriction on firearms in parks is constitutional ................... 11

      1. There is a robust historical tradition of prohibiting firearms
        in parks ........................................................ 11

      2. Prohibitions on firearms in parks are analogous to historical
        prohibitions on firearms in public forums and in schools ................... 17

   II. The Non-Merits Factors Favor a Stay ....................................... 19

**CONCLUSION** .......................................................... **21**

# TABLE OF AUTHORITIES

## Cases

*Amdor v. Lujan Grisham*,
   No. S-1-SC-40105 ............................................................................ 2

*Antonyuk v. Chiumento*,
   89 F.4th 271 (2d Cir. 2023) ................................................... passim

*Baca v. Dep't of Army*,
   983 F.3d 1131 (10th Cir. 2020) ...................................................... 14

*District of Columbia v. Heller*,
   554 U.S. 570 (2008) ........................................................ 10, 16, 19

*Dobbs v. Jackson Women's Health Organization*,
   597 U.S. 215 (2022) ......................................................................... 16

*Homans v. City of Albuquerque*,
   264 F.3d 1240 (10th Cir. 2001) ........................................................ 5

*Kipke v. Moore*,
   Nos. 1:23-cv-01293 & 1:23-cv-01295 (consol.), 2023 WL 6381503
    (D. Md. Sept. 29, 2023) ................................................. 9, 12, 13, 15

*Lafave v. Cnty. of Fairfax*,
   No. 1:23-cv-01605 (E.D. Va. Jan. 24, 2024) .................................. 15

*LaFave v. Cnty. of Fairfax*,
   No. CL2021-01569, 2023 Va. Cir. LEXIS 203 (Fairfax Cnty. Cir. Ct.
   June 23, 2023) ............................................................................... 12

*Lara v. Commissioner Pennsylvania Police*,
   --- F.4th ----, No. 21-1832, 2024 WL 189453 (3d Cir. Jan. 18, 2024) ................ 9

*Maryland v. King*,
   567 U.S. 1301 (2012) ...................................................................... 20

*Md. Shall Issue, Inc. v. Montgomery Cnty.*,
   No. 8:21-cv-01736, 2023 WL 4373260 (D. Md. July 6, 2023), *appeal
   docketed*, No. 23-1719 (4th Cir. July 10, 2023) .......................... 9, 12, 15

*Nat'l Rifle Ass'n v. Bondi,*
    61 F.4th 1317 (11th Cir.), *vacated pending reh'g en banc*, 72 F.4th 1346
    (11th Cir. 2023) ........................................................................................9

*New York State Rifle & Pistol Ass'n v. Bruen,*
    597 U.S. 1 (2022)..........................................................................passim

*Nken v. Holder,*
    556 U.S. 418 (2009).........................................................................5

*Uniformed Fire Officers Ass'n v. De Blasio,*
    973 F.3d 41 (2d Cir. 2020) ..............................................................20

*United States v. Alaniz,*
    69 F.4th 1124 (9th Cir. 2023)..........................................................14

*United States v. Hunt,*
    63 F.4th 1229 (10th Cir. 2023)....................................................12, 14

*Vincent v. Garland,*
    80 F.4th 1197 (10th Cir. 2023), *pet'n for cert. filed*, No. 23-683 (U.S.
    Dec. 21, 2023) ............................................................................7, 10

*We the Patriots, Inc. v. Lujan Grisham,*
    No. 1:23-cv-00773 (D.N.M. Oct. 9, 2023) ........................................3

**Statutes and Rules**

N.M. Stat. Ann. §§ 12-10A-1 to -19 ......................................................20

**Historical Regulations**

1786 Va. Acts 35, ch. 49 .......................................................................17

1869-70 Tenn. Pub. Acts 23-24, ch. 22 ..................................................17

1871 Tex. Gen. Laws ch. 34 § 3.............................................................17

1883 Mo. Sess. Laws 76 ........................................................................18

1889 Ariz. Sess. Laws 17 .......................................................................18

1890 Okla. Terr. Stats, art. 47 (1893) ....................................................18
    Collection of Statutes of the Parliament of England in Force in the State

of North Carolina, ch. 3 (F. Martin Ed. 1792)..................................................17

R.H. Clark, The Code of the State of Georgia (1873) ...........................................18

**Other Authorities**

Darrell A.H. Miller et al., *Technology, Tradition, and "The Terror of the People,"*
  Notre Dame L. Rev. (forthcoming 2023) (manuscript, at 20-23),
  https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4521030 ....................21

Nadav Shoked, *Property Law's Search for a Public*, 97 Wash. U. L. Rev. 1517 (2020).12

Paul M. Reeping et al., *The Effect of Gun-Free School Zones on Crimes Committed
  with a Firearm in Saint Louis, Missouri*, 100 J. Urban Health 1118 (2023),
  https://bit.ly/3Rwvwqd ......................................................................................20

