Nos. 23-2192, 23-2194

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

JAMES SPRINGER,

*Plaintiff-Appellee/Cross-Appellant*,

v.

MICHELLE LUJAN GRISHAM, OFFICE OF THE GOVERNOR, PATRICK ALLEN, AND
NEW MEXICO DEPARTMENT OF HEALTH,

*Defendants-Appellants/Cross-Appellees.*

On Appeal from the United States District Court for the District of New Mexico
(No. 1:23-cv-00781-KWR-LF) (Hon. Kea W. Riggs)

**DEFENDANTS-APPELLANTS' OPENING BRIEF**

ORAL ARGUMENT REQUESTED

Holly Agajanian
*Chief General Counsel to Gov. Lujan Grisham*
Kyle P. Duffy
*Deputy General Counsel to Gov. Lujan Grisham*
490 Old Santa Fe Trail, Suite 400
Santa Fe, NM 87501

Cody Rogers
Serpe Andrews
2540 El Paseo Road, Suite D
Las Cruces, NM 88001

Janet Carter
William J. Taylor, Jr.
Carina Bentata Gryting
Everytown Law
450 Lexington Ave, P.O. Box 4184
New York, NY 10163
(646) 324-8174
jcarter@everytown.org

Freya Jamison
Everytown Law
P.O. Box 14780
Washington, DC 20044

## CORPORATE DISCLOSURE STATEMENT

Because Defendants-Appellants are all state officers and agencies, no corporate disclosure statement is required under Federal Rule of Appellate Procedure 26.1.

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................1

JURISDICTION ...................................................................................2

STATEMENT OF THE ISSUE.................................................................2

STATEMENT OF THE CASE..................................................................2

    I.  Factual Background .......................................................................2

    II. Procedural History ........................................................................5

SUMMARY OF ARGUMENT.................................................................9

ARGUMENT ......................................................................................10

    I.  Standard of Review.....................................................................10

    II. Plaintiff Is Unlikely to Succeed on the Merits of His Second Amendment
        Claim ........................................................................................11

        A. The *Bruen* Framework .............................................................11

        B. Methodological Considerations in *Bruen*'s Historical Analysis.................13

            i.  Analogical reasoning under *Bruen* ..........................................13

            ii.  The Reconstruction era is the proper focus of historical analysis.......14

            iii. Understanding the historical record ..................................20

        C. Plaintiff Has Not Established that He Is Likely to Succeed in Showing
           that the Parks Restriction Is Unconstitutional ..........................22

            i.  There is a robust historical tradition of prohibiting firearms in
               parks.................................................................................23

            ii.  Prohibitions on firearms in parks are analogous to historical
               prohibitions on firearms in public forums and gatherings and in
               schools ............................................................................26

               a.  Public forums and gatherings ......................................26

               b.  Schools ..............................................................29

            iii. The district court's grounds for rejecting the historical tradition of
               regulation were mistaken ..................................................30

      a.  19th-century parks regulations illuminate earlier understanding ................................................................30

      b.  Public understanding does not dissipate within two decades.........33

      c.  Parks as we understand them today were an "unprecedented societal concern" in the late 19th century.....................................35

    iv.  Sensitive places are not limited to those with comprehensive, government-provided security ............................................................39

III.    Plaintiff Did Not Carry His Burden on the Non-Merits Factors ............43

CONCLUSION....................................................................................................46


ATTACHMENT A

    Memorandum Opinion and Order on Appeal ...............................Attachment A


ATTACHMENT B (separate volumes)

    Historical Parks Restrictions (Part 1 of 3)........................... Attachment B, Part 1

    Historical Parks Restrictions (Part 2 of 3)........................... Attachment B, Part 2

    Historical Parks Restrictions (Part 3 of 3)........................... Attachment B, Part 3


ATTACHMENT C (separate volume)

    Historical Gathering Place Restrictions ...........................................Attachment C

# TABLE OF AUTHORITIES

## Cases

*Andrews v. State,*
     50 Tenn. 165 (1871) ........................................................................28

*Antonyuk v. Chiumento,*
     89 F.4th 271 (2d Cir. 2023), *petition for cert. filed*, No. 23-910 (U.S. Feb. 20, 2024)
     ........................................................................ 10, 14, 16, 21, 22, 24-30, 33-39

*Baca v. Department of Army,*
     983 F.3d 1131 (10th Cir. 2020) ..................................................24, 32

*Bevis v. City of Naperville,*
     85 F.4th 1175 (7th Cir. 2023), *petitions for cert. filed*, Nos. 23-877, 23-878, 23-879,
     23-880 (U.S. Feb. 12, 2024) ..............................................................13

*Bonidy v. U.S. Postal Service,*
     790 F.3d 1121 (10th Cir. 2015) ..................................................40, 41

*Burson v. Freeman,*
     504 U.S. 191 (1992) ..................................................................22, 42

*Clapper v. Amnesty Int'l USA,*
     568 U.S. 398 (2013) ........................................................................45

*Colorado v. EPA,*
     989 F.3d 874 (10th Cir. 2021) ........................................................45

*Diné Citizens Against Ruining Our Env't v. Jewell,*
     839 F.3d 1276 (10th Cir. 2016) ....................................................1, 11

*District of Columbia v. Heller,*
     554 U.S. 570 (2008) ........................................12, 17, 19, 29, 31, 33

*Dobbs v. Jackson Women's Health Organization,*
     597 U.S. 215 (2022) ........................................................................39

*English v. State,*
     35 Tex. 473 (1871) ..........................................................................28

*Ezell v. City of Chicago,*
     651 F.3d 684 (7th Cir. 2011) ......................................................18, 19

*Fish v. Kobach,*
     840 F.3d 710 (10th Cir. 2016) ........................................................11

iv

*Free the Nipple–Fort Collins v. City of Fort Collins*,
916 F.3d 792 (10th Cir. 2019) ...........................................................11

*Friedman v. City of Highland Park*,
784 F.3d 406 (7th Cir. 2015) .............................................................21

*Gould v. Morgan*,
907 F.3d 659 (1st Cir. 2018) .............................................................19

*Kennedy v. Bremerton Sch. Dist.*,
597 U.S. 507 (2022) .........................................................................13

*Kipke v. Moore*,
Nos. 1:23-cv-01293 & 1:23-cv-01295 (consol.), 2023 WL 6381503 (D. Md. Sept.
29, 2023) ...................................................................16, 25, 37, 41

*Koons v. Platkin*,
673 F. Supp. 3d 515 (D.N.J. 2023), *appeal docketed*, No. 23-1900 (3d Cir. May 17,
2023) .............................................................................................38

*LaFave v. Cnty. of Fairfax*,
No. 1:23-cv-01605 (E.D. Va. Jan. 24, 2024), Doc. 33 .......................25

*LaFave v. Cnty. of Fairfax*,
No. CL2021-01569, 2023 Va. Cir. LEXIS 203 (Fairfax Cnty. Cir. Ct. June 23,
2023) .............................................................................................37

*Lara v. Commissioner Pennsylvania State Police*,
91 F.4th 122 (3d Cir. 2024), *petition for reh'g en banc filed*, No. 21-1832, Dkt. 81 (3d
Cir. Feb. 15, 2024) .........................................................................17

*Maryland v. King*,
567 U.S. 1301 (2012) .......................................................................43

*McCullen v. Coakley*,
573 U.S. 464 (2014) ....................................................................14, 22

*McDonald v. City of Chicago*,
561 U.S. 742 (2010) ....................................................................22, 29

*McIntyre v. Ohio Elections Comm'n*,
514 U.S. 334 (1995) .........................................................................34

*Md. Shall Issue, Inc. v. Montgomery Cnty.*,
No. 8:21-cv-01736, 2023 WL 4373260 (D. Md. July 6, 2023), *appeal docketed*, No.
23-1719 (4th Cir. July 10, 2023) ...................................................16, 25

*Moore v. Madigan*,
    702 F.3d 933 (7th Cir. 2012) ............................................................... 23

*Nat'l Rifle Ass'n v. Bondi*,
    61 F.4th 1317 (11th Cir.), *vacated on grant of reh'g en banc*, 72 F.4th 1346 (11th Cir.
    2023) ................................................................................................. 16, 18

*New York State Rifle & Pistol Ass'n v. Bruen*,
    597 U.S. 1 (2022) .......................... 1, 11-17, 19-21, 23, 24, 27-29, 31, 33-35

*Nolan v. U.S. Dep't. of Just.*,
    973 F.2d 843 (10th Cir. 1992) ............................................................ 32

*Ocean State Tactical, LLC v. Rhode Island*,
    --- F.4th ----, No. 23-1072, 2024 WL 980633 (1st Cir. Mar. 7, 2024) .............. 34

*State v. Huntly*,
    25 N.C. 418 (1843) ............................................................................. 26

*State v. Shelby*,
    2 S.W. 468 (Mo. 1886) ....................................................................... 28

*Tenille v. W. Union Co.*,
    809 F.3d 555 (10th Cir. 2015) ............................................................ 45

*Uniformed Fire Officers Ass'n v. De Blasio*,
    973 F.3d 41 (2d Cir. 2020) ................................................................. 44

*United States v. Alaniz*,
    69 F.4th 1124 (9th Cir. 2023) ........................................................ 12, 32

*United States v. Class*,
    930 F.3d 460 (D.C. Cir. 2019) ........................................................ 23, 41

*United States v. Greeno*,
    679 F.3d 510 (6th Cir. 2012) ............................................................ 19

*United States v. Hunt*,
    63 F.4th 1229 (10th Cir. 2023) ......................................................... 32

*United States v. Reyna*,
    No. 3:21-cr-00041, 2022 WL 17714376 (N.D. Ind. Dec. 15, 2022), *appeal
    docketed*, No. 23-1231 (7th Cir. Feb. 7, 2023) ................................... 23

*United States v. Sup. Ct. of N.M.*,
    839 F.3d 888 (10th Cir. 2016) ........................................................... 25

*Vincent v. Garland*,
   80 F.4th 1197 (10th Cir. 2023), *petition for cert. filed*, No. 23-683 (U.S. Dec. 21, 2023) ................................................................................12, 17, 34, 40

*We the Patriots, Inc. v. Lujan Grisham*,
   No. 1:23-cv-00073, --- F. Supp. 3d ----, 2023 WL 6622042 (D.N.M. Oct. 11, 2023) ...............................................................................................6, 7, 16

## Statutes and Rules

1786 Va. Acts 35, ch. 49................................................................................26

1869-70 Tenn. Pub. Acts 23-24 ....................................................................27

1871 Tex. Gen. Laws ch. 34 § 3 ....................................................................27

1883 Mo. Sess. Laws 76 ................................................................................27

1889 Ariz. Sess. Laws 17 ..............................................................................28

1890 Okla Terr. Stats., Art. 47, § 7 ..............................................................28

2 Edw. 3, 258, ch. 3 (1328) ...........................................................................26

28 U.S.C. § 1292(a)(1)......................................................................................2

28 U.S.C. § 1331 ...............................................................................................2

Collection of Statutes of the Parliament of England in Force in the State of North Carolina 60-61, ch. 3 (F. Martin Ed. 1792).....................................26

