Nos. 23-2192, 23-2194

IN THE
United States Court of Appeals for the Tenth Circuit

JAMES SPRINGER,

*Plaintiff-Appellee/Cross-Appellant*,

v.

MICHELLE LUJAN GRISHAM, OFFICE OF THE GOVERNOR;
PATRICK ALLEN; AND NEW MEXICO DEPARTMENT OF HEALTH,

*Defendants-Appellants/Cross-Appellees*.

On Appeal from the United States District Court
for the District of New Mexico
NO. 1:23-CV-00781-KWR-LF
Hon. Kea W. Riggs

**JOINT BRIEF OF BRADY CENTER TO PREVENT GUN
VIOLENCE AND GIFFORDS LAW CENTER TO PREVENT
GUN VIOLENCE AS *AMICI CURIAE* FOR APPELLANTS**

Kelly M. Percival
GIFFORDS LAW CENTER TO
  PREVENT GUN VIOLENCE
268 Bush Street #555
San Francisco, CA  94104
(415) 433-2062
*Counsel for Amicus Curiae Giffords
Law Center to Prevent Gun
Violence*

Thomas M. Bondy
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
2100 Pennsylvania Ave., NW
Washington, D.C.  20037
(202) 339-8400

Douglas N. Letter
BRADY CENTER TO PREVENT
  GUN VIOLENCE
840 First Street, NE, Suite 400
Washington, D.C.  20002

Robert H. Owen
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
2121 Main Street
Wheeling, WV  26003

*Counsel for Amicus Curiae Brady
Center to Prevent Gun Violence*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................ ii

INTEREST OF *AMICI CURIAE* ............................................................. 1

INTRODUCTION AND SUMMARY ....................................................... 4

ARGUMENT ............................................................................................. 7

    I.    The Public Health Order Should Not Be Subjected To An Overly Stringent Test Under *Bruen*. ............................... 7

        A.    *Bruen* requires a historical inquiry, not a historical match. ..................................................... 7

        B.    New Mexico's restrictions on firearms in public parks and playgrounds pass muster under *Bruen*. ....... 9

    II.    The Second Amendment Cannot Override First Amendment Rights. ............................................................. 20

    III.    New Mexico's Interest In Protecting Public Safety Strongly Weighs Against A Preliminary Injunction. .......... 29

CONCLUSION ........................................................................................ 32

CERTIFICATE OF COMPLIANCE

## TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Antonyuk v. Chiumento,*
    89 F.4th 271 (2d Cir. 2023)................................................ 12, 13, 14, 19

*Antonyuk v. Hochul,*
    639 F. Supp. 3d 232 (N.D.N.Y. 2022) .................................................. 18

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.,*
    910 F.3d 106 (3d Cir. 2018) .................................................... 3

*Bonidy v. U.S. Postal Serv.,*
    790 F.3d 1121 (10th Cir. 2015) ............................................... 1

*Colorado Outfitters Ass'n v. Hickenlooper,*
    823 F.3d 537 (10th Cir. 2016) ................................................ 1

*District of Columbia v. Heller,*
    554 U.S. 570 (2008) ....................................................... 2, 3, 13, 15, 20

*Hanson v. Dist. of Columbia,*
    671 F. Supp. 3d 1 (D.D.C. 2023) .............................................. 2

*Hawkins v. City & Cnty. of Denver,*
    170 F.3d 1281 (10th Cir. 1999) .............................................. 25

*Hirschfeld v. Bureau of Alcohol, Tobacco, Firearms &*
    *Explosives,*
    417 F. Supp. 3d 747 (W.D. Va. 2019) ...................................... 4

*Maryland Shall Issue v. Hogan,*
    353 F. Supp. 3d 400 (D. Md. 2018) ........................................ 4

*Maryland v. King,*
    567 U.S. 1301 (2012) ........................................................ 31

*McDonald v. City of Chicago,*
    561 U.S. 742 (2010) ........................................................ 1, 3

*Nat'l Ass'n for Gun Rights, Inc. v. City of San Jose*,
2023 WL 4552284 (N.D. Cal. July 13, 2023)......................................2

*Nat'l Ass'n for Gun Rights v. Lamont*,
__ F. Supp. 3d __, 2023 WL 4975979
(D. Conn. Aug. 3, 2023)......................................................2, 4

*New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*,
434 U.S. 1345 (1977)..........................................................32

*New York State Rifle & Pistol Ass'n v. Bruen*,
597 U.S. 1 (2022)....................1, 3, 4, 5, 7, 8, 9, 13, 14, 20, 21, 22, 26

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*,
460 U.S. 37 (1983).............................................................25

*Peruta v. County of San Diego*,
824 F.3d 919 (9th Cir. 2016) ...................................................4

*Polis v. Rocky Mountain Gun Owners*,
No. 23-1251 (10th Cir. Dec. 14, 2023) ..........................................1

*Siegel v. Platkin*,
653 F. Supp. 3d 136 (D.N.J. 2023) .............................................19

*Stimmel v. Sessions*,
879 F.3d 198 (6th Cir. 2018)....................................................3

*United States v. Cruikshank*,
92 U.S. 542 (1875)............................................................22

*United States v. Hayes*,
555 U.S. 415 (2009)............................................................2

*We the Patriots, Inc. v. Grisham*,
Nos. 23-2166, -2167, -2185 (10th Cir. Mar. 8, 2024) ............................1

## Constitutional Provisions

U.S. Const. amend. I.................................................5, 6, 20, 21, 23, 26-29

U.S. Const. amend. II ...................................3-5, 7-9, 14-15, 20-22, 26, 29

U.S. Const. amend. XIV ...................................................... 7, 11, 16, 25, 28

**Other Authorities**

*Armed Assembly: Guns, Demonstrations, and Political Violence in America*, Everytown Research & Policy (Aug. 23, 2021), https://tinyurl.com/4p2838f7 ............................................. 27