Steven Barkan & Michael Rocque, *Crime Prevention: Programs, Policies, and Practices*
  (2021).................................................................................................................21

Transcript of Oral Argument, New York State Rifle & Pistol Ass'n v.
  Bruen, No. 20-843 (U.S. Nov. 3, 2021).............................................................10

**LIST OF SUPPORTING DOCUMENTS**

- Appendix A: Executive Order 2024-001: Renewing State of Public Health Emergency Due to Gun Violence (January 26, 2024)

- Appendix B: Amended Public Health Order Imposing Temporary Firearm Restrictions, Drug Monitoring, and Other Public Safety Measures (October 6, 2023) (Doc. 10-1)*

- Appendix C: Order Denying Plaintiffs' Motion for Preliminary Injunction in *We the Patriots, Inc. v. Lujan Grisham*, No. 1:23-cv-00773-DHU-LF (October 11, 2023)

- Appendix D: Order Granting Part and Denying in Part Plaintiff's Renewed Motion for Preliminary Injunction (December 5, 2023) (Doc. 19)

- Appendix E: Order Denying Defendants' Request to Reconsider or Stay Preliminary Injunction (January 22, 2024) (Doc. 37)

- Appendix F: Table of Restrictions on Firearms in Parks (Doc. 21-1)

- Appendix G: Compilation of Restrictions on Firearms in Parks (Doc. 21-2)

- Appendix H: Compilation of Restrictions on Firearms in Places of Public Assembly or Gathering (Doc. 21-3)

---

\* References to "Doc." without additional information refer to entries on the District Court docket below.

**INTRODUCTION AND BACKGROUND**

New Mexico is suffering from an epidemic of gun violence. Guns killed 550 New Mexicans in 2022, a deadly trend that continued into 2023. App. A at 1-2. New Mexico's gun death rates are among the highest in the nation and are increasing at a significantly higher rate than the country as a whole. *Id.* at 1. The crisis disproportionately impacts Albuquerque and Bernalillo County, the state's most populous areas. *Id.* at 3. And the impact from this heightened gun violence goes beyond fatalities and physical injuries—causing emotional trauma, economic harm, and other devastating long-term consequences. *Id.* at 2.

Recognizing New Mexico's gun violence epidemic, and following the tragic shooting of a young child in Albuquerque, Governor Michelle Lujan Grisham declared gun violence a statewide public health emergency on September 7, 2023. She subsequently renewed the state of emergency each month thereafter.[1]

Department of Health Secretary Patrick Allen issued a series of public health orders to implement the emergency orders. The operative public health order (the "PHO"), issued on October 6, 2023, prohibits individuals from "possess[ing] a

---

[1] The executive orders are available at https://www. governor.state.nm.us/about-the-governor/executive-orders/. The most recent order, issued on January 26, 2024, extended the state of emergency through February 23, 2024. App. A at 5.

firearm, … either openly or concealed, in public parks or playgrounds within the City of Albuquerque or Bernalillo County" for the duration of the emergency.[2] App. B at 2. The PHO exempts law enforcement, licensed security officers, and active-duty military personnel, and does not apply to Albuquerque's Shooting Range Park or to state parks owned or managed by the New Mexico State Parks Division or the State Land Office. *Id.*

Seven separate suits challenging the PHO on Second Amendment grounds[3] were consolidated before Judge Urias, but this case was reassigned to Judge Riggs due to a potential conflict of interest. Docs. 7, 8. The challengers sought a preliminary injunction to halt enforcement of the PHO from each district judge. Doc. 10; Third Mot. for Prelim. Inj., *We the Patriots, Inc. v. Lujan Grisham*, No. 1:23-cv-00773 (D.N.M. Oct. 9, 2023), Doc. 25.

On October 11, 2023, Judge Urias declined to enjoin the PHO, ruling that the challengers in the consolidated cases failed to establish likely success in their Second Amendment challenge to the PHO's prohibition on guns either in parks or

---

[2] Plaintiff challenged prior iterations of the PHO earlier in this suit. *See* Docs. 1, 2, 9. Secretary Allen's issuance of the operative PHO mooted those claims.

[3] A separate suit challenging Governor Lujan Grisham's authority to declare the state of emergency was argued before the New Mexico Supreme Court on January 8, 2024. *See Amdor v. Lujan Grisham*, No. S-1-SC-40105. No decision has issued to date.

in playgrounds (hereafter, respectively, the "Parks Restriction" and the "Playgrounds Restriction"). *See* App. C (also available at 2023 WL 6622042 (D.N.M. Oct. 11, 2023)). Judge Urias reasoned that, because plaintiffs challenged state restrictions, the most relevant period for the historical analysis is the mid-to-late 19th century, when the ratification of the Fourteenth Amendment made the Second Amendment applicable to the states. *Id.* at 16. He then concluded that Defendants could plausibly establish a national historical tradition of firearm restrictions in city parks sufficient to satisfy the standard established in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022). App. C at 18.[4]