N.M. Stat. Ann. §§ 12-10A-1 to -19 .............................................................43

R.H. Clark, *The Code of the State of Georgia* 818 (1873) ..............................27

## Other Authorities

Allan Greer, *Commons and Enclosure in the Colonization of North America*, 2 Am. Hist. Rev. 365 (2012)..........................................................................36

Appellants' Brief, *We the Patriots v. Lujan Grisham*, Nos. 23-2166, 23-2167, 23-2185 (10th Cir. Jan. 31, 2024), Doc. 10010993058-1 ...................................... 15, 39-40

Brief for Independent Institute as Amicus Curiae, *New York State Rifle & Pistol Ass'n v. Bruen*, No. 20-843 (U.S.) ...............................................................21

*Bulletin of the Park and Outdoor Art Association* (1901), bit.ly/3NPLSae ......................36

Darrell A.H. Miller et al., *Technology, Tradition, and "The Terror of the People,"* Notre Dame L. Rev. (forthcoming), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4521030 ...................44

David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205 (2018) ........................................................................21

David Hemenway & Sara J. Solnick, *The Epidemiology of Self-Defense Gun Use: Evidence from the National Crime Victimization Surveys 2007-2011*, 79 Preventive Med. 22 (2015) ...................................................................................................................45

David Schuyler, *Summary of Parks in Urban America*, Oxford Rsch. Encyc. of Am. Hist. (Nov. 3, 2015) ................................................................................................36

David Schuyler, *The New Urban Landscape: The Redefinition of City Form in Nineteenth-Century America* (1988) ...............................................................................................36

Evan D. Bernick, *Fourteenth Amendment Confrontation*, 51 Hofstra L. Rev. 1 (2022)....18

*Executive Order 2024-004*, Gov. Michelle Lujan Grisham (Feb. 23, 2024), https://www.governor.state.nm.us/wp-content/uploads/2024/02/Executive-Order-2024-004.pdf ......................................................................... 2-3, 43

Frederick Law Olmstead, *A Consideration of the Justifying Value of a Public Park* (1881) ................................................................................................................37

John J. Donohue et al., *Right-to-Carry Laws and Violent Crime: A Comprehensive Assessment Using Panel Data and a State-Level Synthetic Control Analysis*, 16 J. Empirical Legal Stud. 198 (2019), https://law.stanford.edu/wp-content/uploads/2017/06/Donohue_et_al-2019-JELS-RTC-Law-and-Viol-Crime.pdf ................................................................................................................43

Josh Blackman & Ilya Shapiro, *Keeping Pandora's Box Sealed: Privileges or Immunities, the Constitution in 2020, and Properly Extending the Right to Keep and Bear Arms to the States*, 8 Geo. J.L. & Pub. Pol'y 1 (2010) ........................................................................18

Katie Zezima, *People Used to Be Able to Walk into the White House. Legally*, Wash. Post (Sept. 23, 2014), https://perma.cc/M2UM-VHND ..........................................42

Luke Barr, *Trump Says He Wants Police at Polling Sites. Experts Say that's Unlawful*, ABC News (Aug. 21, 2020), tinyurl.com/fcv5x9xe.......................................................42

Michael B. Rappaport, *Originalism and Regulatory Takings: Why the Fifth Amendment May Not Protect Against Regulatory Takings, But the Fourteenth Amendment May*, 45 San Diego L. Rev. 729 (2008) ...................................................................................18

Michael Rawson, *Eden on the Charles, the Making of Boston* (2010) .............................37

N.M. Dep't of Health, *Comprehensive Report on Gunshot Victims Presenting at Hospitals in New Mexico* (2023), www.nmhealth.org/publication/view/report/8463/ ...........4

Nadav Shoked, *Property Law's Search for a Public*, 97 Wash. U. L. Rev. 1517 (2020).......................................................................................................................35

Paul M. Reeping et al., *The Effect of Gun-Free School Zones on Crimes Committed with a Firearm in Saint Louis, Missouri*, 100 J. Urb. Health 1118 (2023), https://bit.ly/3Rwvwqd ...................................................................................43

Setha Low et al., *Rethinking Urban Parks: Public Space and Cultural Diversity* (2009)......37

Stephen A. Siegel, *Injunctions for Defamation, Juries, and the Clarifying Lens of 1868*, 56 Buff. L. Rev. 655 (2008) ..............................................................................18

Steven E. Barkan & Michael Rocque, *Crime Prevention: Programs, Policies, and Practices* (2021).........................................................................................................45

Steven G. Calabresi & Sarah E. Agudo, *Individual Rights Under State Constitutions When the Fourteenth Amendment Was Ratified in 1868: What Rights Are Deeply Rooted in American History and Tradition?*, 87 Tex. L. Rev. 7 (2008)....................................18

Steven R. Pendery, *Probing the Boston Common*, 43 Archaeology 42 (1990) ..............37

Transcript of Oral Argument, *New York State Rifle & Pistol Ass'n v. Bruen*, No. 20-843 (U.S. Nov. 3, 2021).........................................................................................19

United States Capitol Police, *Our History*, https://www.uscp.gov/the-department/our-history .....................................................................................42

## STATEMENT OF RELATED CASES

Defendants-Appellants respectfully submit that this case is related to the consolidated appeals in *We the Patriots v. Lujan Grisham* (No. 23-2166), *Fort v. Lujan Grisham* (No. 23-2167), and *Donk v. Lujan Grisham* (No. 23-2185). Those consolidated appeals present a Second Amendment challenge to the same restriction on carrying firearms in public parks and playgrounds in Albuquerque and Bernalillo County at issue in this case and Plaintiff's cross-appeal.

## INTRODUCTION

New Mexico is suffering from an epidemic of gun violence. In the face of this public health crisis, Plaintiff sought and won a preliminary injunction precluding Defendants from enforcing a narrow, common-sense restriction prohibiting firearms in parks in Albuquerque and Bernalillo County, the state's most populous city and county and the center of its gun violence epidemic. The district court enjoined that prohibition under the Second Amendment even as it correctly rejected Plaintiff's request to block the similar prohibition on firearms in playgrounds.

This Court should reverse the district court's decision to enjoin the prohibition on firearms in parks. The Supreme Court made clear in *New York State Rifle & Pistol Ass'n v. Bruen* that the Second Amendment is not a "regulatory straightjacket." 597 U.S. 1, 30 (2022). Restricting guns in parks is "consistent with this Nation's historical tradition of firearm regulation," *id.* at 34, including well over a hundred historical prohibitions on carrying firearms in parks. Accordingly, Plaintiff cannot demonstrate a constitutional violation, let alone make the "clear and unequivocal" showing required for injunctive relief. *See Diné Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1276, 1281 (10th Cir. 2016).

## JURISDICTION

This Court has jurisdiction to review the district court's preliminary injunction under 28 U.S.C. § 1292(a)(1). Plaintiff alleges the district court had jurisdiction under 28 U.S.C. § 1331.

## STATEMENT OF THE ISSUE

Whether the Second Amendment prevents Defendants from restricting firearms in Albuquerque and Bernalillo County public parks.[1]

## STATEMENT OF THE CASE

### I.     Factual Background

Public parks are places of repose, recreation, and enjoyment of nature's beauty. People from all walks of life gather in parks to play, learn, celebrate, picnic, rally, exercise, relax, or simply seek solitude and peace. But the reality of visiting a park is not always so bucolic. Albuquerque has recently experienced a rise of gun violence in its public parks; at least five park shootings were reported in 2023 and early 2024 alone. *Executive Order 2024-004*, Gov. Michelle Lujan Grisham, at 3 (Feb. 23, 2024), https://www.governor.state.nm.us/wp-content/uploads/2024/02/Executive-Order-2024-004.pdf ("February Executive Order").

---

[1] Plaintiff's cross-appeal is expected to present the same question with respect to playgrounds: Whether the Second Amendment prevents Defendants from restricting firearms in Albuquerque and Bernalillo County playgrounds.

2

This recent rise in park shootings is part of a broader epidemic of gun violence in the state. In 2022, 550 New Mexicans died by gun violence, symbolizing a deadly upward trend of gun violence that has earned the state one of the highest rates of gun deaths in the country. *Id.* at 2. This preventable crisis disproportionately impacts Albuquerque and Bernalillo County, the state's most populous areas. *Id.* at 3. Sadly, children are far from immune; guns are the leading cause of death among New Mexico's children and teens. *Id.* at 1. In just a six-week period in the summer of 2023, gun violence in the state took the lives of a five-year-old girl, an eleven-year-old boy, and a thirteen-year-old girl. *Id.* at 1-2. This heightened gun violence has devasting and lasting consequences. In addition to fatalities and physical injuries, it causes emotional trauma, economic harm, and other lasting consequences for affected individuals, families, and communities. *Id.* at 2.

Recognizing the epidemic proportions of New Mexico's gun violence crisis, Governor Michelle Lujan Grisham declared gun violence a statewide public health emergency on September 8, 2023. App. 28-30.[2] The Governor's emergency order directed state agencies to collaborate on an effective and coordinated response to the emergency and allocated funds for that effort. *Id.* at 29-30.

---

[2] References to Defendants-Appellants' appendix are denoted "App. __." References to the opinion and order on appeal are to Attachment A to this brief, denoted "Attach. A at __."

Agencies quickly got to work implementing the Governor's order. On September 29, 2023, the New Mexico Department of Health published a comprehensive study on firearm-related injuries and deaths in the state between 1999 and 2023.[3] The report confirmed the alarming trends identified in the Governor's order: New Mexico's firearm-induced casualty rates are among the highest in the nation and are increasing at a significantly higher rate than the country as a whole. *Id.* at 5. Not only have shootings become more frequent, they have also become more deadly: between 2019 and 2022, New Mexico's trauma centers saw a 39% increase in patients requiring treatment for firearm injuries and a 61% increase in gunshots injuries requiring surgical intervention. *Id*. at 4.

In accordance with the Governor's order and informed by this sobering data, Defendant Patrick Allen, Secretary of the New Mexico Department of Health, issued a series of public health orders aimed at reducing gun violence and its devastating effects. The relevant portion of the operative public health order (the "Order"), issued on October 6, 2023, prohibits most individuals from "possess[ing] a firearm, … either openly or concealed, in public parks or playgrounds within the City of Albuquerque or Bernalillo County" for the duration of the emergency (hereinafter the "Parks Restriction" and the "Playgrounds Restriction,"

---

[3] N.M. Dep't of Health, *Comprehensive Report on Gunshot Victims Presenting at Hospitals in New Mexico* (2023), www.nmhealth.org/publication/view/report/8463/ ("Gunshot Victims Report").

respectively). App. 52. The Order does not apply to Albuquerque's Shooting Range Park or to state parks owned or managed by the New Mexico State Parks Division or the State Land Office, and exempts law enforcement, military personnel, and licensed security officers. *Id.*

Governor Lujan Grisham's original emergency order expired on October 6, 2023. *Id.* at 30. The Governor renewed the state of emergency in month-long increments thereafter, finding renewal necessary to protect the public health, safety, and welfare amid the ongoing crisis.[4] Absent further renewal, the state of emergency (and the Order) will expire on March 22, 2024.