Arlin J. Benjamin, Jr. et al., *Effects of Weapons on Aggressive Thoughts, Angry Feelings, Hostile Appraisals, and Aggressive Behavior: A Meta-Analytic Review of the Weapons Effect Literature*, 22 Personality & Soc. Psych. Rev. 347 (2018), https://tinyurl.com/4vm4bzz2 .................................. 31

Joseph Blocher & Reva B. Siegel, *Guided by History: Protecting the Public Sphere from Weapons Threats Under Bruen*, 98 N.Y.U. L. Rev. 1795 (Dec. 2023), https://tinyurl.com/4wdt57kd ............................................. 22

City of Albuquerque, Parks & Recreation, *Parks*, http://tinyurl.com/2t5k4mux (last visited Mar. 5, 2024)................... 23

Audrey Claire Davis, *Story Time in the Park: "How Will We Get to the Beach?"*, KRQE News (July 24, 2023), http://tinyurl.com/yz87c8tj..................................................... 18

Declaration of Professor Saul Cornell, *Wolford v. Lopez*, No. 23-cv-00265, Dkt. No. 55-2 (D. Hawaii) .................................. 10, 11, 25

Declaration of Leah Glaser, *May v. Bonta*, Nos. 23-cv-01696, -01798, Dkt. No. 21-4 (C.D. Cal.)............................................ 15, 16, 17

Declaration of Terence Young, *May v. Bonta*, Nos. 23-cv-01696, -01798, Dkt. No. 21-13 (C.D. Cal.)........................................... 12

John J. Donohue et al., *Why Does Right-to-Carry Cause Violent Crime to Increase?* at 2, Nat'l Bur. of Econ. Rsch., Working Paper No. 30190 (June 2023 rev.), https://tinyurl.com/4zw4z8y9 ......................................... 29, 30

Mitchell L. Doucette et al., *Impact of Changes to Concealed-Carry Weapons Laws on Fatal and Nonfatal Violent Crime, 1980-2019*, 192 Am. J. of Epidemiology 342 (Mar. 2023) ................................................................. 30

Grace Kay, *A Majority of Americans Surveyed Believe the US is in the Midst of a "Cold" Civil War*, Bus. Insider (Jan. 13, 2021), https://tinyurl.com/mrxpavt9 ........................... 28

Ezra Klein, *Why We're Polarized* (2020) ................................... 28

Dahlia Lithwick & Mark Joseph Stern, *The Guns Won*, Slate (Aug. 14, 2017), https://tinyurl.com/2zetvdwv .................................. 27

Tori Luecking, *DHS Launches Panel on Religious Security as Hateful Incidents Rise*, Wash. Post (Nov. 3, 2022), https://tinyurl.com/2m4rcanv ............................................ 28

Gregory P. Magarian, *Conflicting Reports: When Gun Rights Threaten Free Speech*, 83 Law & Contemp. Probs. 169 (2020) .................................................................. 26

Darrell A. H. Miller et al., *Technology, Tradition, and "The Terror of the People"*, Notre Dame L. Rev. (forthcoming), https://tinyurl.com/zr98jytm .............................................. 27

Michael Siegel et al., *Easiness of Legal Access to Concealed Firearm Permits and Homicide Rates in the United States*, 107 Am. J. Pub. Health 1923 (Dec. 2017) ........................... 30

Kari Still et al., *The History and Tradition of Regulating Guns in Parks*, 19 Harv. L. & Pol'y Rev. (forthcoming Spring 2024), https://tinyurl.com/yckyst9m ...................... 11

David Welch, *Michigan Cancels Legislative Session to Avoid Armed Protestors*, Bloomberg (May 14, 2020), https://tinyurl.com/53e9unpz............................................ 27

Arnold Woods, *Birth of the Playground: A Closer Look*, OpenSFHistory, http://tinyurl.com/4y76wuxp (last visited Mar. 5, 2024) .................................................... 16

## INTEREST OF *AMICI CURIAE*[1]

*Amicus curiae* the Brady Center to Prevent Gun Violence (Brady) is a nonprofit organization dedicated to reducing gun violence through education, research, and legal advocacy. Brady has a substantial interest in ensuring that the Constitution is properly construed with the safety of our society in mind, and in protecting the authority of democratically elected officials to address the nation's gun violence epidemic.

Brady has filed numerous briefs as *amicus curiae* in cases involving firearms regulations, including in this Court, *e.g.*, *We the Patriots, Inc. v. Grisham*, Nos. 23-2166, -2167, -2185 (10th Cir. Mar. 8, 2024), *Polis v. Rocky Mountain Gun Owners*, No. 23-1251 (10th Cir. Dec. 14, 2023), *Colorado Outfitters Ass'n v. Hickenlooper*, 823 F.3d 537 (10th Cir. 2016), *Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121 (10th Cir. 2015), and in the United States Supreme Court, *e.g.*, *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), *McDonald v. City of*

---

[1] The parties have consented to the filing of this *amicus* brief. No counsel for a party authored the brief in whole or in part. No party, counsel for a party, or any person other than *amici* and their counsel made a monetary contribution intended to fund the preparation or submission of this brief.

1

*Chicago*, 561 U.S. 742 (2010), and *District of Columbia v. Heller*, 554 U.S. 570 (2008).  Multiple decisions have cited Brady's research and expertise on these issues.  *See, e.g.*, *United States v. Hayes*, 555 U.S. 415, 427 (2009); *Nat'l Ass'n for Gun Rights v. Lamont*, __ F. Supp. 3d __, 2023 WL 4975979, at *32 & n.52 (D. Conn. Aug. 3, 2023); *Nat'l Ass'n for Gun Rights, Inc. v. City of San Jose*, 2023 WL 4552284, at *5–6 (N.D. Cal. July 13, 2023); *Hanson v. Dist. of Columbia*, 671 F. Supp. 3d 1, 14, 20, 23 & nn.8, 10 (D.D.C. 2023).  For these reasons, Brady has a strong interest in the outcome of this appeal.