Several weeks later, presented with the same challenge that Judge Urias had just rejected, Judge Riggs granted in part and denied in part Plaintiff's preliminary injunction motion. App. D. Judge Riggs declined to enjoin the Playgrounds Restriction but held that Defendants "failed to carry their burden to show a historical tradition of banning firearms in public parks or their historical analogues." *Id.* at 8-9, 16. As in the consolidated cases before Judge Urias,

---

[4] Some of the plaintiffs have appealed Judge Urias's ruling to this Court. *We the Patriots, Inc. v. Lujan Grisham*, No. 23-2166; *Fort v. Lujan Grisham*, No. 23-2167; *Donk v. Lujan Grisham*, No. 23-2185. Judge Urias denied two emergency motions for a preliminary injunction pending appeal, *We the Patriots, Inc. v. Lujan Grisham*, No. 1:23-cv-00773 (D.N.M.), Docs. 64, 68, and plaintiffs have not sought similar relief in this Court. These appeals have since been consolidated; merits briefing is underway and will be completed by March 20, 2024. *See* No. 23-2166 (consol. dkt.).

Defendants had relied on numerous laws from the mid-to-late 19th and early 20th centuries prohibiting firearms in parks and public-gathering places. Doc. 15 at 12-15. Judge Riggs, however, faulted Defendants for not providing the Court with copies of those laws, and ultimately concluded that Defendants had provided "*no evidence illuminating the scope of the Second Amendment*" around 1791 and "insufficient evidence" illuminating the understanding around the time of the Fourteenth Amendment's adoption. App. D. at 12-15. Defendants appealed Judge Riggs's ruling as to parks, Doc. 20, and Plaintiff cross-appealed as to playgrounds, Doc. 25.

Defendants moved for a stay pending appeal on December 8, 2023. Doc. 21. Judge Riggs issued an administrative stay pending briefing and resolution of that motion. Doc. 22 (Dec. 11, 2023). In his response, Plaintiff wrote that he "would certainly understand if [the District Court] stayed the injunction pending appeal," for "practical reasons," including that the consolidated cases were already pending on appeal. Doc. 26 at 7. Nevertheless, on January 22, 2024,[5] Judge Riggs denied

---

[5] Judge Riggs's order issued on the same day that this Court granted Defendants' motion for a 30-day extension of the deadline for their opening brief.

Defendants' motion, and the preliminary injunction went back into effect. App. E.[6]

Defendants now move for a stay pending appeal. Plaintiff opposes this motion.

## JURISDICTION

This Court has jurisdiction over the appeal pursuant to 28 U.S.C. § 1292(a)(1). Plaintiff alleged that the District Court had jurisdiction under 28 U.S.C. § 1331.

## LEGAL STANDARD

The decision to stay a preliminary injunction pending appeal is "an exercise of judicial discretion, and the propriety of its issue is dependent upon the circumstances of the particular case." *Nken v. Holder*, 556 U.S. 418, 433 (2009) (cleaned up). The Court's discretion is guided by four factors: (a) the likelihood of success on appeal; (b) the threat of irreparable harm if the stay is not granted; (c) the absence of harm to opposing parties if the stay is granted; and (d) any risk to harm to the public interest. *Homans v. City of Albuquerque*, 264 F.3d 1240, 1243 (10th Cir. 2001); *see also* 10th Cir. R. 8.1. Each factor favors a stay in this case.

---

[6] Defendants' motion also requested clarification, reconsideration, and an indicative ruling that the District Court would deny the preliminary injunction. Doc. 21 at 1 n.1, 15-16; Doc. 32 at 10-11. Judge Riggs also denied that relief. App. E. at 1-2, 32.

## ARGUMENT

### I. Defendants Are Likely to Succeed on Appeal

*Bruen* requires a history-based analysis of Second Amendment claims, and history soundly defeats Plaintiff's claims. Once public parks emerged as communal spaces for repose and relaxation in the nineteenth century, scores of laws, ordinances, and rules prohibited firearms in these new parks. In their initial brief in the District Court, Defendants pointed to over a dozen of those laws, as set out in the decision of another federal district court. And there are many dozens more, as identified in Defendants' subsequent submission to the District Court and government filings in other courts. Moreover, these 19th-century and early 20th-century laws are part of historical traditions of restricting firearms in analogous places—public-gathering places and schools—that stretch back to the founding.

Since *Bruen*, the only court of appeals to have addressed a prohibition on firearms in parks rejected the Second Amendment challenge. *See Antonyuk v. Chiumento*, 89 F.4th 271, 355-63 (2d Cir. 2023) (vacating preliminary injunction against New York prohibition on guns in parks). The Second Circuit concluded that founding-era prohibitions on firearms in gathering places and 19th-century prohibitions on guns in city parks together constitute an unbroken tradition of firearms regulation that defeated plaintiffs' request for a preliminary injunction.