## II.    Procedural History

Several cases challenging Governor Lujan Grisham's emergency orders and the Department of Health's implementing public health orders were consolidated before Judge David H. Urias in the District of New Mexico. *We the Patriots v. Lujan Grisham*, No. 1:23-cv-00771 (D.N.M. Oct. 26, 2023), Doc. 26. This case proceeded separately before Judge Kea W. Riggs due to a potential conflict of interest regarding Judge Urias and Plaintiff's counsel. *See* App. 31-34.[5]

---

[4] Each executive order renewing the state of emergency is available at https://www.governor.state.nm.us/about-the-governor/executive-orders/.

[5] A separate suit challenging Governor Lujan Grisham's authority to declare the state of emergency was argued before the New Mexico Supreme Court on January 8, 2024. *See Amdor v. Lujan Grisham*, No. S-1-SC-40105 (N.M. Sup. Ct.). No decision has issued to date.

James Springer, the sole plaintiff in this case, is a resident of Torrance County, New Mexico. *Id*. at 8. He initially sought an ex parte temporary restraining order against Secretary Allen's September 8, 2023, public health order, which prohibited carrying firearms in densely populated cities and counties with specified rates of gun violence. *See id*. at 25-27 (Sept. 8, 2023, public health order); *id*. at 20-23 (request for TRO). Judge Riggs denied that motion as moot because the September 8, 2023, public health order was superseded by subsequent public health orders. *Id*. at 35-40. Plaintiff then sought a preliminary injunction against the operative Order on First Amendment, Second Amendment, and substantive due process grounds, even though the Order does not apply to parks or playgrounds in his home county. *Id*. at 41-50.

In the consolidated cases, Judge Urias ruled on the constitutionality of the Order in October 2023. He declined to enjoin any portion of the Order, ruling that the challengers failed to establish likely success on their Second Amendment claims as to both the Parks Restriction and the Playgrounds Restriction. *We the Patriots, Inc. v. Lujan Grisham*, No. 1:23-cv-00073, --- F. Supp. 3d ----, 2023 WL 6622042, at *7-11 (D.N.M. Oct. 11, 2023). Judge Urias reasoned that, because the plaintiffs challenged state restrictions, the most relevant period for the historical analysis is the mid-to-late 19th century, when the ratification of the Fourteenth Amendment made the Second Amendment applicable to the states, *id*. at *8, and

6

concluded that Defendants could plausibly establish a national historical tradition of firearm restrictions in city parks sufficient to satisfy the standard established in *Bruen*, *id.* at *9. He then explained that it is "settled law" that governments may regulate firearms in "sensitive places" including schools and upheld the Playgrounds Restriction because of the "sound analogy between schools and playgrounds." *Id.* at *10-11. Several plaintiffs appealed, and briefing of their consolidated appeals is under way and currently scheduled to be completed by March 26, 2024. *See* Nos. 23-2166, 23-2167, 23-2185.

Judge Riggs reached a mixed result on Plaintiff's preliminary injunction motion in this case several weeks later. She first considered Plaintiff's standing. Attach. A at 5-8. Judge Riggs found that, at least at the preliminary-injunction stage, Plaintiff had standing to challenge the Parks Restriction. *Id.* at 8. But she concluded that he lacked standing on his other claims, because he did not assert "that he has ever, or intends to, carry firearms in playgrounds," *id.* at 7, and failed to develop any theory of First Amendment standing, *id.* at 8.

Turning to the merits, Judge Riggs concluded that Plaintiff was likely to succeed on his Second Amendment challenge to the Parks Restriction and rejected as inadequate the historical tradition Defendants had presented of firearm regulation in public parks and their analogues. *Id.* at 8-15. Defendants had relied on numerous laws from the mid-to-late 19th and early 20th centuries prohibiting

firearms in parks and public-gathering places, just as they had done in the consolidated cases before Judge Urias. *See* App. 67-70. Judge Riggs, however, faulted Defendants for not providing the Court with copies of those laws, and ultimately concluded that Defendants had provided "*no* evidence illuminating the scope of the Second Amendment" from the time of its ratification in 1791 and "insufficient evidence" illuminating the understanding around the time of the Fourteenth Amendment's adoption. Attach. A at 12, 15. As for the other factors Plaintiff must establish to secure a preliminary injunction, Judge Riggs determined that the likely constitutional violation she had found constituted irreparable injury to Plaintiff that trumped any harm to Defendants' interests or the public interest. *Id.* at 17-19.

Although Judge Riggs rejected Plaintiff's Second Amendment challenge to the Playgrounds Restriction on standing grounds, she also concluded that the claim would fail on the merits because, as Judge Urias and "the majority of district courts to consider th[e] issue" have held, the restriction was likely constitutional given the analogy between playgrounds and schools. *Id.* at 16. Finally, she summarily disposed of Plaintiff's First Amendment and substantive due process claims because, even if Plaintiff had standing to bring them, his briefing "lack[ed] sufficient citation to case law or analysis" to put the issues before the court. *Id.* at 17. Defendants appealed Judge Riggs's grant of a preliminary injunction against

8

the Parks Restriction, App. 105, and Plaintiff appealed the order to the extent it denied his standing and denied the full extent of injunctive relief requested, *id.* at 126.

Defendants promptly moved the district court to stay its injunction pending appeal, and also requested reconsideration or clarification of the injunction. *Id.* at 107-23. Defendants included in that filing a compilation of more than one hundred historical restrictions on firearms in parks and a separate compilation of historical prohibitions on firearms in public gathering places. *See id.* at 108. Judge Riggs issued an administrative stay pending briefing and resolution of that motion, *id.* at 124-25, but ultimately declined to consider any historical laws that had not been cited in the original briefing and denied the requested relief for largely the same reasons she issued the injunction, *id.* at 158-90. Defendants then sought a stay from this Court. *See* No. 23-2192, Doc. 10010994431 (Feb. 2, 2024). That motion was fully briefed as of February 20, 2024, and remains pending.

## SUMMARY OF ARGUMENT

Plaintiff has not established that he is likely to succeed on the merits of his Second Amendment claim. The Parks Restriction sits firmly within this nation's historical tradition of firearm regulation. As soon as modern-style parks emerged in the second half of the 19th century, governments prohibited firearms in those parks—beginning with New York's Central Park in 1858. Over the following

9

decades, governments across the country passed well over a hundred laws prohibiting guns in parks. Research has not revealed *any* instance of a court invalidating these laws under the Second Amendment. Thus, as the Second Circuit recently observed in rejecting a challenge to New York's prohibition on firearms in parks, they "were not merely adopted by legislative bodies in the respective cities in which they applied—they were apparently accepted without any constitutional objection by anyone." *Antonyuk v. Chiumento*, 89 F.4th 271, 359 (2d Cir. 2023), *petition for cert. filed*, No. 23-910 (U.S. Feb. 20, 2024).

The scores of 19th-century and early-20th-century laws prohibiting firearms in parks are also part of a tradition, stretching back to the founding and beyond, of prohibiting guns in crowded public forums and gathering places and in schools. The district court's conclusion that the Order is not part of this nation's tradition of firearms regulation misapplied *Bruen*'s principles and ignored the relevance of the time period surrounding the enactment of the Fourteenth Amendment. Plaintiff has also failed to establish the remaining requirements for a preliminary injunction. This Court should vacate the district court's injunction.

## ARGUMENT

### I. Standard of Review

"A preliminary injunction is an extraordinary remedy, the exception rather than the rule." *Free the Nipple–Fort Collins v. City of Fort Collins*, 916 F.3d 792, 797

10

(10th Cir. 2019) (citation omitted). To obtain a preliminary injunction, the movant must establish each of the following: "(1) a substantial likelihood of prevailing on the merits; (2) irreparable harm unless the injunction is issued; (3) that the threatened injury outweighs the harm that the preliminary injunction may cause the opposing party; and (4) that the injunction, if issued, will not adversely affect the public interest." *Diné Citizens*, 839 F.3d at 1281 (citation omitted). "Because a preliminary injunction is an extraordinary remedy, the movant's right to relief must be clear and unequivocal." *Id.* (citation omitted).

This Court reviews the district court's grant of a preliminary injunction for abuse of discretion and must reverse if that grant is premised on an erroneous conclusion of law or lacks a rational basis in the record. *Fish v. Kobach*, 840 F.3d 710, 723 (10th Cir. 2016). This Court reviews the district court's factual findings for clear error and its legal conclusions de novo. *Id.*

## II.    Plaintiff Is Unlikely to Succeed on the Merits of His Second Amendment Claim

The following sections first set out the methodological principles *Bruen* established (Parts II.A-B), then show that, under those principles, Plaintiff is not likely to succeed on the merits of his challenge to the Parks Restriction (Part II.C).

### A. The *Bruen* Framework

The Second Amendment protects an individual right to keep and bear arms cabined by historical limitations on the scope of that right. *See Bruen*, 597 U.S. at 21

11

("[T]he historical understanding of the [Second] Amendment … demark[s] the limits on the exercise of that right."). As such, the Second Amendment right is "not unlimited," *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008), but rather is subject to a range of textually- and historically-grounded constraints, *see, e.g.*, *id.* at 626-27, 627 n.26 (providing a non-exhaustive list of "presumptively lawful" firearm regulations).

 *Bruen* instructs courts to assess whether a regulation impermissibly infringes the right to bear arms in two steps: one focused on constitutional text and the other focused on history. 597 U.S. at 24. The first step asks whether the Second Amendment's plain text covers the challenger's proposed conduct. *Id.*; *see Vincent v. Garland*, 80 F.4th 1197, 1200 (10th Cir. 2023), *petition for cert. filed*, No. 23-683 (U.S. Dec. 21, 2023). In other words, the court must first ask "whether the challenger is 'part of "the people" whom the Second Amendment protects,'" whether the item at issue is a "weapon" that is "'in common use' today for self-defense," and "whether the 'proposed course of conduct' falls within the Second Amendment." *United States v. Alaniz*, 69 F.4th 1124, 1128 (9th Cir. 2023) (quoting *Bruen*, 597 U.S. at 31-32). If not, the inquiry ends: self-evidently, if people, items, or conduct are outside the Second Amendment's protection, then the government may regulate them without infringing the Second Amendment. *See Bevis v. City of Naperville*, 85 F.4th 1175, 1192 (7th Cir. 2023), *petitions for cert. filed*, Nos. 23-877, 23-878, 23-879,

23-880 (U.S. Feb. 12, 2024). The burden to satisfy this initial, textual inquiry is on the party challenging a law.[6] If they succeed, the burden shifts to the government to "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. Part II.B details methodological considerations governing that historical analysis.