*Amicus curiae* Giffords Law Center to Prevent Gun Violence (Giffords Law Center) is a nonprofit policy organization serving lawmakers, advocates, legal professionals, gun-violence survivors, and others who seek to reduce gun violence and improve the safety of their communities.[2]  The organization was founded more than 30 years ago following a gun massacre at a San Francisco law firm and was renamed Giffords Law Center in 2017 after joining forces with the gun-safety

---

[2] Giffords Law Center's website, www.giffords.org/lawcenter, is the premier clearinghouse for comprehensive information about federal, state, and local firearms laws and Second Amendment litigation nationwide.

organization led by former Congresswoman Gabrielle Giffords.  Today, through partnerships with gun-violence researchers, public-health experts, and community organizations, Giffords Law Center researches, drafts, and defends the laws, policies, and programs proven to effectively reduce gun violence.  Together with its partner organization Giffords, Giffords Law Center also advocates for the interests of gun owners and law enforcement officials who understand that gun-safety legislation and community violence prevention strategies are not only consistent with the Second Amendment—they are essential to protecting public health and safety.

Giffords Law Center has contributed technical expertise and informed analysis as an *amicus* in numerous cases involving firearm regulations and constitutional principles affecting gun policy.  *See, e.g.*, *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022); *McDonald v. City of Chicago*, 561 U.S. 742 (2010); *District of Columbia v. Heller*, 554 U.S. 570 (2008).  Several courts have cited research and information from Giffords Law Center's *amicus* briefs in Second Amendment rulings.  *See, e.g.*, *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*, 910 F.3d 106, 121–22 (3d Cir. 2018); *Stimmel v.*

*Sessions*, 879 F.3d 198, 204, 208, 210 (6th Cir. 2018); *Peruta v. County of San Diego*, 824 F.3d 919, 943 (9th Cir. 2016) (en banc) (Graber, J., concurring); *Nat'l Ass'n for Gun Rights v. Lamont*, __ F. Supp. 3d __, 2023 WL 4975979, at \*12 (D. Conn. Aug. 3, 2023); *Hirschfeld v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 417 F. Supp. 3d 747, 754, 759 (W.D. Va. 2019); *Maryland Shall Issue v. Hogan*, 353 F. Supp. 3d 400, 403–05 (D. Md. 2018).[3]

## INTRODUCTION AND SUMMARY

The Supreme Court has held that responsible law-abiding citizens have a right to carry firearms for the purpose of self-defense, but it has emphasized that the right is not unlimited. In its decision in *New York State Rifle & Pistol Association v. Bruen*, the Court explained that courts should undertake a text-and-history analysis when considering constitutional challenges to gun-safety regulations. 597 U.S. 1, 17 (2022). The test begins with a threshold inquiry, identifying the relevant activity and asking whether the plain text of the Second Amendment protects that activity (an inquiry regarding which the

---

[3] Giffords Law Center filed the briefs in *Stimmel* and *Peruta* under its former name, the Law Center to Prevent Gun Violence.

4

plaintiff challenging the regulation bears the burden of proof).  If yes, the analysis then proceeds to an inquiry comparing modern and historical laws.  Recognizing that modern regulations often will not have a corresponding "historical *twin*," the Court endorsed an approach that allows for analogical reasoning, where courts assess whether modern gun regulations maintain the "balance struck by the founding generation" and later generations, including around the time of Reconstruction.  *Id.* at 29–30 & n.7.

Bruen's second step does not require modern regulations to precisely match a historical analogue.  Courts must look to the purposes behind historical regulations—the "why"—and the methods used by those regulations—the "how"—to inform their analysis.  Under this correct analysis, New Mexico's Second Amended Public Health Order (Public Health Order) regarding parks and playgrounds passes constitutional muster.

This case also raises important issues regarding the intersection of the First and Second Amendments.  First Amendment rights, such as the right to free speech and assembly, can justify firearms restrictions in appropriate venues.  Firearms can rightfully be restricted in

designated civic locations, such as public parks in particular, because of the important First Amendment activity that takes place there. The presence of firearms in these public places threatens to have a chilling effect on the exercise of critical First Amendment rights.

Finally, scientific research provides critical evidence that courts should consider when analyzing gun regulations under *Bruen*. And the results of the research are clear: Having more guns in public spaces makes us less safe. This conclusion confirms that restrictions limiting public carry, like New Mexico's Public Health Order here, are driven by a well-founded motivation to keep the public safe, a premise that has deep roots in the historical tradition of gun regulations in this country.

Under these principles, the district court here properly denied Plaintiff's motion for a preliminary injunction with respect to playgrounds, but improperly enjoined the portion of the Public Health Order that restricts carrying firearms in public parks. This Court should therefore affirm in part, and reverse in part, the judgment below.

## ARGUMENT

### I. The Public Health Order Should Not Be Subjected To An Overly Stringent Test Under *Bruen*.

#### A. *Bruen* requires a historical inquiry, not a historical match.

In *Bruen*, the Supreme Court set out a text-and-history test for evaluating the constitutionality of firearm regulations. 597 U.S. at 17. The first question is whether the plain text of the Second Amendment covers an individual's conduct. If it does, then "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.*

*Bruen* requires courts to determine whether modern gun regulations are "relevantly similar" to historical regulations, particularly to those in effect around the time the Second and Fourteenth Amendments were ratified (1791 and 1868, respectively). *Bruen*, 597 U.S. at 27–29. If modern regulations are sufficiently analogous to past ones, they pass constitutional muster.