That decision is correct, and because its reasoning applies equally here, Defendants are likely to succeed on appeal.

### A.     The *Bruen* framework

In *Bruen*, the Supreme Court established a new two-step test for Second Amendment claims focused on constitutional text and historical tradition. *See* 597 U.S. at 17-19. A court must first consider whether "the Second Amendment's plain text covers [the challenger's] conduct." *Id*. at 24; *see Vincent v. Garland*, 80 F.4th 1197, 1200 (10th Cir. 2023), *pet'n for cert. filed*, No. 23-683 (U.S. Dec. 21, 2023). If so, the burden shifts to the government to show that the challenged regulation is "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 19, 24; *see Vincent*, 80 F.4th at 1200.

To guide courts in the historical analysis, *Bruen* stressed that a modern firearms regulation need not be a "dead ringer for historical precursors" and will pass constitutional muster so long as it is "analogous enough" to historical restrictions. 597 U.S. at 30 ("[A]nalogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*."). Courts should uphold a modern law if, in comparison to historical regulations, the law imposes a "comparable burden on the right of armed self-defense" and the burden is "comparably justified." *Id*. at 29. In other words, courts

should consider "how and why" a regulation burdens the right to self-defense. *Id.*
*Bruen* also instructed courts to "use analogies to … historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." *Id.* at 30. At the same time, *Bruen* recognized that "cases implicating unprecedented societal concerns … may require a more nuanced approach" to the historical inquiry. *Id.* at 27. Thus, firearms prohibitions concerning societal conditions that did not exist at the founding—like public parks, *see infra* pp. 11-12—demand a more expansive approach to historical analogy. *See Antonyuk*, 89 F.4th at 359 n.78 ("Though the historical analogues here are relatively simple to draw, the relative novelty of public parks as institutions also justifies a flexible approach under *Bruen*." (cleaned up)).

Even leaving aside the issue of new societal conditions, *Bruen* raised, but expressly left open, the question whether the most important time period for the historical analysis is 1791 (when the Second Amendment was first adopted as a constraint on the federal government) or 1868 (when the Fourteenth Amendment made it applicable to state and local governments). *See* 597 U.S. at 37-38. The clear weight of authority favors the view that the period around 1868 is as important as, if not more important than, 1791, at least in challenges to state and local laws. *See*

*Antonyuk*, 89 F.4th at 304 ("Because the [challenged law] is a state law, the prevailing understanding of the right to bear arms in 1868 and 1791 are both focal points of our analysis."); *Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1323 (11th Cir.) ("[T]he more appropriate barometer is the public understanding of the right when the States ratified the Fourteenth Amendment and made the Second Amendment applicable to the States."), *vacated pending reh'g en banc*, 72 F.4th 1346 (11th Cir. 2023).[7] This includes Judge Urias in his decision declining to enjoin the PHO. *See* App. C at 16 (agreeing that "historical sources from the period of the ratification of the Fourteenth Amendment in 1868 are more probative of the scope of the Second

---

[7] *See also, e.g.*, *Kipke v. Moore*, Nos. 1:23-cv-01293 & 1:23-cv-01295 (consol.), 2023 WL 6381503, at *6 (D. Md. Sept. 29, 2023); *Md. Shall Issue, Inc. v. Montgomery Cnty.*, No. 8:21-cv-01736, 2023 WL 4373260, at *8 (D. Md. July 6, 2023), *appeal docketed*, No. 23-1719 (4th Cir. July 10, 2023). The Third Circuit recently took a different approach in *Lara v. Commissioner Pennsylvania State Police*, concluding that 1791 is the more relevant date in a case challenging Pennsylvania's age restriction on carrying firearms. --- F.4th ----, No. 21-1832, 2024 WL 189453, at *7-8 (3d Cir. Jan. 18, 2024). The court based its conclusion on the "general assumption" in several Supreme Court cases *Bruen* cited, not on originalist principles. *See id.* But when *Bruen* referred to prior decisions that "generally *assumed*" that the scope of other rights was pegged to their 1791 understanding, *see* 597 U.S. at 37 (emphasis added), it was making clear that those decisions had not so *held*. And that assumption—in prior cases that did not address the significance of the Fourteenth Amendment's ratification—cannot have resolved the question that *Bruen* expressly left open. *See id.* at 37-38.