## B. Methodological Considerations in *Bruen*'s Historical Analysis

### i. Analogical reasoning under *Bruen*

To guide courts in the historical analysis, *Bruen* stressed that a modern firearms regulation need not be a "dead ringer for historical precursors" and will pass constitutional muster so long as it is "analogous enough" to historical restrictions. 597 U.S. at 30 ("[A]nalogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*."). Courts should uphold a modern law if, in comparison to historical regulations, the law imposes a "comparable burden on the right of armed self-

_____

[6] *Bruen* makes this clear by indicating that a presumption that the Constitution protects a plaintiff's conduct arises *after* ("when" or "because") the textual inquiry is satisfied. *See* 597 U.S. at 24, 44 n.11; *cf. Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 524 (2022) ("[A] plaintiff bears certain burdens to demonstrate an infringement of [their] rights under the [First Amendment]. If the plaintiff carries these burdens, the focus then shifts to the defendant to [justify] … its actions[.]").

defense" and the burden is "comparably justified." *Id*. at 29. In other words, courts should consider "how and why" a regulation burdens the right to self-defense. *Id*.

*Bruen* also recognized that "cases implicating unprecedented societal concerns … may require a more nuanced approach" to the historical inquiry. *Id*. at 27. If a societal condition did not exist in the time period a court is examining, then self-evidently there will be no historical firearms laws addressing that condition in that period—making the consideration of later history particularly crucial. *See McCullen v. Coakley*, 573 U.S. 464, 481 (2014) ("States adopt laws to address problems that confront them." (citation omitted)). Thus, firearms prohibitions concerning societal conditions that did not exist at the founding—like public parks, *see infra* Part II.C.iii.c—demand a more expansive approach to historical analogy. *See Antonyuk*, 89 F.4th at 359 n.78 ("Though the historical analogues here are relatively simple to draw, the relative novelty of public parks as institutions also justifies a flexible approach under *Bruen*." (cleaned up)).

### ii. The Reconstruction era is the proper focus of historical analysis

*Bruen* expressly left open the question whether the most important time period for the historical analysis focuses on 1791 (when the Second Amendment was first adopted as a constraint on the federal government) or 1868 (when the Fourteenth Amendment made it applicable to state and local governments). *See* 597 U.S. at 37-38. The district court did not explicitly decide this question in granting

14

the preliminary injunction,[7] and this Court also need not resolve it in order to reverse and vacate that injunction. That is because Defendants have established that the Order is consistent with this nation's historical tradition of firearm regulation regardless of the period on which the Court focuses its analysis. The existence of well over one hundred prohibitions on firearms in parks from the second half of the 19th century and later unequivocally establishes that the Reconstruction generation understood the Second Amendment right to permit those prohibitions. *See infra* Part II.C.i. And those prohibitions had roots in the founding-era tradition of prohibiting guns in crowded gathering places and public forums, as the Second Circuit held, and also are analogous to prohibitions on guns in schools. *See infra* Part II.C.ii. Plaintiff, by contrast, has no evidence that there was *any* historical period when prohibiting guns in parks was considered unconstitutional—from the founding, through the 19th century, and into the 20th.

Nevertheless, if this Court chooses to address the issue, it should hold that the Reconstruction era is the primary focus of the historical analysis. Even in leaving the time-period question open, *Bruen* gave strong indications that Reconstruction was the correct focus. These indications have led to a host of

---

[7] Plaintiffs in the consolidated cases on appeal from Judge Urias's decision have made the time-period issue central to their arguments, *see* Appellants' Br. 14-21, *We the Patriots v. Lujan Grisham*, Nos. 23-2166, 23-2167, 23-2185 (10th Cir. Jan. 31, 2024), Doc. 10010993058-1 ("WTP Br."), and Plaintiff here may try to do the same.

persuasive opinions in cases against states concluding that 1868 is at least as

important as, if not more important than, 1791. *See Antonyuk*, 89 F.4th at 304

("Because the [challenged law] is a state law, the prevailing understanding of the

right to bear arms in 1868 and 1791 are both focal points of our analysis."); *id.* at

318 n.27 ("[E]vidence from Reconstruction regarding the scope of the right to bear

arms incorporated by the Fourteenth Amendment is at least as relevant as evidence

from the Founding Era regarding the Second Amendment itself."); *Nat'l Rifle Ass'n*

*v. Bondi*, 61 F.4th 1317, 1323 (11th Cir. 2023) ("[T]he [Second Amendment] right's

contours turn on the understanding that prevailed at the time … when the

Fourteenth Amendment was ratified."), *vacated on grant of reh'g en banc*, 72 F.4th 1346

(11th Cir. 2023);[8] *Md. Shall Issue, Inc. v. Montgomery Cnty.*, No. 8:21-cv-01736, 2023

WL 4373260, at *8 (D. Md. July 6, 2023) ("[H]istorical sources from the time

period of the ratification of the Fourteenth Amendment are equally if not more

probative of the scope of the Second Amendment's right to bear arms as applied to

the states[.]"), *appeal docketed*, No. 23-1719 (4th Cir. July 10, 2023); *Kipke v. Moore*,

Nos. 1:23-cv-01293 & 1:23-cv-01295 (consol.), 2023 WL 6381503, at *6 (D. Md.

Sept. 29, 2023) (agreeing with *Maryland Shall Issue*); *We the Patriots*, 2023 WL

6622042, at *8 (agreeing with *Bondi* and *Maryland Shall Issue* that Reconstruction-era

---

[8] Although *Bondi* has been vacated for rehearing en banc, it remains
persuasive because its reasoning and authorities are robust.

16

sources "are more probative" than founding-era sources); *see also Vincent*, 80 F.4th at 1203 (Bacharach, J., concurring) (noting that, in conducting the *Bruen* analysis, a court should consider history "through the end of the nineteenth century").[9]

The foundation for these decisions is *Bruen*'s originalist principle that "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." *Bruen*, 597 U.S. 34 (quoting *Heller*, 554 U.S. at 634-35 (emphasis added in *Bruen*)). Because the people did not adopt the Second Amendment as a constraint on the states until they ratified the Fourteenth Amendment in 1868, the public understanding from that time should define the

---

[9] The Third Circuit recently took a different approach in *Lara v. Commissioner Pennsylvania State Police*, 91 F.4th 122 (3d Cir. 2024), *petition for reh'g en banc filed*, No. 21-1832, Dkt. 81 (3d Cir. Feb. 15, 2024). This Court should not follow *Lara*. Instead of engaging with originalist principles, the Third Circuit based its conclusion on the "general assumption" in several Supreme Court cases cited by *Bruen*. *See Lara*, 91 F.4th at 133-34 (citing *Bruen*, 597 U.S. at 37). But those cases did not address the significance of the Fourteenth Amendment's ratification for the question of which time period is most relevant to the historical inquiry and cannot have resolved the question that *Bruen* expressly left open. *See Bruen*, 597 U.S. at 37-38. Because it failed to recognize that issue and cannot be squared with originalist principles, *Lara* is not persuasive.

The district court made the same error as *Lara* in its order denying a stay, and compounded it by characterizing the "general assumption" in prior Supreme Court cases *Bruen* cited as "*holding* that the protections of the Bill of Rights as applied to the states is 'pegged to the public understanding … in 1791.'" App. 184-85 (emphasis added). That misstated *Bruen*, in which the Court was very clear that its prior decisions had "*assumed*"—not held—that the scope of other rights was pegged to the 1791 understanding. *See* 597 U.S. at 37 (emphasis added). If *Bruen* believed its prior decisions contained controlling holdings, it would have said so— instead of expressly leaving the issue open.

17

scope of the right, at least as against the states. After all, "[i]t makes no sense to suggest that the States would have bound themselves to an understanding of the [Second Amendment] that they did not share when they ratified the Fourteenth Amendment." *Bondi*, 61 F.4th at 1324.

Accordingly, focusing on Reconstruction in a case against a state is the view more consistent with originalist theory. Leading originalist scholars routinely take this position.[10] So did federal circuits when considering the first, historical step of the Second Amendment analysis they applied prior to *Bruen*.[11] Indeed, when Justice

---

[10] *See, e.g.*, Josh Blackman & Ilya Shapiro, *Keeping Pandora's Box Sealed: Privileges or Immunities, the Constitution in 2020, and Properly Extending the Right to Keep and Bear Arms to the States*, 8 Geo. J.L. & Pub. Pol'y 1, 52 (2010) ("1868 is … the proper temporal location for applying a whole host of rights to the states, including the right that had earlier been codified as the Second Amendment …. Interpreting the right to keep and bear arms as instantiated by the Fourteenth Amendment—based on the original public meaning in 1791—thus yields an inaccurate analysis." (footnote omitted)); Evan D. Bernick, *Fourteenth Amendment Confrontation*, 51 Hofstra L. Rev. 1, 23 (2022) (calling view that 1868 understanding applies against states "ascendant among originalists"); Steven G. Calabresi & Sarah E. Agudo, *Individual Rights Under State Constitutions When the Fourteenth Amendment Was Ratified in 1868: What Rights Are Deeply Rooted in American History and Tradition?*, 87 Tex. L. Rev. 7, 115-16 & 116 n.485 (2008) (asserting that "[Akhil] Amar is exactly right" that 1868 meaning controls as against states); Michael B. Rappaport, *Originalism and Regulatory Takings: Why the Fifth Amendment May Not Protect Against Regulatory Takings, But the Fourteenth Amendment May*, 45 San Diego L. Rev. 729, 748 (2008); Stephen A. Siegel, *Injunctions for Defamation, Juries, and the Clarifying Lens of 1868*, 56 Buff. L. Rev. 655, 662 n.32 (2008) ("I am unable to conceive of a persuasive originalist argument asserting the view that, with regard to the states, the meaning of the Bill of Rights in 1789 is to be preferred to its meaning in 1868.").

[11] *See Ezell v. City of Chicago*, 651 F.3d 684, 702 (7th Cir. 2011) (Sykes, J.) ("[W]hen state- or local-government action is challenged, the focus of the original-meaning inquiry is carried forward in time; the Second Amendment's scope as a

Thomas asked counsel for New York's NRA affiliate, former Solicitor General Paul

Clement, about the correct time period during oral argument in *Bruen*, he

responded that if "the case arose in the states, I would think there would be a

decent argument for looking at the history at the time of Reconstruction … and

giving preference to that over the founding." Tr. of Oral Arg. at 8:2-17, *Bruen* (No.