At the outset, the *Bruen* Court instructed that modern regulations must be "*consistent with* this Nation's historical tradition of firearm regulation." *Id.* at 17 (emphasis added). A modern regulation is "consistent" with this historical tradition if it is "analogous" to—and not

7

necessarily a "twin" of or "dead ringer" for—historical regulations.  *Id.* at 30 (emphasis omitted).  When explaining the analogical method required, the Court identified two relevant metrics: the "how" and the "why" of the regulation's effect on Second Amendment rights.  *Id.* at 29.  If the "how" and "why" are comparable to historical regulations, then the regulation is in keeping with the "balance struck by the founding generation," and is constitutional.  *Id.* at 29 n.7.

Determining whether a gun regulation's "how" and "why" are in keeping with this balance requires courts to identify and apply the relevant concerns that the legislatures considered.  On one side, for example, is the overarching governmental interest in protecting public safety, which is part of what *Bruen* calls the regulation's "why."  *See id.* at 30.  On the other side is the way in which the regulation limits Second Amendment rights to achieve that interest—what *Bruen* calls the regulation's "how."  *Id.* at 29.  Courts applying *Bruen* must evaluate these considerations and determine whether the modern and historical laws are sufficiently analogous.  *Id.* at 28–30.

*Bruen* requires an *analogical* inquiry, not a one-to-one match or other more rigid method of comparison.  Indeed, the decision recognized

the substantial differences between the circumstances faced by 18th-, 19th-, and even early-20th-century legislatures, and those faced by legislatures today.  *Id.* at 27.  Technological and societal changes have drastically altered the harms that elected representatives must address with firearm regulations.  More than 150 or 200 years ago, there was nothing close to the gun violence of modern America.

The greater the "unprecedented societal concerns or dramatic technological changes" addressed by modern governments, the more critical it is to use what the Court called a "more nuanced approach" to the analogical inquiry.  *Id.* at 27.  And the *Bruen* Court acknowledged the validity of a major, historical concern:  protecting public safety in sensitive places.  *Id.* at 30.  This is exactly what New Mexico seeks to do through its Public Health Order—protect public safety by restricting firearms in specifically designated sensitive places—just as past governments have historically and traditionally done.

### B. New Mexico's restrictions on firearms in public parks and playgrounds pass muster under *Bruen*.

**1.**  Historical evidence shows that guns have always been restricted in public parks.  After *Bruen* was decided in 2022, however, many plaintiffs began challenging such restrictions on Second

Amendment grounds, including the Public Health Order.  The records in some of these cases help to shed light on the historical restrictions on firearms in these venues.

For example, in *Wolford v. Lopez*, a case relied on by the district court, Professor Saul Cornell, the Paul and Diane Guenther Chair in American History at Fordham University, submitted an expert declaration explaining in detail the history of firearms restrictions in public parks.  No. 23-cv-00265, Dkt. No. 55-2 (D. Hawaii) (Cornell Decl.).  Professor Cornell first explained that "[t]here were no modern-style parks in the era of the Second Amendment."  Cornell Decl. ¶ 55. During that time, "the nation was still 90% rural, and the majority of the population was engaged in agricultural pursuits," *id.*, so there was not a need for designated public green spaces.  "The creation of parks as we now know them began in the middle of the nineteenth century," when they became "places of refuge from the congestion, grime, and stresses of city life."  *Id.* ¶ 56.  In the post-Civil War period, "[t]he expansion of urban parks, the creation of new state parks, and eventually the involvement of the federal government in land preservation intensified."  *Id.*

10

Crucially, firearms were not allowed in any of these parks, whether city, state, or federal. "From the outset modern parks banned firearms." *Id.* ¶ 57; *see also* Kari Still et al., *The History and Tradition of Regulating Guns in Parks*, 19 Harv. L. & Pol'y Rev. (forthcoming Spring 2024) (manuscript at 19), https://tinyurl.com/yckyst9m ("when parks were created, prohibitions on carrying guns were adopted at the same time").

Indeed, millions of Americans "lived under a firearms regulatory regime that prohibited firearms in parks." Cornell Decl. ¶ 57. And this made perfect sense: Public parks were viewed as "places of relaxation, repose, and recreation," and "there was little disagreement that state and local governments had the authority under the police power to regulate and prohibit guns in parks." *Id.* ¶¶ 56–57. Thus, critically, "limits on arms in public parks were the norm in America in the era of the Fourteenth Amendment." *Id.* ¶ 57.

The public record contains dozens of historical examples of local regulation of guns in parks. *See* Defendants-Appellants' Opening Br. 23–25. As the Second Circuit recently explained, just "eight examples (Chicago, Detroit, New York City, Philadelphia, Pittsburgh, Salt Lake

11

City, St. Paul, St. Louis)" were sufficient to "establish[] a municipal tradition of regulating firearms in urban public parks." *Antonyuk v. Chiumento*, 89 F.4th 271, 359 (2d Cir. 2023), *petition for cert. filed*, No. 23-910 (U.S. Feb. 22, 2024); *see also id.* at 354 n.69 (citing municipal ordinances from these eight cities). These included some of the oldest and most iconic public parks in the country—*e.g.*, Manhattan's Central Park, Brooklyn's Prospect Park, Philadelphia's Fairmount Park, and San Francisco's Golden Gate Park. *See* Declaration of Terence Young, Emeritus Professor of Geography at California Polytechnic State University, Pomona, *May v. Bonta*, Nos. 23-cv-01696, -01798, Dkt. No. 21-13 (Young Decl.) ¶¶ 34–35 (C.D. Cal.). "America's large urban parks embraced firearms prohibitions shortly after they came into existence," beginning with Central Park and soon after "by authorities in the other large parks that rapidly appeared across the United States." Young Decl. ¶¶ 34–35, 37; *see also* Still, *supra*, at nn.157–72 (citing dozens of municipal regulations enacted from the 19th to early 20th centuries restricting guns in public parks).