Amendment's right to bear arms than those from the Founding Era").[8] Focusing on 1868 is also the view more consistent with originalist theory. When asked by Justice Thomas about the correct time period during oral argument in *Bruen*, counsel for New York's NRA affiliate responded with the Reconstruction era.[9]

Moreover, even if 1791 were the most relevant focus, "examination of a variety of legal and other sources to determine the *public understanding* of a legal text in the period *after* its enactment or ratification" is also "a critical tool of constitutional interpretation." *District of Columbia v. Heller*, 554 U.S. 570, 605 (2008) (second emphasis added); *see also Bruen*, 597 U.S. at 20 (quoting same). *Bruen* clarified that materially later history that *contradicts* the established original meaning of the constitutional text at the relevant point in time would not change that meaning. *See* 597 U.S. at 36, 66 n.28. But it emphasized that, conversely, "a regular course of practice can liquidate [and] settle the meaning of disputed or indeterminate terms [and] phrases in the Constitution." *Id.* at 35-36 (cleaned up) (quoting decision quoting James Madison).

---

[8] *See also, e.g.*, *Vincent*, 80 F.4th at 1203 (Bacharach, J., concurring) (noting that, in conducting the *Bruen* analysis, a court should consider history "through the end of the nineteenth century").

[9] *See* Tr. of Oral Arg. at 8:2-17, *Bruen* (No. 20-843) ("[If] the case arose in the states, I would think there would be a decent argument for looking at the history at the time of Reconstruction … and giving preference to that over the founding.").

Here, Defendants have presented copious historical laws from the Reconstruction era and later, and those laws do not contradict any earlier evidence. To the contrary, as *Antonyuk* held, those laws reflect and confirm limitations on the right to keep and bear arms that existed at the founding—and they demonstrate that, for as long as modern parks have existed, governments have restricted firearms within them. Plaintiff presents no treatises, caselaw, or other evidence to establish that, in any era, the public understanding of the right forbade the government to prohibit guns in parks. As in *Bruen*, therefore, the answer is the same in both key periods—and throughout American history: the Second Amendment permits Defendants to prohibit guns in sensitive places like parks.

## B. The PHO's restriction on firearms in parks is constitutional

Applying *Bruen*'s principles, Defendants are likely to succeed in their appeal. The Parks Restriction is part of a robust tradition of prohibiting firearms in parks and analogous sensitive places.

### 1. There is a robust historical tradition of prohibiting firearms in parks

Parks as we understand them today did not exist in the founding era. Early green spaces, such as town commons or greens, served very different societal functions from today's parks—Boston Common, for example, was primarily used

for common grazing and activities like militia training for two centuries. *See Antonyuk*, 89 F.4th at 361 (citing Nadav Shoked, *Property Law's Search for a Public*, 97 Wash. U. L. Rev. 1517, 1556-57 (2020)). Instead, the "rise of public parks as municipal institutions [occurred] over the latter half of the 19th century," following "the success of New York's Central Park." *Id.* at 359 (cleaned up).[10]

Beginning in the 1850s, as governments created these new public parks, they swiftly prohibited firearms within them. Defendants directed the District Court to fourteen city-park regulations and three state-park regulations that had been cited—and deemed sufficient to establish a "tradition of regulation of firearms in parks"—by the district court in *Maryland Shall Issue*. *See* Doc. 15 at 12-13 (quoting *Md. Shall Issue*, 2023 WL 4373260, at *11 (quotations omitted), and listing examples it relied on).[11] These regulations include the original 1858 rules of Central Park,

---

[10] Several trial-level courts have concluded the same. *See, e.g.*, *Kipke*, 2023 WL 6381503, at *9 (concluding that the few parks in existence at the time of the founding did not resemble modern parks, and that "Boston Common … was used primarily as a pasture, a place of execution, and site for the militia to muster and drill"); *LaFave v. Cnty. of Fairfax*, No. CL2021-01569, 2023 Va. Cir. LEXIS 203, at *17 (Fairfax Cnty. Cir. Ct. June 23, 2023) ("Parks in the modern sense did not come into being until the mid-19th century[.]").

[11] The District Court's suggestion that it could not consider these historical laws (or other materials cited below, such as secondary sources) because Defendants did not attach copies to their opposition papers is without merit. *See infra* notes 15-16; *cf., e.g.*, *United States v. Hunt*, 63 F.4th 1229, 1249-50 (10th Cir. 2023) (rejecting argument that court could not consider materials unless they were "attached as hard copies to the government's brief").

which forbade "[a]ll persons" to "carry fire-arms" in the newly formed park[12]; an

1868 Pennsylvania law that "[n]o person shall carry fire arms" in the newly created

Fairmount Park in Philadelphia "or within fifty yards thereof"[13]; and laws

prohibiting firearms in Chicago and Phoenixville, Pennsylvania in the 1870s,

among others.[14] In addition to the laws cited in *Maryland Shall Issue*, there are many

dozens of similar laws from the Reconstruction era and subsequent decades; in all,

laws located to date appeared in eight cities in the 1850s to 1870s, six more cities in

the 1880s, 20 more in the 1890s, another 21 in the 1900s, and more throughout

the 1910s and 1920s. *See* App. F; App. G.[15] The late-19th and early-20th century

---

[12] App. F at Tab 1; App. G at Tab 1.