20-843).[12]

    In any event, even if 1791 were the most relevant focus, "examination of a

variety of legal and other sources to determine *the public understanding* of a legal text

in the period *after* its enactment or ratification" is also "a critical tool of

constitutional interpretation." *Bruen*, 597 U.S. at 20 (quoting *Heller*, 554 U.S. at 605

---

limitation on the States depends on how the right was understood when the
Fourteenth Amendment was ratified."); *United States v. Greeno*, 679 F.3d 510, 518
(6th Cir. 2012) (following *Ezell*); *Gould v. Morgan*, 907 F.3d 659, 669 (1st Cir. 2018)
("Because the challenge here is directed at a state law, the pertinent point in time
would be 1868 (when the Fourteenth Amendment was ratified)."). Because *Bruen*
explained that "[s]tep one" of the pre-*Bruen* framework these courts applied "is
broadly consistent with *Heller*," 597 U.S. at 19, these step-one analyses remain, as a
general matter, good law.

    [12] The originalist answer to the correct time period in cases against the
federal government is more complex, because *Bruen* stated that individual rights
applicable against the states "have the same scope as against the Federal
Government," 597 U.S. at 37, and the Second Amendment has bound the federal
government since 1791. But *Bruen* itself charted the path through this complexity. It
cited scholars Akhil Amar and Kurt Lash, who explain that the 1868
understanding should apply not only with respect to the states but also to the
federal government, because (in the words of Professor Lash) adoption of the
Fourteenth Amendment "invested those original 1791 texts [of the Bill of Rights]
with new 1868 meanings." *See id.* at 37-38 (citation omitted).

(second emphasis added)). *Bruen* clarified that, under this passage in *Heller*, materially later history that *contradicts* the established original meaning of the constitutional text at the relevant point in time would not change that meaning. *See* 597 U.S. at 36, 66 n.28. But it emphasized that, conversely, "a regular course of practice can liquidate [and] settle the meaning of disputed or indeterminate terms [and] phrases in the Constitution." *Id.* at 35-36 (cleaned up) (quoting decision quoting James Madison). Thus, even if this Court were to focus on the founding era and find the evidence from that period indeterminate, it should recognize that later evidence of regulatory authority settles the meaning of the Second Amendment right and demonstrates that the Parks Restriction is constitutional.[13]

### iii.  Understanding the historical record

Two further principles should guide this Court's historical analysis. *First*, even a small number of historical laws can be sufficient to carry a government's

---

[13] Looking to 19th-century and later evidence can also help contextualize earlier legislative inaction, even if this Court were to focus on the founding era. For instance, if a regulation passed in the decades around Reconstruction—*within the lifetimes* of some who were alive at the founding—did not raise a constitutional challenge at the time, and there is no separate evidence showing that the regulation would have raised constitutional concern in the decades prior, then it can be inferred that the regulation comports with the founding-era understanding of the right. Thus, absent affirmative evidence to the contrary, this Court should presume that a Reconstruction-era or later public understanding of the right also reflects the founding-era understanding. Such a presumption reflects and reinforces the Supreme Court's position that "individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government." *Bruen*, 597 U.S. at 37.

burden to show consistency with historical tradition, so long as there is not "countervailing historical evidence." *Antonyuk*, 89 F.4th at 303. As the Second Circuit explained, *Bruen*'s conclusion that history supported prohibiting guns in legislative assemblies, courthouses, and polling places relied on sources that identified only one or two founding-era laws. *See id.* at 303-04. Notably, the two sources *Bruen* cited for the historical record justifying prohibitions on legislative assemblies referenced only two laws from a single colony, Maryland, which were enacted three years apart, in 1647 and 1650. *See* David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 235 (2018); Br. for Indep. Inst. as Amicus Curiae 11-12, *Bruen* (No. 20-843); *Bruen*, 597 U.S. at 30. "Thus, depending on the historical context, comparable historical laws need not proliferate to justify a modern prohibition." *Antonyuk*, 89 F.4th at 304.

*Second*, concluding that a small number of state and local laws can demonstrate a public understanding of a limitation on the Second Amendment is consistent with bedrock federalism principles that entitle a state to effectuate the policy choice of its citizens within constitutional bounds. States historically may have chosen not to regulate particular conduct, not because the public understood the right to keep and bear arms to forbid regulation, but because of policy preferences and local conditions. *See Friedman v. City of Highland Park*, 784 F.3d 406, 412 (7th Cir. 2015) (Easterbrook, J.) ("[T]he Constitution establishes a federal

21

republic where local differences are cherished as elements of liberty, rather than eliminated in a search for national uniformity."); *McDonald v. City of Chicago*, 561 U.S. 742, 785 (2010) (plurality opinion) (noting that states and localities may "experiment[] with reasonable firearms regulations" (cleaned up)). For example, "lawmakers are not moved to forbid behavior that is governed by custom, universal practice, or private warning." *Antonyuk*, 89 F.4th at 301-02. Nor would a state be expected to "regulate for problems that do not exist" in their jurisdiction. *McCullen*, 573 U.S. at 481 (quoting *Burson v. Freeman*, 504 U.S. 191, 207 (1992) (plurality op.)). Accordingly, while laws restricting firearms demonstrate that the people of those jurisdictions understood the right to keep and bear arms to permit such restrictions, the absence of such laws in other jurisdictions does not warrant any inference that their citizens considered such restrictions unconstitutional.

### C. Plaintiff Has Not Established that He Is Likely to Succeed in Showing that the Parks Restriction Is Unconstitutional

Plaintiff is unlikely to succeed on the merits of his Second Amendment challenge to the Parks Restriction. Applying *Bruen*'s principles, the Parks Restriction is part of a robust tradition of prohibiting firearms in parks and analogous sensitive places.[14]

---

[14] Even before reaching that historical inquiry, Plaintiff must establish at *Bruen*'s first step that the Second Amendment's text protects his proposed conduct—carrying guns in local parks *specifically*, not just carrying guns in public *generally*. *See, e.g.*, *United States v. Reyna*, No. 3:21-cr-00041, 2022 WL 17714376, at *4

### i.   There is a robust historical tradition of prohibiting firearms in parks

Parks as we understand them today first appeared in the second half of the nineteenth century,[15] and for as long as these parks have existed, governments have prohibited guns in them. This tradition first manifested in the archetypal modern park, New York's Central Park, where the original 1858 rules forbade "[a]ll persons" to "carry fire-arms." *See* Attach. B, Tab 1. Eight years later, a similar rule prohibited firearms in Brooklyn's Prospect Park. *See id.* Tab 3. More prohibitions followed: in 1868, the Pennsylvania legislature decreed that "[n]o person shall carry fire arms" in the newly-created Fairmount Park in Philadelphia "or within fifty yards thereof," *id.* Tab 4, and in the 1870s, laws prohibiting firearms in parks appeared in San Francisco, Chicago, Buffalo, Hyde Park, Illinois, and Phoenixville,

---

(N.D. Ind. Dec. 15, 2022) ("[T]he regulated conduct must be defined specifically enough that it can [be] meaningfully compare[d] to the Second Amendment's plain text[.]"), *appeal docketed*, No. 23-1231 (7th Cir. Feb. 7, 2023). To do so, he must surmount the fact that nothing in the Order limits his ability to keep or bear arms so long as he do not choose to enter Albuquerque or Bernalillo County parks. *Cf. Moore v. Madigan*, 702 F.3d 933, 940 (7th Cir. 2012) (Posner, J.) ("[W]hen a state bans guns merely in particular places, such as public schools, a person can preserve an undiminished right of self-defense by not entering those places[.]"); *United States v. Class*, 930 F.3d 460, 465 (D.C. Cir. 2019) (quoting same). The Order stands in stark contrast to the law struck down in *Bruen*—a carry regime that "prevent[ed] law-abiding citizens with ordinary self-defense needs from carrying arms in public for that purpose." *Bruen*, 597 U.S. at 60. Thus, unlike in *Bruen*, Plaintiff's textual burden is not just to establish that the Second Amendment's text protects carrying outside the home, but that it protects carrying in parks specifically. He has not met that burden.

[15] *See infra* Part II.C.iii.c.

Pennsylvania, *see id.* Tabs 5-9. In all, laws located to date appeared in eight cities in the 1850s to 1870s, eight more cities in the 1880s, 21 more in the 1890s, another 26 in the 1900s, and many more throughout the 1910s and 1920s. *See id.* Tabs 1-94.[16] The late-19th and early-20th century also saw the proliferation of state and national parks, which were also accompanied by firearms prohibitions shortly after their creation. *See id.* Tabs 95-132. Altogether, research to date has identified *well over one hundred* historical laws prohibiting guns in parks.[17]

Not only were parks restrictions numerous, but research has not revealed *any* instance of a court invalidating them. In other words, they "were not merely adopted by legislative bodies in the respective cities in which they applied—they were apparently accepted without any constitutional objection by anyone." *Antonyuk*, 89 F.4th at 359; s*ee also Bruen*, 597 U.S. at 30 (finding it "settled" that

---

[16] These historical laws establish that—to take one example in each of 28 states and the District of Columbia—firearms were prohibited in parks in New York, N.Y. (1858), Philadelphia, Pa. (1868), San Francisco, Cal. (1872), Chicago, Ill. (1873), St. Louis, Mo. (1881), New Haven, Conn. (1882), Boston, Mass. (1886), St. Paul, Minn. (1888), Salt Lake City, Utah (1888), Trenton, N.J. (1890), Grand Rapids, Mich. (1891), Milwaukee, Wis. (1891), Spokane, Wash. (1892), Cincinnati, Ohio (1892), Wilmington, Del. (1893), Indianapolis, Ind. (1896), Omaha, Neb. (1898), Boulder, Colo. (1899), Houston, Tex. (1904), Baltimore, Md. (1904), Washington, D.C. (1907), Portland, Or. (1907), Parsons, Kan. (1907), Memphis, Tenn. (1909), Paducah, Ky. (1909), Staunton, Va. (1910), Burlington, Vt. (1910), Oklahoma City, Okla. (1913), and Birmingham, Ala. (1917).

[17] Although Defendants did not present all the laws cited in this brief during the initial preliminary-injunction briefing, they are properly before this Court. *See infra* p. 32 (discussing cases including this Court's decision in *Baca v. Department of Army*, 983 F.3d 1131 (10th Cir. 2020)).

24

certain locations were "'sensitive places' where arms carrying could be prohibited" because there were "no disputes regarding the lawfulness of such prohibitions"). Thus, as the Second Circuit and multiple other district courts have concluded, these park restrictions demonstrate an established historical tradition of prohibiting firearms in public parks. *See, e.g.*, *Antonyuk*, 89 F.4th at 359-60;[18] *Md. Shall Issue*, 2023 WL 4373260, at *11-12; *Kipke*, 2023 WL 6381503, at *9-10.[19] The Parks Restriction fits soundly within this tradition.