Although plaintiffs often seek to limit the historical analysis to 1791, laws that post-date the Founding, such as the many municipal

ordinances restricting guns in public parks starting in the 1850s, are at least as relevant.  The Supreme Court has explained that "examination of a variety of legal and other sources to determine *the public understanding* of a legal text in the period after its enactment or ratification" is "a critical tool of constitutional interpretation."  *Bruen*, 597 U.S. at 20 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 605 (2008)) (emphasis in original).  If post-ratification laws are consistent with prior ones, they can show a continuing tradition of regulation.  *See id.* at 27 ("Following the course charted by *Heller*, we will consider whether 'historical precedent' from before, during, and even after the founding evinces a comparable tradition of regulation.").

As the Second Circuit recently explained, the prohibition of firearms in urban parks was a continuation of this country's "tradition of regulating firearms in historical public forums."  *Antonyuk*, 89 F.4th at 359.  "As urban public parks took root as a new type of public forum," cities continued this tradition of restricting firearms "to likewise keep these new public spaces, urban parks, peaceable."  *Id.*  And none of those restrictions were invalidated by any court; nor is there any evidence of constitutional challenges to them.  *See id.*  "In other words,

13

the ordinances were not merely adopted by legislative bodies in the respective cities in which they applied – they were apparently accepted without any constitutional objection by anyone." *Id.* Prohibiting firearms in public parks is therefore part of the "well-established, representative, and longstanding tradition of regulating firearms in places that serve as public forums and, as a result, tend to be crowded." *Id.* at 360.

*Bruen* makes clear that many modern regulations implicating Second Amendment rights will survive scrutiny under its analytical framework. The *Bruen* majority opinion emphasized that the "analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check," and that many common regulations, such as restrictions on guns in sensitive places, can continue under *Bruen*. 597 U.S. at 30. Likewise, the *Bruen* concurrences emphasized the Court's narrow focus. Justice Alito noted that the opinion "decides nothing" about who may possess a gun, what requirements must be met to purchase a gun, or the kinds of guns that people may possess. *Id.* at 72 (Alito, J. concurring). And Justice Kavanaugh, joined by Chief Justice Roberts, summarized that,

14

"[p]roperly interpreted, the Second Amendment allows a 'variety' of gun regulations." *Id.* at 80 (Kavanaugh, J. concurring) (quoting *Heller*, 554 U.S. at 636).

The majority in *Bruen* clearly expected many modern gun laws to survive its analytical test, including many public carry laws on the books around the country. *See id.* at 38 n.9. New Mexico's Public Health Order decisively passes muster given the history of public parks and gun regulation canvassed above.

**2.** Playgrounds—like public parks—did not exist at the time of the Second Amendment and began to appear in the late 1800s. *See, e.g.,* Declaration of Leah Glaser, tenured professor of history and coordinator of the Public History program at Central Connecticut State University, *May v. Bonta*, Nos. 23-cv-01696, -01798, Dkt. No. 21-4 (Glaser Decl.) ¶ 69. Indeed, "[d]esigners of mid-nineteenth century parks like Frederick Law Olmsted did not initially include playgrounds in urban park planning, favoring passive recreation over active." *Id.* ¶ 70.

The concept for using parks less for enlightenment and repose and more for active recreation and "play-centered activities" began in the

late nineteenth century, shortly after ratification of the Fourteenth Amendment. *Id.* ¶¶ 69–70. "Sharon's Quarter"—a playground in San Francisco's Golden Gate Park—for example, was established in 1888. *Id.* ¶ 70; *see also* Arnold Woods, *Birth of the Playground: A Closer Look*, OpenSFHistory, http://tinyurl.com/4y76wuxp (last visited Mar. 5, 2024). Public playgrounds became ubiquitous throughout the nation thereafter, starting in the early twentieth century. Glaser Decl. ¶ 70.

As discussed above, firearms have been restricted in public parks from the very beginning and were the norm in the era of the Fourteenth Amendment. Because playgrounds are commonly features of parks, the historical analogues of park regulations discussed above apply with at least equal force to playgrounds. Thus, for the same reasons New Mexico's regulation of guns in parks survive scrutiny under *Bruen*, the regulation of guns in playgrounds is likewise constitutional.

Restrictions on guns in playgrounds are further supported by analogy to the well-established principle that state and local governments may ban firearms in schools. While playgrounds developed in part as features of parks (in addition to community centers, school grounds, and other locations), they were created for a

16

distinct purpose.  "Progressive reformers formed the Playground Association of America (PAA) in 1906 and it was under their guidance that playgrounds established a moral code of child development with directed child-centered activities."  *Id.* ¶ 71.  Formal public playgrounds began to appear in places like settlement houses, "located near tenements and poor immigrant worker neighborhoods," not only to support immigrant families, but also as "a vehicle for assimilating children in spaces distanced from their parents and neighborhoods."  *Id.* ¶ 73.  These early playgrounds had "separate areas for boys and girls and trained playground workers to organize play and provide instruction on acceptable behavior when needed."  *Id.*  This coincided with the emerging concept of "educating children through play," following in the footsteps of German educational reformer Friedrich Fröbel's kindergartens in the early 1800s (featuring sand gardens to encourage the development of morally, mentally, and physically healthy children) and the opening of the first English-language kindergarten in the United States in the 1860s.  *Id.* ¶ 70.

Playgrounds, thus, were conceived and developed historically in the United States for educational and child-development purposes.

17

They continue to be used for those purposes today.  Indeed, New Mexico's playgrounds and parks are not only intended as safe spaces for children to play, but they are areas where educational activities are programmed and staffed.  *See, e.g.,* Audrey Claire Davis, *Story Time in the Park: "How Will We Get to the Beach?"*, KRQE News (July 24, 2023), http://tinyurl.com/yz87c8tj (discussing recent Albuquerque Public Schools' "Story Time in the Park" program—students and families gathered at a playground at Albuquerque's Four-H Park, North Valley, where they received free lunch and a copy of the featured children's book, which educators read aloud to children "in an effort to inspire summer learning").