[13] App. F at Tab 4; App. G at Tab 4.

[14] *E.g.*, App. F at Tabs 6, 9; App. G at Tabs 6, 9. Defendants also directed the District Court to *Kipke*, which relied on additional prohibitions on guns in St. Louis (1881) and Boston (1886) parks. *See* Doc. 15 at 15; *Kipke*, 2023 WL 6381503, at \*10.

[15] In seeking a stay or reconsideration in the District Court, Defendants presented a compilation of well over a hundred historical parks laws, both compiled as PDFs (App. G) and identified by citation and source in a table of contents (App. F). Governments defending parks restrictions have presented many or all of these laws in other federal cases. *See, e.g.*, *LaFave v. Cnty. of Fairfax*, No. 1:23-cv-01605 (E.D. Va. Jan 5, 2024), Docs. 19-18, 24 (and attachments); *Christian v. Nigrelli*, No. 1:22-cv-00695 (W.D.N.Y. Nov. 4, 2022), Docs. 33-3, 33-4, 34, 35. These historical laws establish that—to take one example in each of 25 states and the District of Columbia—firearms were prohibited in parks in New York, N.Y. (1858), Philadelphia, Pa. (1868), San Francisco, Cal. (1872), Chicago, Ill. (1873), St. Louis, Mo. (1881), Boston, Mass. (1886), Salt Lake City, Utah (1888), Trenton, N.J. (1890), Grand Rapids, Mich. (1891), Milwaukee, Wis. (1891), Spokane, Wash. (1892), Cincinnati, Ohio (1892), Wilmington, Del. (1893), St. Paul, Minn. (1894),

also saw the proliferation of state and national parks, which were also accompanied by firearms prohibitions shortly after their creation. *See id.*[16]

Not only were parks restrictions numerous, but research has not revealed any instance of a court invalidating them, meaning they "were not merely adopted by legislative bodies in the respective cities in which they applied—they were apparently accepted without any constitutional objection by anyone." *Antonyuk*, 89

---

Indianapolis, Ind. (1896), New Haven, Conn. (1898), Boulder, Colo. (1899), Houston, Tex. (1904), Neligh, Neb. (1904), Washington, D.C. (1907), Portland, Or. (1907), Memphis, Tenn. (1909), Paducah, Ky. (1909), Staunton, Va. (1910), Birmingham, Ala. (1917), and Burlington, Vt. (1921).

[16] The District Court declined to consider the additional historical laws Defendants presented with their stay motion, *see supra* note 15, deeming them "new evidence" with "characteristics of a factual record" that Defendants were required to submit in their initial opposition papers—and suggesting that even this Court may not be able to consider such material on appeal. App. E at 6, 8-9. That was error. This Court has made clear that laws are not subject to such constraints on the timing of their submission. *See, e.g.*, *Baca v. Dep't of Army*, 983 F.3d 1131, 1140 (10th Cir. 2020) (stating that "we do allow a party to provide new legal authority on appeal for the position that he advanced below" and permitting consideration of Army and Department of Defense policies raised for first time on appeal because they were "new legal authority in support of" plaintiff's claim "rather than a new theory of relief" (alterations adopted in first quotation)). This rule applies equally to the submission of historical laws supporting the constitutionality of a challenged firearm restriction under *Bruen*. *See United States v. Alaniz*, 69 F.4th 1124, 1129 n.1 (9th Cir. 2023) (rejecting challenger's argument in a Second Amendment case "that the government's analogues cannot be considered on appeal because they were not raised below," and affirming that "[b]ecause the constitutional claim was raised below, [the court] may consider the government's [*Bruen*] step two arguments and analogues put forward on appeal"); *cf., e.g.*, *Hunt*, 63 F.4th at 1250 (noting that "[w]hen the resolution of a dispute turns on legislative facts, courts regularly relax the restrictions on judicial inquiry").

F.4th at 359; s*ee also Bruen*, 597 U.S. at 30 (finding it "settled" that certain locations were "'sensitive places' where arms carrying could be prohibited" because there were "no disputes regarding the lawfulness of such prohibitions"). Thus, as the Second Circuit and multiple district courts have concluded, such park restrictions demonstrate an established historical tradition of prohibiting firearms in public parks. *See, e.g.*, *Antonyuk*, 89 F.4th at 359-60;[17] *Md. Shall Issue*, 2023 WL 4373260, at *11-12; *Kipke*, 2023 WL 6381503, at *9-10.[18] The PHO fits soundly within this tradition. *See* App. C at 16-18.