---

[18] While *Antonyuk* expressed skepticism that the historical laws New York relied on at the preliminary-injunction stage would support a modern prohibition on firearms in "rural" parks, it found it unnecessary to resolve the issue on a facial challenge and noted the litigation was still in its early stages. *See* 89 F.4th at 362-63. Historical prohibitions on firearms in national and state parks (which New York did not present in *Antonyuk*) robustly support the constitutionality of prohibitions in "rural" parks, but this Court also need not decide that issue because none of the parks the Order covers—all of which are located in and around the City of Albuquerque—can plausibly be considered "rural." And that is all the more true given that "[i]t appears that Plaintiff has raised a *facial* challenge to the public health order's restriction on carrying firearms in public parks," App. 189 n.3 (emphasis added), meaning that Plaintiff must establish that the Parks Restriction "'violates the Constitution in all, or virtually all, of its applications,'" *id.* (citing *United States v. Sup. Ct. of N.M.*, 839 F.3d 888, 907 (10th Cir. 2016)). Thus, even if Plaintiff could establish that prohibitions on firearms in "rural" parks were unconstitutional, he could prevail under that theory only if he also established that "all, or virtually all" of Albuquerque and Bernalillo County's parks were "rural."

[19] The district court in *LaFave v. County of Fairfax*, No. 1:23-cv-01605 (E.D. Va. Jan. 24, 2024), Doc. 33, also denied a preliminary injunction against a restriction on firearms in parks in Fairfax County, Virginia, without a written opinion.

### ii. Prohibitions on firearms in parks are analogous to historical prohibitions on firearms in public forums and gatherings and in schools

Even if this Court were to focus on the founding era, it should still conclude that the Parks Restriction is consistent with historical tradition. Specifically, it is analogous to longstanding traditions of prohibiting firearms in public forums and gatherings and in schools.

### a. Public forums and gatherings

As *Antonyuk* concluded with respect to New York's prohibition on firearms in parks, the Parks Restriction is consistent with the "well-established and representative tradition of regulating firearms in public forums and quintessentially crowded places, enduring from medieval England to Reconstruction America and beyond." 89 F.4th at 356. These types of restrictions extend back to the 1328 Statute of Northampton in England, which stated that "no Man great nor small" shall "go [or] ride armed … in Fairs [or] Markets." 2 Edw. 3, 258, ch. 3 (1328), Attach. C, Tab 1. Founding-era laws in Virginia and North Carolina "replicated the medieval English law prohibiting firearms in fairs and markets, *i.e.*, the traditional, crowded public forum." *Antonyuk*, 89 F.4th at 357 (footnote omitted) (citing 1786 Va. Acts 35, ch. 49 and Collection of Statutes of the Parliament of England in Force in the State of North Carolina 60-61, ch. 3 (F. Martin Ed. 1792)); Attach. C, Tabs 2-3; *see also State v. Huntly*, 25 N.C. 418, 420-23 (1843) (observing

26

that statutory text also reflected common law). Thus, "medieval law survived to become our Founders' law." *Antonyuk*, 89 F.4th at 357 (quoting *Bruen*, 597 U.S. at 35).

Firearms restrictions in places of public assembly or gathering became increasingly common in the latter half of the 19th century.[20] Tennessee, Texas, and Missouri "passed laws prohibiting weapons in public forums and crowded places such as assemblies for 'educational, literary or scientific purposes, or into a ball room, social party or other social gathering.'" *Antonyuk*, 89 F.4th at 357 (citation omitted); *see also* 1869-70 Tenn. Pub. Acts 23-24, Attach. C, Tab 4; 1871 Tex. Gen. Laws ch. 34 § 3, Attach. C, Tab 5;[21] 1883 Mo. Sess. Laws 76, Attach. C, Tab 8. Georgia also passed a law prohibiting carrying guns to courts, polling places, places of worship, "or any other public gathering," R.H. Clark, *The Code of the State of Georgia* 818 (1873), Attach. C, Tab 6, and the Oklahoma and Arizona territories passed similar gathering-place laws, *see Antonyuk*, 89 F.4th at 357 (citing 1889 Ariz.

---

[20] Defendants presented several of these laws in their opposition to the motion for preliminary injunction. *See* App. 68. As discussed below, this Court may consider additional laws on appeal. *See infra* p. 32.

[21] In its order denying a stay, the district court incorrectly stated that *Bruen* considered the 1871 Texas statute that "prohibited firearms in public venues and social gatherings" to be an "outlier." App. 181. Instead, as *Antonyuk* explained, *Bruen* concluded one provision of the law was an outlier, but did not "cast doubt on … [its] separate restriction relating to public assembly," which is "consistent with the national tradition and existed in many states." 89 F.4th at 358 n.75.

Sess. Laws 17 and 1890 Okla. Terr. Stats., Art. 47, § 7); Attach. C, Tabs 9-10.[22]

The state Supreme Courts of Texas, Tennessee, and Missouri "upheld this type of statute as constitutional." *Antonyuk*, 89 F.4th at 358 (discussing *English v. State*, 35 Tex. 473, 478-79 (1871); *Andrews v. State*, 50 Tenn. 165, 181-82 (1871); *State v. Shelby*, 2 S.W. 468, 469 (Mo. 1886)).

Thus, as the Second Circuit concluded in *Antonyuk*, the founding-era prohibitions on firearms in fairs and markets, along with the 19th-century prohibitions in places of public gathering, demonstrate a "long, unbroken line" of a "tradition of regulating firearms in often-crowded public forums." 89 F.4th at 358. And, as public parks emerged as "a new type of public forum" in the mid- and late-19th century, "cities continued the tradition of regulating firearms in historical public forums, such as fairs and markets, to likewise keep these new public spaces, urban parks, peaceable." *Id.* at 359.

---

[22] Contrary to the district court's conclusion, Attach. A at 15, *Bruen* did not reject reliance on all territorial laws. *Bruen* held only that the territorial carry restrictions New York presented could not "overcome the overwhelming evidence" the Court had already found supporting "an otherwise enduring American tradition permitting public carry." 597 U.S. at 67. There is no such contrary evidence (let alone "overwhelming evidence") of a right to carry at public gatherings, and instead, the territorial laws from Arizona and Oklahoma are entirely consistent with the laws from at least four other states. Thus, as *Antonyuk* observed, "there [i]s no reason … to discount territorial laws." 89 F.4th at 360.

### b. Schools

Separately, the Parks Restriction is constitutional because it is consistent with the well-accepted principle that the government may prohibit firearms in schools. *Heller* announced that its decision did not cast doubt on "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings," calling those laws "presumptively lawful regulatory measures." 554 U.S. at 626-27, 627 n.26; *see also McDonald*, 561 U.S. at 786 (reiterating the same). *Bruen* repeated the first of those quotations, "assum[ing] it settled that these locations were 'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment," *see* 597 U.S. at 30, and Justice Kavanaugh, joined by the Chief Justice—representing two votes necessary for the majority—reproduced the passage in full, *see id.* at 81 (Kavanaugh, J., concurring). Thus, schools are established sensitive places, *see Antonyuk*, 89 F.4th at 339 n.56, and so, as *Bruen* instructs, courts can analogize from restrictions in schools to approve restrictions in "*new* and analogous sensitive places." 597 U.S. at 30 (emphasis added).

The Parks Restriction is analogous to historical restrictions on firearms in schools. It places a "comparable burden" on the right to armed self-defense—like school restrictions, it prohibits carrying only in discrete locations. And its burden is

"comparably justified"—like school restrictions, it protects a vulnerable population (children), who make extensive use of Albuquerque and Bernalillo County parks.[23]

### iii.    The district court's grounds for rejecting the historical tradition of regulation were mistaken

The district court disagreed that the Parks Restriction was consistent with historical tradition. It faulted Defendants for providing "*no* evidence illuminating the scope of the Second Amendment … around the time it was adopted." Attach. A at 15. And it said that the 19th-century laws Defendants presented were "insufficient" to "illuminat[e]" the understanding of the right to keep and bear arms around the time of the Fourteenth Amendment, principally because the "vast majority of Defendants' citations come at least 20 years after" the adoption of that Amendment. *Id.* The court was mistaken on both fronts.

### a.  19th-century parks regulations illuminate earlier understanding

As explained above, the Reconstruction era is the most important period for determining the public understanding of the right to keep and bear arms. *See supra* Part II.B.ii. But even if the understanding at the time of the Second Amendment's enactment were most important, examining 19th-century laws is still "a critical tool

---

[23] *Antonyuk* relied on similar reasoning to uphold a prohibition on firearms at zoos. *See* 89 F.4th at 363-64. It did not address whether this analogy would extend to parks because it had already deemed parks restrictions consistent with the tradition of prohibiting guns in public-gathering places. *Id.* at 361 n.84.

of constitutional interpretation," *Bruen*, 597 U.S. at 20 (quoting *Heller*, 554 U.S. at 605). Where, as here, there is no contrary evidence—no 18th- or 19th-century cases, treatises, or other legal materials maintaining that prohibiting firearms in parks would violate the right to bear arms—the 19th-century understanding presumptively reflects the 18th-century understanding. *See supra* p. 20 and note 13. Only 77 years separated the founding from Reconstruction; it is far more plausible to conclude that the understanding of the right remained consistent across that time than to conclude that it swung from one pole to the opposite—from forbidding the regulation of guns in parks at the founding, to such regulations being widespread and apparently universally accepted in the 19th century—without leaving any evidence that such a radical change took place.

In addition, 19th-century parks prohibitions have their roots in older regulatory traditions. *Antonyuk* explained that those prohibitions continued an earlier tradition of prohibiting guns in crowded gathering places and public forums, *see supra* Part II.C.ii.a, and the Parks Restriction is also analogous to prohibitions of guns in schools, which the Supreme Court has accepted are sensitive places, *see supra* Part II.C.ii.b.

31

Defendants relied on 19th-century gathering places in the district court, App. 68,[24] and cite additional, founding-era gathering-places laws in this brief because this Court has made clear that new legal authority may be presented for the first time on appeal, *see, e.g.*, *Baca*, 983 F.3d at 1140 ("[W]e do allow a party to provide new legal authority on appeal for the position that he advanced below." (cleaned up)). This rule applies equally to the submission of historical laws supporting the constitutionality of a challenged firearm restriction under *Bruen*. *See Alaniz*, 69 F.4th at 1129 n.1 (rejecting challenger's argument in a Second Amendment case "that the government's analogues cannot be considered on appeal because they were not raised below," and affirming that "[b]ecause the constitutional claim was raised below, [the court] may consider the government's [*Bruen*] step two arguments and analogues put forward on appeal"); *cf., e.g.*, *Hunt*, 63 F.4th at 1250 (noting that "[w]hen the resolution of a dispute turns on legislative facts, courts regularly relax the restrictions on judicial inquiry").

---

[24] The district court's suggestion that it could not consider these historical laws (or other materials cited below, such as secondary sources) because Defendants did not attach copies to their opposition papers was without merit. *See, e.g.*, *United States v. Hunt*, 63 F.4th 1229, 1249-50 (10th Cir. 2023) (rejecting argument that court could not consider materials unless they were "attached as hard copies to the government's brief"); *see also Nolan v. U.S. Dept. of Just.*, 973 F.2d 843, 846 (10th Cir. 1992) ("Mere technicalities should not obstruct the consideration of a case on its merits." (cleaned up)).