*Id.* (Four-H Park playground, Story Time in the Park).

As even the district court in *Antonyuk v. Hochul* recognized, a ban on guns in playgrounds thus "finds support in . . . historical analogues prohibiting firearms in schools given that, by their very nature, both

18

places often contain children." 639 F. Supp. 3d 232, 324 (N.D.N.Y. 2022). Plaintiffs there did not challenge the district court's common-sense refusal to enjoin enforcement of the state's regulation of playgrounds, and that part of the district court's ruling stands, alongside the Second Circuit's reversal of the district court's decision enjoining enforcement of New York's law with respect to parks. *Antonyuk*, 89 F.4th at 354 n.70. The district court's unchallenged holding in *Antonyuk* is consistent with the historical development of public playgrounds, which are closely tied not just to parks but also to schools, as even courts (misguidedly) enjoining gun regulations in parks have recognized. As anybody knows who has ever visited or seen a schoolyard when school is out, school playgrounds are commonly also used as community playgrounds. Thus, because the Supreme Court has instructed that schools are "sensitive places" where firearms may be banned, the playgrounds of those schools are also sensitive places. And if school playgrounds are sensitive places, it follows that playgrounds in general are also sensitive places. *See, e.g.*, *Siegel v. Platkin*, 653 F. Supp. 3d 136, 151–52 (D.N.J. 2023) (finding that playgrounds are a "sensitive place" under *Bruen*).

In *Bruen* and *Heller*, the Supreme Court expressly held that the government's ability to regulate guns in connection with certain sensitive places is well settled, *e.g.*, government buildings, polling places, and schools. *Bruen*, 597 U.S. at 30 (citing *Heller*, 554 U.S. at 626). Playgrounds are analogous to schools not only because (i) they are sensitive places where children congregate, but also because (ii) they exist—historically and today—as safe spaces for the educational development of children. States, thus, can afford the same protections to children in both playgrounds and schools without offending Second Amendment rights.

## II. The Second Amendment Cannot Override First Amendment Rights.

As noted above, the Supreme Court held in *Heller* and reaffirmed in *Bruen* that weapons may be prohibited in "sensitive places," including schools, legislative assemblies, government buildings, polling places, and courthouses. *Bruen*, 597 U.S. at 30. It is now settled law that firearms can be prohibited at those sensitive places consistent with the Second Amendment, and courts can use analogies "to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." *Id.*

20

The Supreme Court did not comprehensively define "sensitive places" in *Bruen*, though it cautioned against construing the term so broadly as to include all places of "public congregation" where law-enforcement and other public-safety professionals are available. *Id.* at 30–31. The entirety of New York City, for example, is not in all respects a "sensitive place" merely because its streetscape is generally a place of public congregation protected by the New York City Police Department. Such a construction, the Court reasoned, "would in effect exempt cities from the Second Amendment and would eviscerate the general right to publicly carry arms for self-defense." *Id.* at 31.

By the same token, the term should not be construed so narrowly as to preclude the government from suitably regulating areas of public congregation *other than* schools, legislative assemblies, government buildings, polling places, and courthouses—particularly where the introduction of weapons at such locations would impinge upon other constitutional protections.

Firearms may be restricted in sensitive places at least in part because many are places of civic engagement, a core American value enshrined in the Constitution and long protected under the First

21

Amendment.  *See, e.g.*, *Bruen*, 597 U.S. at 30; *United States v. Cruikshank*, 92 U.S. 542, 552 (1875) ("a government, republican in form, implies a right on the part of its citizens to meet peaceably for consultation in respect to public affairs").  By recognizing sensitive places where people gather regularly and peacefully, the Supreme Court has confirmed that the Second Amendment is not meant to interfere with the government's ability to preserve our right to engage in civil discourse without being inhibited by the presence of weapons. Fundamentally, the exclusion of guns at "sensitive places" under *Bruen* reaffirms a common law history recognizing the government's authority to protect "a public sphere for democratic dialogue, democratic governance, and the reproduction of *democratic community* in which people can relate freely without intimidation or coercion."  Joseph Blocher & Reva B. Siegel, *Guided by History: Protecting the Public Sphere from Weapons Threats Under Bruen*, 98 N.Y.U. L. Rev. 1795, 1799 (Dec. 2023), https://tinyurl.com/4wdt57kd.  Albuquerque's and Bernalillo County's public parks are well within that public sphere.

Albuquerque's Park Management Division maintains and manages more than 288 park sites, including city parks, playgrounds,

baseball and softball diamonds, outdoor play courts, and dog parks. *See* City of Albuquerque, Parks & Recreation, *Parks*, http://tinyurl.com/2t5k4mux (last visited Mar. 5, 2024). Albuquerque's parks are regularly used for First Amendment activities. These activities include a whole range of protests, rallies, marches, religious and secular celebrations, and concerts. Recent examples include:

| Date | Event | Description | Location |
|------|-------|-------------|----------|
| 7/31/2021 | Protest | Anti-Mask Mandate Protest | Vista Del Norte Park |
| 10/3/2021 | Rally/Protest | Rally regarding missing Native Americans | Tiguex Park |
| 4/9/2022 | Event | Easter Celebration | Tiguex Park |
| 6/19/2022 | Event | Father's Day Event | Tiguex Park |
| 6/24/2022 | Protest | *Roe v. Wade* support | Tiguex Park |
| 4/29/2023 | Event | Albuquerque's Spring into Summer Event | Tiguex Park |
| 6/10/2023 | Parade | Albuquerque's Annual Pride Parade | Balloon Fiesta Park |
| 9/9/2023 | Strike/Rally | SAG-AFTRA member gathering | Tiguex Park |

| 9/14/2023 | March | Albuquerque Climate Strike | Robinson Park |
| 10/9/2023 | Event | Indigenous Peoples' Day Gathering | Tiguex Park |
| 10/23/2023 | Protest | Israel-Palestine Ceasefire Protest | Robinson Park |
| 10/28/2023 | Rally | Pro-Palestine Rally | Tiguex Park |
| 11/18/2023 | Rally | Pro-Palestine Rally | Morningside Park[4] |