The District Court rejected these park restrictions on the basis that Defendants did not cite "historical analogues before 1850 limiting firearms during recreational activity or in places of recreation." App. E at 22. That was error, for at least four reasons. *First*, as explained, examining later laws to illuminate earlier public understanding is "a critical tool of constitutional interpretation," *Heller*, 554

---

[17] Although *Antonyuk* expressed skepticism that the historical laws New York relied on at the preliminary-injunction stage would support a modern prohibition on firearms in "rural" parks, it found it unnecessary to resolve the issue on a facial challenge and noted the litigation was still in its early stages. *See* 89 F.4th at 362. Historical prohibitions on firearms in national and state parks (which New York did not present in *Antonyuk*) robustly support the constitutionality of prohibitions in "rural" parks, but this Court also need not decide that issue, because none of the parks the PHO covers—all of which are located in and around the City of Albuquerque—can plausibly be considered rural.

[18] *See also Lafave v. Cnty. of Fairfax*, No. 1:23-cv-01605 (E.D. Va. Jan. 24, 2024), Doc. 33 (order denying preliminary injunction of county park restriction).

U.S. at 605, and should be avoided only if challengers affirmatively establish the existence of a contradictory earlier tradition—which Plaintiff has not done here. *Second*, and in any event, the most relevant time period for the Court's analysis is the period surrounding the ratification of the Fourteenth Amendment. *See supra* pp. 8-10. *Third*, the absence of founding-era regulation does not mean that such regulation was constitutionally prohibited at the founding. In *Dobbs v. Jackson Women's Health Organization*, the Supreme Court rejected the argument that the absence of laws criminalizing pre-quickening abortion "at the Founding and for decades thereafter" supported a right to an abortion, explaining "the fact that many States in the late 18th and early 19th century did not criminalize pre-quickening abortions does not mean that anyone thought the States lacked the authority to do so." 597 U.S. 215, 252-53 (2022); *see also Antonyuk*, 89 F.4th at 301 (cautioning against "reasoning from historical silence" because "[l]egislatures past and present have not generally legislated to their constitutional limits"). *Finally*, as discussed below, Reconstruction-era and modern parks restrictions do have earlier historical analogues, including (1) the founding-era tradition of prohibiting firearms in often-crowded public forums, and (2) longstanding prohibitions on firearms in schools.

## 2. Prohibitions on firearms in parks are analogous to historical prohibitions on firearms in public forums and in schools

Even if this Court were to focus on the founding era, it should still conclude that the PHO is consistent with historical tradition.

As *Antonyuk* concluded with respect to New York's parks restriction, the PHO is consistent with the "well-established and representative tradition of regulating firearms in public forums and quintessentially crowded places, enduring from medieval England to Reconstruction America and beyond." *Antonyuk*, 89 F.4th at 356. *Antonyuk* pointed to founding-era laws in Virginia and North Carolina that "replicated the medieval English law prohibiting firearms in fairs and markets, *i.e.*, the traditional, crowded public forum." *Id.* at 357 (footnote omitted) (citing 1786 Va. Acts 35, ch. 49 and Collection of Statutes of the Parliament of England in Force in the State of North Carolina 60–61, ch. 3 (F. Martin Ed. 1792)). Thus, "medieval law survived to become our Founders' law." *Id.* at 357 (quoting *Bruen*, 597 U.S. at 35). Firearms restrictions in places of public assembly or gathering became increasingly common in the latter half of the 19th century. *See id.* at 357-58; *see also, e.g.*, 1869-70 Tenn. Pub. Acts 23-24, ch. 22 (prohibiting weapons in "any fair, race course, or other public assembly of the people"); 1871 Tex. Gen. Laws ch. 34 § 3 (prohibiting weapons in any "place where persons are assembled

for amusement or for educational or scientific purposes, or into any circus, show, or public exhibition of any kind or into a ball room, social party, or social gathering"); R.H. Clark, The Code of the State of Georgia 818 (1873); 1883 Mo. Sess. Laws 76; 1890 Okla, Terr. Stats, art. 47 (1893); 1889 Ariz. Sess. Laws 17.[19] Courts repeatedly upheld the constitutionality of these laws. *See Antonyuk*, 89 F.4th at 356 (citing cases).

The District Court rejected reliance on several of these laws, *see* App. D at 15 (discounting all laws from territories as opposed to states); App. E at 23-24 (same, and asserting that *Bruen* had dismissed 1871 Texas law as outlier), but *Antonyuk* explains why its purported grounds for doing so are erroneous. *See* 89 F.4th at 360 (explaining "there [i]s no reason … to discount" the same territorial laws Defendants present here); *id.* at 358 n.75 (explaining that *Bruen* found one aspect of 1871 Texas statute to be an outlier, but did not "cast doubt on … [its] separate restriction relating to public assembly," which is "consistent with the national tradition and existed in many states.").

Separately, the PHO is constitutional because it is consistent with the well-accepted principle that the government may prohibit firearms in schools. *See Heller*,

---

[19] Defendants presented four of these laws in their opposition to the motion for preliminary injunction. *See* Doc. 15 at 13; *see also* App. H (compilation of public assembly and gathering laws included with District Court stay motion).