### b. Public understanding does not dissipate within two decades

Even as it appeared to be open to Reconstruction-era evidence, the district court discounted several historical parks prohibitions Defendants presented as "irrelevant or unpersuasive" because they were enacted in the "late 1880s or 1890s, more than two decades after the enactment of the Fourteenth Amendment." Attach. A at 12-13; *see also id.* at 15 (concluding that, "[a]s to the Fourteenth Amendment, Defendants presented insufficient evidence illuminating" the scope of the right, because "the vast majority of Defendants' citations come at least 20 years after the enactment of the Fourteenth Amendment").[25] That was error. Evidence of the public understanding of the right in the period after 1868 is just as probative of the 1868 understanding as evidence from the period before. *See Antonyuk*, 89 F.4th at 304 (finding it "implausible" that "public understanding would promptly

---

[25] In denying a stay, the district court appeared more focused on the founding era, saying that "*Bruen* repeatedly focused on the understanding of the right to bear arms at the time of the Second Amendment, and discounted later laws as not providing sufficient understanding of the understanding of the right … at th[at] time[.]" App. 184. In fact, *Bruen* discussed historical laws from before the founding through the late 19th century, 597 U.S. at 38-70, and only dismissed later laws that were *contrary* to what it found was the "overwhelming weight of other evidence regarding the right to keep and bear arms," *id.* at 67 (quoting *Heller*, 554 U.S. at 632); *see also id.* at 66 n.28 (declining to consider 20th-century evidence that "contradicts earlier evidence"). Evidence regarding an earlier understanding, of course, can illuminate the understanding in a later period, just as much as later evidence can cast light on how the right was understood before that time—making it unsurprising that *Bruen* considered evidence from a wide swath of time even as it left open the question of the most relevant time period.

dissipate whenever [one] era gave way to another"); *id.* at 354-55, 354 n.69 (giving

significant weight to parks ordinances from 1880s and 1890s); *McIntyre v. Ohio*

*Elections Comm'n*, 514 U.S. 334, 375 (1995) (Scalia, J., dissenting) ("Principles of

liberty fundamental enough to have been embodied within constitutional

guarantees are not readily erased from the Nation's consciousness."). As such, at

least one judge of this Court has recognized that courts should consider history

"through the end of the nineteenth century." *Vincent*, 80 F.4th at 1203 (Bacharach,

J., concurring); *see also Ocean State Tactical, LLC v. Rhode Island*, --- F.4th ----, No. 23-

1072, 2024 WL 980633, at *10 (1st Cir. Mar. 7, 2024) (noting that *Bruen* "left open

the possibility that 'late-19th-century evidence' and '20th-century historical

evidence' may have probative value if it does not 'contradict[ ] earlier evidence,'"

and considering 20th-century laws "regulating … M-16s" within the historical

tradition supporting a large-capacity magazine restriction (citation omitted and

alteration in original)).

Thus, contrary to the district court's view, focusing on laws no later than

1888 has no foundation in *Bruen* and defies common sense. Nor was the district

court correct to dismiss early 20th-century laws. *Bruen* declined to consider 20th-

century evidence presented in that case because, the Court concluded, that

evidence "contradict[ed] earlier evidence." 597 U.S. at 66 n.28; *see also Ocean State*

*Tactical*, 2024 WL 980633, at *10. Here, by contrast, Plaintiff has *no* evidence

showing that Americans of any generation understood the Second Amendment to

forbid excluding firearms from parks. *See also supra* pp. 30-31.[26]

### c. Parks as we understand them today were an "unprecedented societal concern" in the late 19th century

A separate reason why the robust history of parks regulations from the

second half of the 19th century and later is especially relevant in this case is that

parks as we understand them today did not exist before that time. Addressing this

very argument, the Second Circuit concluded that the "'modern idea of the park

emerged in the nineteenth century,' before which 'open spaces that were not

privately owned … consisted of grazing areas open to all, with Boston Common

being the 'most famous example for this kind of [grazing] park space.'" *Antonyuk*,

89 F.4th at 361 (quoting Nadav Shoked, *Property Law's Search for a Public*, 97 Wash.

U. L. Rev. 1517, 1556-57 (2020)) (alteration in *Antonyuk*)). Accordingly, modern-

style parks were an "unprecedented societal concern[]" in the late 19th century,

which necessitates a "more nuanced approach" to *Bruen*'s analogical inquiry. *See*

597 U.S. at 27.

---

[26] In any event, even if the district court's narrow focus on the two decades
before or after 1868 had been correct, Defendants have presented 18 laws passed
within the arbitrary window of 1848-1888. *See* Attach. B, Tabs 1-18; *see also supra*
p. 32 (Defendants may submit additional legal authorities on appeal).

History supports the Second Circuit's conclusion. Early commons and greens were different in kind from modern-day parks, serving as, for instance, sites to grow crops, graze livestock, and harvest firewood and other resources. *See* Allan Greer, *Commons and Enclosure in the Colonization of North America*, 2 Am. Hist. Rev. 365, 370-73 (2012). Boston Common, for example, was primarily used as shared grazing land during its first two centuries and was also used for militia assembly and executions. *Bulletin of the Park and Outdoor Art Association* 3 (1901), bit.ly/3NPLSae (explaining that Boston Common was used for grazing and militia assembly "till a very recent date" and "not until 1859" was it "finally settled" that "Boston Common should be a public park").

Instead, as *Antonyuk* found, "the rise of public parks as municipal institutions [occurred] over the latter half of the 19th century," "following the success of New York's Central Park" in the 1850s. 89 F.4th at 359 (cleaned up) (quoting David Schuyler, *Summary of Parks in Urban America*, Oxford Rsch. Encyc. of Am. Hist. (Nov. 3, 2015)); *see also* David Schuyler, *The New Urban Landscape: The Redefinition of City Form in Nineteenth-Century America* 1-8 (1988) (describing emergence in 19th century of "new urban landscape," whose proponents urged establishment of public parks to "create[] communal spaces" where "rural scenery might sooth the 'nerves and mind' of visitors," and identifying Central Park as "the first major attempt to achieve" the proponents' goals); Frederick Law Olmsted, *A Consideration of the*

36

*Justifying Value of a Public Park* 7 (1881) ("Twenty-five years ago we had no parks,

park-like or otherwise, which might not better have been called something else.").

Several trial-level courts have concluded the same. *See, e.g., Kipke*, 2023 WL

6381503, at *9 (noting that the few parks in existence at the time of the founding

did not resemble modern parks, and that "Boston Common … 'was used primarily

as a pasture, a place of execution, and site for the militia to muster and drill'"

(citation omitted)); *LaFave v. Cnty. of Fairfax*, No. CL2021-01569, 2023 Va. Cir.

LEXIS 203, at *17 (Fairfax Cnty. Cir. Ct. June 23, 2023) ("Parks in the modern

sense did not come into being until the mid-19th century[.]").[27]

---

[27] In the district court, Defendants presented several sources demonstrating
that Boston Common in its early years was very different from modern parks, in
that it was used "primarily as a pasture, a place for public executions, and a site for
the militia to muster and drill." App. 70 n.16; *see* Setha Low et al., *Rethinking Urban
Parks: Public Space and Cultural Diversity* 19-20 (2009) (explaining that although "parks
first appeared in North America in the early nineteenth century," these places
"were relatively unimproved commons, places originally set aside for grazing cattle
and training militias"); Steven R. Pendery, *Probing the Boston Common*, 43
Archaeology 42, 45-46 (1990) (explaining that Boston Common was used for cattle
grazing until 1830, after which the city began building "tree-lined foot-paths" in
the Common's interior and "transformed [it] into a wooded, contemplative park");
Michael Rawson, *Eden on the Charles, the Making of Boston* 22-73 (2010) (describing the
transformation of Boston Common into a park for leisure in the mid-19th century).
The district court criticized two of those sources for not explicitly stating that
"there were no historical analogues to modern parks." App. 183. But explaining
that the primary uses of early green spaces like Boston Common were very
different from the functions of modern-day parks *is* explaining why the two types of
locations are not analogous. *See Antonyuk*, 89 F.4th at 362. The court's criticism of
the third source, as not providing a footnote for the proposition that, in 1830,
"[t]he beginning of America's great park-building age was still over thirty years
away," Rawson, *supra*, at 73, ignores the fact that, to a historian, the timing of

Because early green spaces were different in kind than modern-day parks, the district court erred in suggesting that Defendants needed to demonstrate that firearms were restricted in those locations. *See* Attach. A at 13-14 (citing *Koons v. Platkin*, 673 F. Supp. 3d 515, 640 (D.N.J. 2023), *appeal docketed*, No. 23-1900 (3d Cir. May 17, 2023)). As *Antonyuk* explained, "though the history of firearm regulation in the 17th-century Boston Common might tell us about the National tradition of regulating firearms in militia mustering grounds and 'grazing areas open to all,' it tells us little about the history of firearm regulation in the public square." 89 F.4th at 361.

Moreover, even if earlier green spaces *were* parks, an absence of prohibitions on firearms in those places would not establish that anyone thought such prohibitions to be unconstitutional. "Legislatures past and present have not generally legislated to their constitutional limits," and an absence of legislation could reflect all manner of policy or practical considerations—including "a lack of political demand"—that have nothing to do with constitutionality. *Antonyuk*, 89 F.4th at 301-02 (citation omitted). Thus, in *Dobbs v. Jackson Women's Health Organization*, the Supreme Court rejected the argument that the absence of laws criminalizing pre-quickening abortion "at the Founding and for decades

---

America's great park-building age is well known. *See generally Antonyuk*, 89 F.4th at 359, 359 nn.80-81 (surveying historical sources and describing the rise of public parks "over the latter half of the 19th century").

thereafter" supported a right to an abortion, explaining "the fact that many States in the late 18th and early 19th century did not criminalize pre-quickening abortions does not mean that anyone thought the States lacked the authority to do so." 597 U.S. 215, 252-53 (2022); *see also Antonyuk*, 89 F.4th at 301 ("[I]t is not necessarily the case that, if no positive legislation from a particular place is in the record, it must be because the legislators there deemed such a regulation inconsistent with the right to bear arms."). Any suggestion that an absence of firearms restrictions in places like Boston Common is evidence contradicting the copious later parks restrictions would rest on exactly the inference from legislative silence that *Dobbs* (and *Antonyuk*) rejected.

### iv.    Sensitive places are not limited to those with comprehensive, government-provided security

In the related consolidated appeal, *We the Patriots v. Lujan Grisham*, a subset of the plaintiffs contend that the only "sensitive" places where guns may be prohibited are "enclosed, securable locations protected by government-provided comprehensive security." WTP Br. 24-29.[28] Remarkably, three of the plaintiffs there refused to join that part of the consolidated brief, *see id.* at 24 n.7, which is

---

[28] The plaintiffs do not explain precisely what they mean by "comprehensive security," but it appears they have in mind "guards and metal detectors," as featured "at entrances to courthouses or … at the airport." *Id.* at 28.

itself a clear indication that the argument is untenable. Because Plaintiff here may present a similar argument, Defendants highlight two of its flaws.