---

[4] KRQE News, *Protestors Want Parents and Students Deciding on Whether to Mask or Not* (July 31, 2021), http://tinyurl.com/3xa7sj67; KOAT Action News, *Dozens Rally for Missing and Murdered Indigenous Women at Tiguex Park* (Oct. 3, 2021), http://tinyurl.com/mr49x83y; KOAT Action News*, "I Want Them to Know That They're Not Alone": Albuquerque Group Honors Those Lost to Gun Violence* (Apr. 9, 2022), http://tinyurl.com/37xsykhv; Ivan Leonard, *What's Happening in ABQ June 17-23: Father's Day, Juneteenth, Pride and More*, Albuquerque J., N.M. (June 15, 2022), http://tinyurl.com/5n7pujcd; Jordan Honeycutt & Jessica Garate, *Hundreds Gather at Tiguex Park to Protest Roe v. Wade Decision*, Albuquerque News (June 25, 2022), http://tinyurl.com/y5u283uv; City of Albuquerque, *Spring into Summer Event Returns to Tiguex Park* (Apr. 25, 2023), http://tinyurl.com/3ezzybwc; Griffin Rushton, *Annual Pride Parade Held in Albuquerque*, KOB 4 (June 12, 2023), http://tinyurl.com/4p59s9pt; Feliz Romero, *Local SAG-AFTRA Members Gather Saturday in Albuquerque Park*, KOB 4 (Sept. 10, 2023), http://tinyurl.com/49rcudu7; Emma B. Mincks, *Albuquerque Climate Action Demands More From Industry and Elected Leaders*, Source NM (Sept. 21, 2023), http://tinyurl.com/2jxc8bcp; Jonathan Fjeld, *First Santa Fe Plaza Powwow Among Indigenous Peoples' Day Events in New*

Albuquerque is no outlier in this regard.  Public parks in the
United States are traditional places of assembly and congregation.  As
the Supreme Court and this Court have recognized, parks "have
immemorially been held in trust for the use of the public and, time out
of mind, have been used for the purposes of assembly, communicating
thoughts between citizens, and discussing public questions." *Hawkins v.
City & Cnty. of Denver*, 170 F.3d 1281, 1286 (10th Cir. 1999) (quoting
*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45
(1983)).  As such, as noted above, "[f]rom the outset modern parks
banned firearms," and regulations prohibiting guns in public parks
"were the norm in America in the era of the Fourteenth Amendment."
Cornell Decl. ¶ 57.

Under *Bruen*, prohibiting firearms at events and activities
occurring in courthouses, legislative assemblies, civic buildings, and

*Mexico*, KOB 4 (Oct. 9, 2023), http://tinyurl.com/2zhu95jp; Feliz Romero,
*Albuquerque Activists Will Rally Saturday to Demand Gaza Ceasefire*,
KOB 4 (Oct. 27, 2023), http://tinyurl.com/5erdhh8k; KOAT Action News,
*Rally Held in Albuquerque in Light of the War Between Hamas and
Israel* (Oct. 28, 2023), http://tinyurl.com/4pt5cfc3; Matthew Reisen,
*Protesters Gather in Nob Hill to Call for an End to Israel's Siege of
Gaza*, Albuquerque J. (Nov. 19, 2023), http://tinyurl.com/4j2nwr26.

analogous locations is well within the sphere of what governments can regulate without infringing on Second Amendment guarantees. 597 U.S. at 30. New Mexico's Public Health Order prohibiting firearms at public parks extends that same reasonable, common-sense protection to other key venues for peaceable assembly. There is no principled reason that the government can prohibit firearms at an event on the courthouse steps or in a legislative assembly, but be held powerless to regulate the same type of activity at a public park. Indeed, such regulations, which reflect in part fundamental First Amendment concerns, are amply supported by longstanding history and tradition.

Construing the Second Amendment without the historical limitations acknowledged in *Bruen* poses a direct collision with core First Amendment protections. If more individuals or groups are allowed to carry guns in public places where people typically gather to exercise their rights of assembly and free speech, it will become more dangerous to peaceably assemble, organize, march, rally, and express ideas and beliefs in public settings. *See* Gregory P. Magarian, *Conflicting Reports: When Gun Rights Threaten Free Speech*, 83 Law & Contemp. Probs. 169, 169 (2020) ("In the real world, … guns far more

commonly impede and chill free speech than protect or promote it."). Those who have historically been silenced may experience an especially intense chilling effect. *See generally Armed Assembly: Guns, Demonstrations, and Political Violence in America*, Everytown Research & Policy (Aug. 23, 2021), https://tinyurl.com/4p2838f7; Darrell A. H. Miller et al., *Technology, Tradition, and "The Terror of the People"*, Notre Dame L. Rev. (forthcoming) (manuscript at 20-23), https://tinyurl.com/zr98jytm (results from survey experiment suggest that people would be "less likely to visit public parks if firearm carry is allowed in such domains").

In practice, the abstract promise of First Amendment rights affords little assurance against hostile listeners bearing guns. Recent experience proves the point. *See* David Welch, *Michigan Cancels Legislative Session to Avoid Armed Protestors*, Bloomberg (May 14, 2020), https://tinyurl.com/53e9unpz; Dahlia Lithwick & Mark Joseph Stern, *The Guns Won*, Slate (Aug. 14, 2017), https://tinyurl.com/2zetvdwv ("When the police are literally too afraid of armed protesters to stop a melee, First Amendment values are diminished; discussion is supplanted by disorder and even death ….").