554 U.S. at 626 (describing "longstanding" tradition of "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings"); *Bruen*, 597 U.S. at 30 (reiterating *Heller*'s description of schools as "sensitive places"); *Antonyuk*, 89 F.4th at 339 n.56 (describing school restrictions as "well-established"). And so, as *Bruen* instructs, courts can analogize from the restrictions in schools to approve restrictions in "*new* and analogous sensitive places." 597 U.S. at 30. The PHO is analogous to historical restrictions on firearms in schools. It places a "comparable burden" on the right to armed self-defense—like school restrictions, it prohibits carrying only in discrete locations. And its burden is "comparably justified"—like school restrictions, it protects a vulnerable population (children), who make extensive use Albuquerque and Bernalillo County parks.[20]

## II.    The Non-Merits Factors Favor a Stay

New Mexico "suffers … irreparable injury" whenever it is barred "from effectuating statutes enacted by representatives of its people." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers).[21] The injunction undermines

---

[20] *Antonyuk* relied on similar reasoning to uphold a prohibition on firearms at zoos. *See* 89 F.4th at 363-64. It did not address whether this analogy would extend to parks because it had already deemed parks restrictions consistent with the tradition of prohibiting guns in public-gathering spaces. *Id.* at 361 n.84.

[21] Although the PHO is not a statute, it was issued pursuant to the statutory scheme the Legislature enacted to respond to public health emergencies. *See* N.M. Stat. Ann.  §§ 12-10A-1 to -19 (2003, as amended through 2015).

the judgment of New Mexico's democratic branches on how best to keep residents safe. That harm is especially profound here: the preliminary injunction imposes "an ongoing and concrete harm to" the State's "law enforcement and public safety interests," *King*, 567 U.S. at 1303, and produces confusion given that another district court judge has refused to preliminarily enjoin the PHO. Furthermore, the public, which has the right to enjoy public spaces like parks, may also be irreparably harmed absent a stay, as allowing individuals to carry firearms into public parks where people and children gather significantly increases the likelihood of shootings in those locations.[22] Firearm injuries and deaths "c[an]not be undone, thus rendering the consequences irreparable." *Uniformed Fire Officers Ass'n v. De Blasio*, 973 F.3d 41, 48 (2d Cir. 2020). The presence of guns in parks also has intimidating and chilling effects and reduces the public's use and enjoyment of parks.[23]  In contrast, a stay will not substantially harm Plaintiff because there is no evidence that carrying his firearms in Albuquerque-area parks would reduce the

---

[22] *See, e.g.*, Paul M. Reeping et al., *The Effect of Gun-Free School Zones on Crimes Committed with a Firearm in Saint Louis, Missouri*, 100 J. Urban Health 1118, 1123 (2023), https://bit.ly/3Rwvwqd (finding "statistically significant 13.7% fewer crimes committed with a firearm in gun-free school zones compared to gun-allowing zones").

[23] *See* Darrell A.H. Miller et al., *Technology, Tradition, and "The Terror of the People,"* Notre Dame L. Rev. (forthcoming 2023) (manuscript, at 20-23), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4521030.

likelihood of Plaintiff or his family being injured in a shooting.[24] And, indeed, Plaintiff does not live in Albuquerque or Bernalillo County, nor has he articulated specific plans to visit any parks affected by the PHO in the near future. *See* Doc. 10-2. Accordingly, the equities and public interest also strongly favor granting a stay.

## CONCLUSION

The Court should stay the District Court's preliminary injunction pending appeal.

February 2, 2024                    Respectfully submitted,

/s/ Janet Carter
Janet Carter
William J. Taylor, Jr.
Everytown Law
450 Lexington Ave, P.O. Box 4184
New York, NY 10163
(646) 324-8174
jcarter@everytown.org

Holly Agajanian
*Chief General Counsel to Gov. Lujan Grisham*
Kyle P. Duffy
*Deputy General Counsel to Gov. Lujan Grisham*
490 Old Santa Fe Trail, Suite 400
Santa Fe, NM 87501

---

[24] *See, e.g.*, Steven Barkan & Michael Rocque, *Crime Prevention: Programs, Policies, and Practices* 65 (2021) (noting study finding "little evidence that self-defense gun use reduces the likelihood of victim injury during a crime").

Cody Rogers
Serpe Andrews
2540 El Paseo Road, Suite D
Las Cruces, NM 88001

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS

This motion complies with the word limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), it contains 5,199 words.

This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface (fourteen-point Baskerville font) using Microsoft Word.

Respectfully submitted,

/s/ Janet Carter
Janet Carter

**CERTIFICATE OF SERVICE**

I hereby certify that on February 2, 2024, I filed the foregoing via the

CM/ECF filing system, which caused all counsel of record to be served by

electronic means.

Respectfully submitted,

/s/ Janet Carter
Janet Carter