*First*, the argument that only enclosed locations protected by "government-provided comprehensive security" can be "sensitive places" is inconsistent with *Heller*, *Bruen*, and *Bonidy v. U.S. Postal Service*, 790 F.3d 1121 (10th Cir. 2015). The plaintiffs in *We the Patriots* based their argument on the assertion that the Supreme Court has only identified three locations as "presumptively sensitive places" where firearms may be banned: courthouses, polling places, and legislative assemblies. WTP Br. 24. But that ignores the fact that *Heller* and *Bruen* confirmed that schools and government buildings are also sensitive places. *See supra* p. 29. Any argument that *Heller*'s passage regarding schools and government buildings is mere dicta is foreclosed by *Bonidy*, where this Court, in addressing a firearm prohibition in post offices, "reject[ed]" the "suggest[ion]" that *Heller*'s language "is mere dicta and … that we should disregard it." 790 F.3d at 1125; *see also Vincent*, 80 F.4th at 1201-02 (holding that a pre-*Bruen* decision of this Court, relying on other aspects of *Heller*'s "presumptively lawful" language, remains binding circuit precedent because "*Bruen* did not indisputably and pellucidly abrogate" it). Accordingly, *Bonidy* held, "the Second Amendment right to carry firearms does not apply to federal buildings, such as post offices." 790 F.3d at 1125.

Post offices do not normally feature "government-provided comprehensive security"—indeed, *Bonidy* noted that the specific post office at issue "d[id] not regularly employ any security officers," *id.* at 1123, or have "security … devices," *id.* at 1133 (Tymkovich, J., concurring in part and dissenting in part); *see also Class*, 930 F.3d at 465 (describing post office as "an unsecured government building"). So *Bonidy*'s conclusion that post offices are sensitive places forecloses the claim that only locations with comprehensive protection could be sensitive. Any number of other government buildings similarly lack comprehensive security—public libraries, community recreation centers, and so on. And schools—which include not just buildings but also yards and playing fields—are neither "enclosed" nor routinely protected by comprehensive security. Thus, "because *Bruen* conclusively named schools among the other examples of sensitive places, … [the] argument that sensitive places are limited to buildings with comprehensive, state-provided security is baseless." *Kipke*, 2023 WL 6381503, at *6; *see also Class*, 930 F.3d at 465 ("Many 'schools' and 'government buildings'—the paradigmatic 'sensitive places' identified in *[Heller]*—are open to the public, without any form of special security or screening.").

*Second*, even considering just courthouses, polling places, and legislative assemblies, the security-based argument still fails. Government-provided, comprehensive security is generally not present at polling places. Indeed, law

enforcement officers are often "barred from the vicinity of the polls to avoid any appearance of coercion in the electoral process." *Burson*, 504 U.S. at 207 (describing Tennessee law); *see also, e.g.*, Luke Barr, *Trump Says He Wants Police at Polling Sites. Experts Say that's Unlawful*, ABC News (Aug. 21, 2020), tinyurl.com/fcv5x9xe (quoting Minnesota Secretary of State explaining that "you can't preemptively station or assign [police officers] to a polling place. You just can't do it. It's unlawful."). Similarly, as a historical matter, even such indisputably sensitive places as the U.S. Capitol and the White House lacked "comprehensive security." *See* United States Capitol Police, *Our History*, https://www.uscp.gov/the-department/our-history (noting that when Congress moved to Washington, DC in 1800, a "lone watchman, John Golding, was hired to protect the Capitol Building," and that the watch remained one person until 1828, when it was expanded to four); Katie Zezima, *People Used to Be Able to Walk into the White House. Legally*, Wash. Post (Sept. 23, 2014), https://perma.cc/M2UM-VHND ("Despite being open to the public, there was very little security at the White House until a drunk man threw rocks at President John Tyler …. Abraham Lincoln … stationed guards at the White House. After the Civil War, however, security measures dropped off.").

For these reasons, if Plaintiff raises a similar security-based argument, this Court should reject it.

## III.   Plaintiff Did Not Carry His Burden on the Non-Merits Factors

The remaining preliminary injunction factors also weigh in Defendants' favor. New Mexico "suffers … irreparable injury" whenever it is barred "from effectuating statutes enacted by representatives of its people." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (citation omitted).[29] Affirming the district court's injunction would undermine the judgment of New Mexico's democratic branches on how best to keep residents safe. That harm would be especially profound here, where the preliminary injunction imposes "an ongoing and concrete harm to" the State's "law enforcement and public safety interests." *Id.* Furthermore, the public would also suffer irreparable harm, as allowing individuals to carry firearms into public parks where people and children gather increases the likelihood of shootings in those locations.[30] Sadly, the possibility of being shot in a park or playground is not just theoretical—there is a documented history of

---

[29] Although the Order is not a statute, it was issued pursuant to the statutory scheme the Legislature enacted to respond to public health emergencies. *See* N.M. Stat. Ann. §§ 12-10A-1 to -19 (2003, as amended through 2015).

[30] *See, e.g.*, Paul M. Reeping et al., *The Effect of Gun-Free School Zones on Crimes Committed with a Firearm in Saint Louis, Missouri*, 100 J. Urb. Health 1118, 1123 (2023), https://bit.ly/3Rwvwqd (finding "statistically significant 13.7% fewer crimes committed with a firearm in gun-free school zones compared to gun-allowing zones"); *see also, e.g.*, John J. Donohue et al., *Right-to-Carry Laws and Violent Crime: A Comprehensive Assessment Using Panel Data and a State-Level Synthetic Control Analysis*, 16 J. Empirical Legal Stud. 198, 200 (2019), https://law.stanford.edu/wp-content/uploads/2017/06/Donohue_et_al-2019-JELS-RTC-Law-and-Viol-Crime.pdf (finding substantial increases in rates of violent crimes in states with lenient concealed carry licensing laws).

shootings in Albuquerque parks.[31] Firearm injuries and deaths "c[an]not be undone, thus rendering the[ir] consequences irreparable." *Uniformed Fire Officers Ass'n v. De Blasio*, 973 F.3d 41, 48 (2d Cir. 2020). The presence of guns in parks also has significant intimidating and chilling effects and reduces the public's use and enjoyment of parks.[32]

The district court's contrary finding that the non-merits factors favor Plaintiff, *see* Attach. A at 17-18, was in error and should not be followed. The district court based this finding entirely on its conclusion that Plaintiff would likely succeed on his Second Amendment challenge to the Parks Restriction. *See id.* But that is not so; as discussed, *see supra* Part II.C, the Order is constitutional. Moreover, the record is far from clear as to if, when, where, or how often Plaintiff—who lives in a different county—plans to visit Albuquerque and Bernalillo County parks in the future. *See* App. 55.[33] And Plaintiff has failed to show

---

[31] *See* February Executive Order at 3 (noting "a recent rise of gun violence in [Albuquerque] parks, with at least five such shootings reported in 2023 and early 2024").

[32] *See* Darrell A.H. Miller et al., *Technology, Tradition, and "The Terror of the People*," Notre Dame L. Rev. (forthcoming) (manuscript at 20-23), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4521030 (documenting these intimidating and chilling effects).

[33] In the context of assessing Plaintiff's standing to challenge the Parks Restriction, the district court determined that Plaintiff "clearly asserts that ... he intends to carry firearms in public parks in Albuquerque and Bernalillo County." Attach. A at 7. But that clarity is not borne out by the record. In his declaration in support of the preliminary injunction motion, Plaintiff merely asserted that he was prohibited from carrying a firearm when he visited unspecified "parks" in the past.

that his ability to carry firearms in Albuquerque-area parks would actually reduce his or his family's likelihood of injury should a shooting occur. *See, e.g.*, Steven E. Barkan & Michael Rocque, *Crime Prevention: Programs, Policies, and Practices* 65 (2021) (describing study finding "little evidence that self-defense gun use reduces the likelihood of victim injury during a crime" (quoting David Hemenway & Sara J. Solnick, *The Epidemiology of Self-Defense Gun Use: Evidence from the National Crime Victimization Surveys 2007-2011*, 79 Preventive Med. 22, 27 (2015))). Accordingly, the non-merits factors weigh in favor of Defendants here.

---

App. 55 ("I have been prohibited … from lawfully carrying my firearm … for most of the months of September and October at the parks that I attend for non-scholastic youth sporting events or just to enjoy the beautiful fall weather in Albuquerque during the balloon fiesta."). Nowhere, however, does Plaintiff state that he intends to visit Albuquerque or Bernalillo County parks in the future, and certainly he has not identified any specific park covered by the Order that he has plans to visit. Any possible harm to Plaintiff from the Order is thus, at best, speculative. *See, e.g.*, *Colorado v. EPA*, 989 F.3d 874, 884 (10th Cir. 2021) (noting that "a speculative or theoretical injury will not suffice" for preliminary injunctive relief). And, for these same reasons, contrary to the district court's conclusion, Plaintiff also has not articulated an actual or imminent injury sufficient to support his standing to challenge the Parks Restriction. *See, e.g.*, *Tenille v. W. Union Co.*, 809 F.3d 555, 560 (10th Cir. 2015) (stating that "'[a]llegations of *possible* future injury are not sufficient' to establish standing" (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (emphasis in original)).

## CONCLUSION

This Court should reverse in part and vacate the injunction of the Parks Restriction.

March 14, 2024                    Respectfully submitted,

                                 /s/ Janet Carter
                                 Janet Carter
                                 William J. Taylor, Jr.
                                 Carina Bentata Gryting
                                 Everytown Law
                                 450 Lexington Ave, P.O. Box 4184
                                 New York, NY 10163
                                 (646) 324-8174
                                 jcarter@everytown.org

                                 Freya Jamison
                                 Everytown Law
                                 P.O. Box 14780
                                 Washington, DC 20044

                                 Holly Agajanian
                                 *Chief General Counsel to Gov. Lujan Grisham*
                                 Kyle P. Duffy
                                 *Deputy General Counsel to Gov. Lujan Grisham*
                                 490 Old Santa Fe Trail, Suite 400
                                 Santa Fe, NM 87501

                                 Cody Rogers
                                 Serpe Andrews
                                 2540 El Paseo Road, Suite D
                                 Las Cruces, NM 88001

46

**STATEMENT REGARDING ORAL ARGUMENT**

Defendants-Appellants respectfully request oral argument because this appeal involves constitutional questions about state policies and presents complex methodological questions about the application of the Second Amendment under *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022).

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS**

This motion complies with the word limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), it contains 11,799 words.

This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface (fourteen-point Baskerville font) using Microsoft Word.

Respectfully submitted,

/s/ Janet Carter
Janet Carter

## CERTIFICATE OF SERVICE

I hereby certify that on March 14, 2024, I filed the foregoing via the

CM/ECF filing system, which caused all counsel of record to be served by

electronic means.

Respectfully submitted,

/s/ Janet Carter
Janet Carter