The problem is exacerbated in an increasingly polarized society. *See* Grace Kay, *A Majority of Americans Surveyed Believe the US is in the Midst of a "Cold" Civil War*, Bus. Insider (Jan. 13, 2021), https://tinyurl.com/mrxpavt9; Ezra Klein, *Why We're Polarized* (2020); *see also* Tori Luecking, *DHS Launches Panel on Religious Security as Hateful Incidents Rise*, Wash. Post (Nov. 3, 2022), https://tinyurl.com/2m4rcanv (noting that "FBI hate crime statistics show that incidents in churches, synagogues, temples and mosques increased 34.8 percent between 2014 and 2018"). Substantial experience and scientific research make clear that firearms are an unlikely antidote to the strife and polarization of our age. When carried in public, they too often magnify the risk of violence where, instead, calm, peace, and order are needed.

Cities and states must be able to appropriately regulate firearms in modern First Amendment-protected spaces. The right to carry firearms should not be elevated above First Amendment rights, and communities should not be powerless to address the potential for gun violence, intimidation, and other misuse of firearms in parks and other civic forums. The courts cannot reasonably conclude that the Framers

of the Second and Fourteenth Amendments meant to create a right to bear arms that would overwhelm and defeat the First Amendment rights of free speech, free exercise of religion, peaceable public assembly, and freedom of the press to report on public events. There is no evidence that the Framers would ever have countenanced such an imbalance in our constitutional protections.

### III. New Mexico's Interest In Protecting Public Safety Strongly Weighs Against A Preliminary Injunction.

There is a further point militating against the requested injunctive relief: Common sense and a mountain of data unequivocally demonstrate that the more guns there are in a public space, the more dangerous that space becomes. Put simply, more guns means more violence. *See* John J. Donohue et al., *Why Does Right-to-Carry Cause Violent Crime to Increase?* at 2, Nat'l Bur. of Econ. Rsch., Working Paper No. 30190 (June 2023 rev.), https://tinyurl.com/4zw4z8y9 ("The predominant conclusion of … recent literature is that [right-to-carry] laws increase violent crime.").

Indeed, empirical analysis reveals persistent increases in violent crime rates in states with more permissive licensing regimes. For example, in a 2023 study analyzing data from 65 major U.S. cities,

Stanford Professor John Donohue and his colleagues concluded that, "[i]n cities with an average population of over 250,000 between 1979 and 2019, … the introduction of [right-to-carry laws] increases violent crime by 20 percent," "increases gun theft by 50 percent," and "inhibit[s] the ability of police to solve crimes." *Id.* at 1, 14.

These findings are consistent with a 2017 study published by researchers at Boston University and Duke University. That study analyzed, for the first time, the impact of concealed carry laws on handgun and long-gun homicide rates. *See* Michael Siegel et al., *Easiness of Legal Access to Concealed Firearm Permits and Homicide Rates in the United States*, 107 Am. J. Pub. Health 1923 (Dec. 2017). The study concluded that permissive right-to-carry laws were significantly associated with higher crime rates—in particular, 6.5 percent higher total homicide rates, 8.6 percent higher firearm-related homicide rates, and 10.6 percent higher handgun-specific homicide rates, as compared to states with stricter regulations. *Id.* at 1923; Mitchell L. Doucette et al., *Impact of Changes to Concealed-Carry Weapons Laws on Fatal and Nonfatal Violent Crime, 1980-2019*, 192 Am. J. of Epidemiology 342 (Mar. 2023) (adoption of shall-issue

concealed carry laws was associated with significantly increased rates of aggravated assault with a gun and homicide).

Similarly, even assuming people carrying guns in public parks and playgrounds are generally peaceable and law-abiding, that does nothing to diminish the increased risk associated with introducing more firearms to parks and playgrounds. Indeed, a broad body of behavioral research demonstrates that, even apart from the more concrete risks presented, merely seeing a weapon can increase a person's aggressive thoughts, hostility, and aggressive behavior. *See, e.g.*, Arlin J. Benjamin, Jr. et al., *Effects of Weapons on Aggressive Thoughts, Angry Feelings, Hostile Appraisals, and Aggressive Behavior: A Meta-Analytic Review of the Weapons Effect Literature*, 22 Personality & Soc. Psych. Rev. 347 (2018), https://tinyurl.com/4vm4bzz2.

In short, New Mexico's public officials could reasonably conclude that stronger restrictions on public carry reduce crime and enhance public safety. New Mexico's interest in public safety is thus entitled to substantial weight in the balance of relevant considerations, and strongly militates against injunctive relief. *See also Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) ("[A]ny time a

31

State is enjoined by a court from effectuating statutes enacted by
representatives of its people, it suffers a form of irreparable injury."
(quoting *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S.
1345, 1351 (1977) (Rehnquist, J., in chambers))).

## CONCLUSION

The judgment of the district court should be affirmed in part (as to
playgrounds), and reversed in part (as to parks).

Respectfully submitted,

*/s/ Kelly M. Percival*
Kelly M. Percival
GIFFORDS LAW CENTER TO
  PREVENT GUN VIOLENCE
268 Bush Street #555
San Francisco, CA  94104
(415) 433-2062

*Counsel for Amicus Curiae
  Giffords Law Center to Prevent
  Gun Violence*

*/s/ Thomas M. Bondy*
Thomas M. Bondy
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
2100 Pennsylvania Ave., N.W.
Washington, D.C.  20037
(202) 339-8400

Douglas N. Letter
BRADY CENTER TO PREVENT GUN
  VIOLENCE
840 First Street, NE, Suite 400
Washington, D.C.  20002

Robert H. Owen
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
2121 Main Street
Wheeling, WV  26003

*Counsel for Amicus Curiae Brady
  Center to Prevent Gun Violence*

March 21, 2024

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 27(d)(2)(A) because it contains 5,880 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirement of Fed. R. App. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook 14-point font.

/s/ *Thomas M. Bondy*
Thomas M. Bondy
ORRICK, HERRINGTON &
   SUTCLIFFE LLP