# IN THE UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

## JAMES SPRINGER
**Plaintiff-Appellee/Cross Appellant,**

v.

## MICHELLE LUJAN GRISHAM AND PATRICK ALLEN
**Defendants-Appellants/Cross-Appellees.**

**Appeal from the United States District Court
For the District of New Mexico
No. 1:23-cv-00781-KWR-LF**

### *CORRECTED* APPELLEE'S OPENING AND RESPONSE BRIEF

A. Blair Dunn, Esq.
WESTERN AGRICULTURE,
RESOURCE AND BUSINESS
ADVOCATES, LLP
400 Gold Ave SW, Suite 1000
Albuquerque, NM 87102
(505) 750-3060
abdunn@ablairdunn-esq.com

Zach Cook, Esq.
ZACH COOK, LLC
1202 Sudderth # 425
Ruidoso, NM 88345
(575) 937-7644
zach@zachcook.com

*Attorneys for Plaintiff-Cross Appellee*

May 15, 2024

*Oral Argument Requested*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... iv

STATEMENT OF PRIOR RELATED APPEALS ................................................ 1

JURISDICTIONAL STATEMENT ...................................................................... 1

INTRODUCTION ........................................................................................ 1

STATEMENT OF THE ISSUES.......................................................................... 4

STATEMENT OF THE CASE............................................................................ 4

SUMMARY OF THE ARGUMENT ................................................................. 7

ARGUMENT ............................................................................................ 7

    I.       Standard of Review ...................................................................... 7

    II.     Plaintiff Did Satisfy the Requirement of
          Likelihood of Success and Defendants Cannot
          Satisfy their *Bruen* Burden ....................................................... 7

          A. Second Amendment Framework Underpinning *Bruen*………………8

          B. Analogical Reasoning Requires that the Founding era
             is the Proper Focus of Historical Analysis………..……………….…..13

          C. Applying Founding Era Historical Tradition
             the Appellants Cannot Satisfy Their Burden as Restrictions
             on Carrying Firearms in Parks and
             the District Court was Correct………………………………………...16

          D. Applying the Correct Understanding of Playgrounds
             as an Internal Feature of Park to Apply Founding Era
             Historical Tradition the Appellants Cannot Satisfy Their
             Burden for Restrictions on Carrying Firearms
             in Playgrounds and the District Court was Incorrect………………..18

E. Even Applying Reconstruction Era or Later Historical Traditions Appellants Cannot Satisfy Their Burden for Restricting the Carrying of Firearms in Parks and Playgrounds.....................21

III. The District Court Correctly Determined the Plaintiff Carried His Burden on the Non-Merits Factors...................23

CONCLUSION ................................................................................. 25

ORAL ARGUMENT STATEMENT ................................................... 25

CERTIFICATES ............................................................................... 26

## TABLE OF AUTHORITIES

**Cases**

*Antonyuk v. Chiumento,*
89 F.4th 271 (2d Cir. 2023). .......................................................... 7,21,23

*Antonyuk v. Hochul,*
639 F. Supp. 3d 232 (N.D.N.Y. 2022) ....................................................23

*Antonyuk v. Nigrelli,*
2022 WL 19001454 (N.D.N.Y. 2022). ............................................. 19, 23

*Aposhian v. Barr,*
958 F.3d 969 (10th Cir. 2020). ...............................................................25

*District of Columbia v. Heller,*
554 U.S. 570, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008)..................... 9 - 12, 19, 20

*Fish v. Kobach,*
840 F.3d 710 (10th Cir. 2016) .................................................................7

*Klaassen v. Trustees of Indiana U.,*
549 F. Supp. 3d 836 (N.D. Ind. 2021) ....................................................2

*Koons v. Platkin,*
673 F. Supp. 3d 515 (D.N.J. 2023) .......................................................16

*Lara v. Comm'r Pennsylvania State Police,*
91 F.4th 122 (3d Cir. 2024) ...................................................................19

*Malloy v. Hogan,*
378 U.S. 1 (1964)...................................................................................15

*McDonald v. City of Chicago, Ill.,*
561 U.S. 742 (2010)...................................................................... 10,12,15

*Murthy v. Missouri,*
144 S. Ct. 7, 217 L. Ed. 2d 178 (2023) .................................................24

*New York State Rifle & Pistol Ass'n v. Bruen,*
597 U.S. 1 (2022)...........................*2, 3, 5, 7, 8, 11, 12, 13, 14, 16, 19, 20, 21, 22, 23*

*Ramos v. Louisiana,*
140 S. Ct. 1390 (2020) ...................................15

*RoDa Drilling Co. v. Siegal,*
552 F.3d 1203 (10th Cir. 2009). ...................................25

*Summum v. Pleasant Grove City,*
483 F.3d 1044 (10th Cir. 2007) ...................................23

*Timbs v. Indiana,*
139 S. Ct. 682 (2019) ...................................15

*United States v. Marzzarella,*
614 F.3d 85 (3d Cir. 2010)...................................11

*United States v. Miller,*
307 U.S. 174 (1939)...................................9

*United States v. Perez-Gallan,*
640 F. Supp. 3d 697 (W.D. Tex. 2022). ...................................8

*United States v. Reese,*
627 F.3d 792 (10th Cir. 2010)...................................11

*Vincent v. Garland,*
80 F.4th 1197 (10th Cir. 2023) ...................................8

*Young v. Hawaii,*
992 F.3d 765 (9th Cir. 2021) ...................................11

**Statutes and Rules**

28 U.S.C. § 1292(a)(1)......................................................................1

28 U.S.C. § 1331 ..............................................................................1

NMSA 1978 § 30-7-2.1 .....................................................................3

**Other Authorities**

Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* (1998) .........14

Allan Greer, *Commons and Enclosure in the Colonization of North America*,
2 AM. HIST. REV. 365 (2012) ...........................................................18

*Boston Common*, NAT'L PARK SERV.,
https://bit.ly/3SGumtc (last visited May 15, 2024) ....................................16 - 18

*Bulletin of the American Park and Outdoor Art Association*,
(1901) https://bit.ly/3NPLSae...............................................................18

Cass Sunstein, *On Analogical Reasoning*,
106 Harv. L. Rev. 741 (1993).............................................................13

*Census Bulletin No. 65*, U.S. CENSUS BUREAU (June 8, 1901)
https://bit.ly/3GkuFnm ......................................................................21

David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*,
13 CHARLESTON L. REV. 204 (2018) ..........................................................19 - 21

*Duane Park Origins*, THE HIST. MARKER DATABASE,
https://bit.ly/3S92dt4 (last visited May 1, 2024).................................17

James O. Browning, *'Right to Bear Arms' Born of Natural Law*,
Albuquerque J., Dec. 9, 1991 ...............................................................9

Margaret Walls, *Parks & Recreation in the U.S.: Local Park Systems*,
RESOURCES FOR THE FUTURE (June 2009), https://bit.ly/42gjo0D............16

Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 58 Law & Contemp. Probs. 55 ................................................................. 9

ROY ROSENZWEIG & ELIZABETH BLACKMAR, THE PARK AND THE PEOPLE: A HISTORY OF CENTRAL PARK (1992) ....................................... 18

*The Earliest New York City Parks*,
N.Y. CITY DEP'T OF PARKS & RECREATION,
https://on.nyc.gov/3hBZXfe (last visited May 15, 2024) ........................................ 17

Trust for Public Land, *The 150 Largest City Parks*,
https://bit.ly/47VJw1Q (Dec. 2010) ....................................................................... 16

William Baude & Robert Leider, *The General Right to Bear Arms*,
99 Notre Dame L. Rev (forthcoming 2024) ........................................................... 8

## STATEMENT OF PRIOR RELATED APPEALS

Plaintiff-Appellee respectfully submits that this case is related to the consolidated appeals in *We the Patriots v. Lujan Grisham* (No. 23-2166), *Fort v. Lujan Grisham* (No. 23-2167), and *Donk v. Lujan Grisham* (No. 23-2185). Those consolidated appeals present a Second Amendment challenge to the same restriction on carrying firearms in public parks and playgrounds in Albuquerque and Bernalillo County at issue in this case and Plaintiff's cross-appeal.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction to review the district court's partial grant and denial of a preliminary injunction under 28 U.S.C. § 1292(a)(1). Plaintiff alleges the district court had jurisdiction under 28 U.S.C. § 1331.

## INTRODUCTION

As has become far too common with Governor Michelle Lujan Grisham, any sort of a crisis or substantial problem appears to become inflated for the purpose of political theatre to an emergency of public health that requires the surrender of fundamental liberty, that only in a grossly speculative instance might do something to positively affect the issue *du jour*. Thus, as it has been aptly been offered during the Covid pandemic, if the government can justify stripping away rights in the name of a crisis, then the government will make everything a crisis. That is still the issue in this case where:

A public health crisis of this magnitude begs the question: how should the law respond to state action that infringes on the People's liberties during such times?

To be sure, the Constitution isn't put on the shelf. Indeed, in times of crisis, perhaps constitutional adherence proves the very anchor we all need against irrational and overweening government intrusion that would otherwise scuttle the ship. As the arbiters of the Constitution's checks and balances, *see Marbury v. Madison*, 5 U.S. 137, 176-78, 1 Cranch 137, 2 L.Ed. 60 (1803); *accord Morrison*, 529 U.S. at 616, 120 S.Ct. 1740, the courts play an important role in ensuring that the government doesn't simply declare a never-ending public emergency and expand its powers *ad libitum* to the People's detriment.

*Klaassen v. Trustees of Indiana U.*, 549 F. Supp. 3d 836, 861 (N.D. Ind. 2021), *vacated and remanded*, 24 F.4th 638 (7th Cir. 2022). Though that decision was ultimately vacated that is precisely still the question at issue here. However, in this case, the district court has, instead of being caught up the theatre about protecting children from gun violence by disarming their law-abiding parents, largely correctly followed the law and respected Constitutionally protected freedom.

More importantly, the Governor's position here, marked by political theatre that in no way reflects the type of narrowly tailored regulation that will plausibly positively affect reality, does not find the necessary support required in *Bruen*. In reality, what the Governor's position reflects is that she wants to make children more vulnerable to violence by taking away their law-abiding parents' rights to defend those children when they visit public parks and playgrounds in one the most dangerous cities and counties in New Mexico. The summation of Appellants'

Opening Brief reduces to the premise if parents are unwilling to surrender their Second Amendment rights to defend their children at these public parks and playgrounds(which find only minor support in the *Nation's* history and tradition even during *New York State Rifle & Pistol Ass'n v. Bruen,* 597 U.S. 1, 30 (2022) potentially applicable time period surrounding Reconstruction[1]) to support the Governor's political agenda, then their children should *just stay home*.

Importantly, Mr. Springer brought this cross appeal to address a factual misunderstanding by the District Court with regard to regulating firearms on playgrounds. To be sure, there are playgrounds located on school premises, but the carrying of firearms at those playgrounds is already regulated by NMSA 1978 § 30-7-2.1 and are, therefore, not playgrounds regulated by the Appellants' Orders at issue here. Instead, what the Public Health Orders purport to regulate are playgrounds that are in almost every instance an internal feature of Albuquerque's and Bernalillo County's parks. In fact, Mr. Springer's affidavit was misapprehended, in this regard, by the District Court, because the parks that Mr. Springer frequents and intends to continue to visit, as explained in his affidavit, contain playgrounds that he can easily stand outside of while remaining in the park carrying his firearm (pursuant to the

---

[1] Mr. Springer does in no way concede that that Governor's assertion for history and tradition from the late 19th and early 20th century supplanting well established Supreme Court precedent that the proper analogues for enumerated rights are from the Founding Era.

District Court's appropriately issue preliminary injunction), so that he may observe both his younger child playing on the playground equipment, while his older children participate in athletics in the larger area of the surrounding park. Thus, the District Court incorrectly determined, as a distinction, that the historical analogues to playgrounds were schools when the correct analogue to playgrounds were parks, where the playground equipment existed internally, which the District Court correctly did not analogize to school, fairs or markets.

The net result, at this juncture for this matter before this Court, is that the district court has correctly preliminarily enjoined the Public Health Orders that make children more vulnerable and less safe, by infringing upon the children's parents' right to self-defense protected by the Second Amendment.

## STATEMENTS OF THE ISSUES

Whether the district court properly preliminarily enjoined the Defendants from restricting the lawful carrying of firearms in Albuquerque and Bernalillo County public parks and denied enjoining the carrying of firearms in playgrounds in Albuquerque and Bernalillo County.

## STATEMENT OF THE CASE

James Springer, the plaintiff in this case, filed his Complaint in this matter in the United States District Court for the District of New Mexico on September 12, 2023, with an emergency request for a temporary restraining order, and a

request for preliminary injunction and permanent injunctive relief. (Aplt App 007-028). He initially sought an ex parte temporary restraining order against Secretary Allen's September 8, 2023, public health order, which prohibited carrying firearms in densely populated cities and counties with specified rates of gun violence. *See id*. at 25-27 (Sept. 8, 2023, public health order); *id*. at 20-23 (request for TRO). Judge Riggs denied that motion as moot because the September 8, 2023, public health order was superseded by subsequent public health orders. *Id*. at 35-40. Plaintiff then sought a preliminary injunction against the operative Order on First Amendment, Second Amendment, and substantive due process grounds. *Id*. at 41-50.

Ruling on the Plaintiff's Motion, Judge Riggs concluded that Plaintiff was likely to succeed on his Second Amendment challenge to the Parks Restriction and correctly determining that Defendants had failed to satisfy the historical tradition burden under a faithful application of *Bruen* of firearm regulation in public parks and their analogues. *Id.* at 8-15. The District Court correctly concluded that rather than founding era historical tradition, Defendants had relied on numerous laws from the mid-to-late 19th and early 20th centuries prohibiting firearms in parks and public-gathering places, but had provided "*no evidence illuminating the scope of the Second Amendment*" from the time of its ratification in 1791 and "insufficient evidence" illuminating the understanding

around the time of the Fourteenth Amendment's adoption. *Id.* at 15. Judge Riggs, then correctly determined that the likely constitutional violation she had found constituted irreparable injury to Plaintiff that exceeded any harm to Defendants' interests and was in the public interest, faithfully applying this Circuit's requirements for a preliminary injunction in this situation. *Id.* at 17-19.

Judge Riggs, however, rejected Plaintiff's Second Amendment challenge to the Playgrounds Restriction on standing grounds misapprehending the facts surrounding the existence of the playgrounds at issue being an internal feature of the parks frequented by Plaintiff, she also incorrectly concluded that the claim would fail on the merits because, as Judge Urias and "the majority of district courts to consider th[e] issue" have held, the restriction was likely constitutional given the analogy between playgrounds and schools. *Id.* at 16. Judge Riggs also addressed the Plaintiff's First Amendment and substantive due process claims because, even if Plaintiff had standing to bring them, his briefing "lack[ed] sufficient citation to case law or analysis" to put the issues before the court, i*d.* at 17, but Plaintiff does not challenge that determination here as it is better suited to additional factual determination and amendment to pleadings before the district court.

Defendants appealed Judge Riggs's grant of a preliminary injunction against the Parks Restriction, App. 105, and Plaintiff appealed the order to the

extent it denied his standing and denied the full extent of injunctive relief requested, *id*. at 126.

## SUMMARY OF THE ARGUMENT

The district court correctly and faithfully applied *Bruen* to determine that Plaintiff was likely to succeed on the merits as to his claim regarding Park Restrictions and incorrectly analogized Playground restrictions to schools. The district court correctly determined that, the Second Circuit's decision in *Antonyuk v. Chiumento*, 89 F.4th 271, 359 (2d Cir. 2023), *petition for cert. filed*, No. 23-910 (U.S. Feb. 20, 2024) was unpersuasive, as the correct historical period to consider the period surrounding the adoption of the Second Amendment, not Reconstruction or later. The district court also correctly determined that Plaintiff established the remaining requirements for a preliminary injunction consistent with this Court's precedent.

## ARGUMENT

### IV. Standard of Review

This Court reviews the district court's grant of a preliminary injunction for abuse of discretion and must reverse if that grant is premised on an erroneous conclusion of law or lacks a rational basis in the record. *Fish v. Kobach*, 840 F.3d 710, 723 (10th Cir. 2016). This Court reviews the district court's factual findings for clear error and its legal conclusions de novo. *Id*..

## V.     Plaintiff Did Satisfy the Requirement of Likelihood of Success and Defendants Cannot Satisfy their *Bruen* Burden

Applying the correct historical period it is clear that Defendants cannot satisfy their burden to show a historical tradition of regulating the carrying of firearms at either parks or playgrounds. Moreover, even applying the Reconstruction era and the post-Reconstruction era analysis that Appellants seek cannot satisfy that burden because it contradicts the historical tradition at the time of adoption of the Second Amendment and for the many decades that followed.

### A. Second Amendment Framework Underpinning *Bruen*

The Second Amendment reads: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. Although the Second Amendment is a now a well-known constitutional guarantee -- and the subject of contentious legal and political debate -- for most of its history, it was a relatively seldom-interpreted provision. *See, e.g., United States v. Perez-Gallan*, 640 F. Supp. 3d 697, 698 (W.D. Tex. 2022)(Counts, J.)("Before Bruen, the Second Amendment looked like an abandoned cabin in the woods."); *Vincent v. Garland*, 80 F.4th 1197, 1199 (10th Cir. 2023)("For over two centuries, the nature of this right was uncertain."). In the Reconstruction period, there was little judicial interpretation of the Second Amendment, as it was not thought that the Fourteenth Amendment incorporated the Second Amendment to apply to the States; and, until 1934, there was no significant

federal gun control legislation. *See* William Baude & Robert Leider, *The General Right to Bear Arms*, 99 Notre Dame L. Rev (forthcoming 2024)(manuscript at 7-8); Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 58 Law & Contemp. Probs. 55, 58 (discussing the Nation Firearms Act of 1934, Pub. L. No. 73-474, 48 Stat. 1236 (1934) ("National Firearms Act")); James O. Browning, *'Right to Bear Arms' Born of Natural Law*, Albuquerque J., Dec. 9, 1991, at A1.

Then, after that period of dormancy, in *United States v. Miller*, 307 U.S. 174 (1939)("Miller") the Supreme Court held, "[i]n the absence of any evidence tending to show that possession or use of a 'shotgun having a barrel of less than eighteen inches in length' at this time has some reasonable relationship to the preservation or efficiency of a well regulated militia, we cannot say that the Second Amendment guarantees the right to keep and bear such an instrument." *Id.* at 178. However, following *Miller*, "the Second Amendment underwent a period of dormancy" until 2008, when the Supreme Court "overturned that dormancy in *District of Columbia v. Heller*." Baude & Leider, *The General Right to Bear Arms* at 14, supra. In *Heller*, 554 U.S. 570, the Supreme Court - for the first time - held that a law regulating firearms was unconstitutional under the Second Amendment, and clarified that the provision does not protect solely the right to have firearms for militia service, because "the conception of the militia at the time of the Second Amendment's

ratification was the body of all citizens capable of military service, who would bring the sorts of lawful weapons that they possessed at home to militia duty." *Heller*, 554 U.S. at 627. *See id*. at 580-81 ("Reading the Second Amendment as protecting only the right to 'keep and bear Arms' in an organized militia therefore fits poorly with the operative clause's description of the holder of that right as 'the people.'" (quoting U.S. Const. amend. II)). In an opinion that the Honorable Antonin Scalia, Associate Justice of the Supreme Court, authored, the Supreme Court subjected the Second Amendment to a close textual analysis - involving individual interpretation of the operative and prefatory clauses, *see* 554 U.S. at 576-600 - and ultimately concluded that the District of Columbia's ordinance prohibiting, among other things, the possession of handguns in the home, is unconstitutional, *see* 554 U.S. at 635. The Supreme Court concluded the *Heller* opinion by stating:

> We are aware of the problem of handgun violence in this country, and we take seriously the concerns raised by the many amici who believe that prohibition of handgun ownership is a solution. The Constitution leaves the District of Columbia a variety of tools for combating that problem, including some measures regulating handguns, see supra, [128 S.Ct. 2783,] 2816-2817, and n. 26. But the enshrinement of constitutional rights necessarily takes certain policy choices off the table. These include the absolute prohibition of handguns held and used for self-defense in the home. Undoubtedly some think that the Second Amendment is outmoded in a society where our standing army is the pride of our Nation, where well-trained police forces provide personal security, and where gun violence is a serious problem. That is perhaps debatable, but what is not debatable is that it is not the role of this Court to pronounce the Second Amendment extinct.

554 U.S. at 636. *See McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 750

(2010)("[W]e hold that the Second Amendment right is fully applicable to the States."). In *Heller's* wake, lower courts struggled with how to apply Constitutional scrutiny in alleged violations of the Second Amendment's Constitutional guarantee. *See, e.g., United States v. Reese*, 627 F.3d 792, 801 (10th Cir. 2010)("The Supreme Court did not specify in Heller precisely what level of scrutiny a reviewing court must apply to a challenged law."). Some Courts of Appeals, like the United States Court of Appeals for the Third Circuit, concluded that, akin to the First Amendment to the Constitution of the United States, "the Second Amendment can trigger more than one particular standard of scrutiny" depending on the nature of the challenged government regulation. *United States v. Marzzarella*, 614 F.3d 85, 97 (3d Cir. 2010). Following from this notion, many Courts of Appeals eventually coalesced around a "two step approach," in which a reviewing court first inquires whether (i) "the challenged law affects conduct that is protected by the Second Amendment," and if so, (ii) the court determines the appropriate level of constitutional scrutiny:

> If a regulation "amounts to a destruction of the Second Amendment right," it is unconstitutional under any level of scrutiny; a law that "implicates the core of the Second Amendment right and severely burdens that right" receives strict scrutiny; and in other cases in which Second Amendment rights are affected in some lesser way, we apply intermediate scrutiny.

*Young v. Hawaii*, 992 F.3d 765, 784 (9th Cir. 2021)(quoting *Silvester v. Harris*, 843 F.3d 816, 821 (9th Cir. 2016), *cert. granted, judgment vacated*, 142 S. Ct. 2895 (2022), and *abrogated by Bruen*, 597 U.S. 1).

In *Bruen*, the Supreme Court clarifies the approach to be taken when assessing a Constitutional challenge to firearm regulations under the Second Amendment, and expressly rejects the two-step approach and any balancing of the government's interest in Second Amendment Constitutional analysis. *See Bruen*, 597 U.S. at 17-24. As the Honorable Clarence Thomas, Associate Justice of the Supreme Court, writes for the majority:

> Despite the popularity of this two-step approach, it is one step too many. Step one of the predominant framework is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history. But *Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context. Instead, the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms.

*Bruen*, 597 U.S. at 19. As Justice Thomas explains, interest balancing is inapplicable in the Second Amendment context, because "[t]he Second Amendment 'is the very product of an interest balancing by the people' and it 'surely elevates above all other interests the right of law-abiding, responsible citizens to use arms' for self-defense." 597 U.S. at 26 (quoting *Heller*, 554 U.S. at 635)(emphasis in *Bruen* and *Heller*). In place of the pre-*Bruen* two-step approach, the Supreme Court in Bruen clarifies the correct approach - another two-step inquiry:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls

outside the Second Amendment's "unqualified command."

*Bruen*, 597 U.S. at 24 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961))

### B. Analogical Reasoning Requires that the Founding era is the Proper Focus of Historical Analysis

Importantly, as was correctly accomplished by the district court in this case, to apply faithfully Bruen's standard, courts, after determining that a right to carry a firearm comes within the Second Amendment's protections, necessarily must look to "the Nation's historical tradition of firearm regulation" and assess whether a challenged regulation is "consistent" with that tradition. *Bruen*, 597 U.S. at 24. In *Bruen*, the Supreme Court instructs that this task often involves "reasoning by analogy," which the Supreme Court notes is "a commonplace task for any lawyer or judge." 597 U.S. at 28. This instruction flows from a general recognition that "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." 597 U.S. at 27.

Moreover, the Supreme Court observes that analogical reasoning must be employed to determine whether a modern regulation is "consistent" with a historical analogue, and, "[l]ike all analogical reasoning, determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are 'relevantly similar.'" 597 U.S. at

28-29 (quoting Cass Sunstein, *On Analogical Reasoning*, 106 Harv. L. Rev. 741, 773 (1993)). As the Supreme Court concludes, "analogical reasoning requires only that the government identify a well-established and representative historical analogue, not a historical twin." *Bruen*, 597 U.S. at 30 (emphasis in *Bruen*).

The Honorable Amy Coney Barrett, Associate Justice of the Supreme Court, notes in her concurring opinion in *Bruen* that the majority opinion "avoids" answering the question whether, when undertaking this historical analysis, courts should "'primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868' or when the Bill of Rights was ratified in 1791." 597 U.S. at 82 (Barrett, J., concurring)(quoting *Bruen*, 597 U.S. at 37). On this question, this Court should conclude that 1791 -- or the Founding Era -- is the relevant historical time-period on which to base this Constitutional analysis. Appellee acknowledges that there is some intuitive appeal to the idea that State-level firearm restrictions should be analyzed according to the Constitutional understandings of 1868 as argued by the Appellants -- i.e., when the Fourteenth Amendment's Due Process Clause (or its Privileges and Immunities Clause) made possible the selective application of the Bill of Rights to the States. *See, e.g.*, Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* at 223 (1998)(arguing that "the very same words 'the right . . . to keep and bear arms' take on a different coloration and nuance when they are relabeled 'privileges or immunities of citizens'

rather than 'the right of the people,' and when they are severed from their association with a well-regulated militia," and, accordingly, "the core applications and central meanings of the right to keep and bear arms and other key rights were very different in 1866 than in 1789"); *Timbs v. Indiana*, 139 S. Ct. 682, 687 (2019)("With only 'a handful' of exceptions, this Court has held that the Fourteenth Amendment's Due Process Clause incorporates the protections contained in the Bill of Rights, rendering them applicable to the States." (quoting *McDonald*, 561 U.S. at 765)).

While this temporal-historical question is interesting from a theoretical perspective, on a basic level, there is -- textually -- only one Second Amendment, and, as the Supreme Court has noted, the Bill of Rights provisions are "to be enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment." *Malloy v. Hogan*, 378 U.S. 1, 10 (1964). *See Ramos v. Louisiana*, 140 S. Ct. 1390, 1397 (2020)("This Court has long explained, too, that incorporated provisions of the Bill of Rights bear the same content when asserted against States as they do when asserted against the federal government."). It is this Circuit's duty to apply faithfully precedent from the Supreme Court, and the statements in *Malloy v. Hogan*, 378 U.S. at 10, and *Ramos v. Louisiana*, 140 S. Ct. at 1397, to instruct that federal Constitutional rights are imposed identically on the States as they are on the United States. Any other approach is not incorporating the Bill of Rights, but rather something else -- namely,

incorporating caselaw and legal understandings as they existed during Reconstruction. In any case, a patchwork approach to incorporation is no way to run a railroad. Finally, the Constitution's "meaning is fixed according to the understandings of those who ratified it." *Bruen*, 597 U.S. at 3. Accordingly, to determine the meaning of the Second Amendment, the Court looks to the understanding of those who ratified it: the First United States Congress, who approved the Second Amendment in 1789, before its eventual ratification in December of 1791.

### C. Applying Founding Era Historical Tradition the Appellants Cannot Satisfy Their Burden as Restrictions on Carrying Firearms in Parks and the District Court was Correct

The Appellants assert that parks first appeared in the second half of the 19th century. Br. at 34. However, this is incorrect, many parks existed before 1800. *See, e.g.*, Trust for Public Land, *The 150 Largest City Parks*, https://bit.ly/47VJw1Q (Dec. 2010) ("*Largest City Parks*"); Margaret Walls, *Parks & Recreation in the U.S.: Local Park Systems*, RESOURCES FOR THE FUTURE (June 2009), https://bit.ly/42gjo0D ("Walls"). And several dozen more parks were created in the years preceding the Fourteenth Amendment's ratification. *See Largest City Parks.* For example, Boston Common, established in 1634, is considered "the nation's first city park." Walls at 1; *accord Koons v. Platkin*, 673 F. Supp. 3d 515, 640 (D.N.J. 2023). It was far from a gun-free zone. Indeed, the space was commonly used for

militia purposes, including training with firearms. *See* Anne Beamish, *Before Parks: Public Landscapes in Seventeenth- and Eighteenth-Century Boston, New York, and Philadelphia*, 40 LANDSCAPE J. 1, 3–6 (2021). And "[t]he Common also served as a site for informal socializing and recreation" including "[s]trolling," "[h]orse- and carriage-riding," "sports," "entertainment," and "raucous celebrations." *Id.*; *see also Boston Common*, NAT'L PARK SERV., https://bit.ly/3SGumtc (last visited May 1, 2024) ("[T]he Common was a place for recreation as early as the 1660s."). In New York, City Hall Park began as a "public common" in the 17th century. *The Earliest New York City Parks*, N.Y. CITY DEP'T OF PARKS & RECREATION, https://on.nyc.gov/3hBZXfe (last visited May 15, 2024). And New York's Bowling Green Park was established in 1733. *Id.* Nearby Duane Park was also the first open space purchased "specifically for use as a public park" in 1797. *Duane Park Origins*, THE HIST. MARKER DATABASE, https://bit.ly/3S92dt4 (last visited May 15, 2024).. Other examples abound throughout the colonies and early Republic. *See, e.g.*, *Largest City Parks* at 5–6.

Critically, the Appellants do not present historical analogues from the Founding era banning carry in such parks, and, instead, attempts to recast all early parks as grazing areas, but that limited purpose is simply not supported by the sources describing such parks. Boston Common, for example, "was a place for recreation as early as the 1660s." *Boston Common*, NAT'L PARK SERV.,

https://bit.ly/3SGumtc (last visited May 15, 2024) ("[A]ctivities held on the Common stretched beyond relaxation and recreation to include public assembly . . . rallies . . . [and] protest[s.]"). Importantly, the primary source Appellants cites for the proposition that Boston Common was a grazing area explains that early commons were also used for public assemblies, festivals, and protests. *See* ROY ROSENZWEIG & ELIZABETH BLACKMAR, THE PARK AND THE PEOPLE: A HISTORY OF CENTRAL PARK 4 (1992). In other words, these commons served many purposes beyond merely providing grazing spaces.

Additionally, the Boston Common "was the rallying ground for all public meetings, parades, picnics, celebrations and sports for children, even before the Revolution." *Bulletin of the American Park and Outdoor Art Association* 3 (1901), https://bit.ly/3NPLSae. Finally, the Greer article discusses early agricultural development on "common pastures," Allan Greer, *Commons and Enclosure in the Colonization of North America*, 2 AM. HIST. REV. 365, 373 (2012), and does not support the Governor's claim that early commons and greens differed from modern-day parks, Br. at 36. It is indisputable that whether labeled green spaces or parks they were both places where the public recreated similar to the parks at issue here and are proper analogue where no historical tradition of regulation of the carrying of firearms therein can be found.

**D. Applying the Correct Understanding of Playgrounds as an Internal Feature of Park to Apply Founding Era Historical Tradition the**

**Appellants Cannot Satisfy Their Burden for Restrictions on Carrying Firearms in Playgrounds and the District Court was Incorrect**

The district court and the Appellants relied upon playgrounds' alleged similarity to schools to support the carry restriction. *Bruen* did not in any way endorse schools as sensitive places, as the Appellants argue. *Bruen* noted *Heller*'s statements on this point, but went on to say that "the historical record yields relatively few 18th- and 19th-century 'sensitive places'" and mentioned only legislative assembles, polling places, and courthouses as the starting point for analogical reasoning. 597 U.S. at 30. Far from endorsing schools as sensitive places, *Bruen* approvingly referenced carry by black Americans at Freedmen's schools before the Fourteenth Amendment's ratification. *See id*. at 61.

*Bruen* was correct to decline to suggest that schools are sensitive places. For the historical record reveals that some early schools banned *students* (not faculty or visitors) from possessing firearms. *See, e.g.*, Kopel & Greenlee, *supra*, at 247–49 (describing the University of Virginia's ban on students carrying firearms as response to the students' "spoiled and violent behavior"); Amicus Br. of the Ctr. for Hum. Liberty at 20–22, *Antonyuk v. Nigrelli*, No. 22-2908, Doc. 313 (2d. Cir. Feb. 9, 2023) (summarizing various Colonial and Founding era bans on student possession on campus). These bans were rooted not in students' vulnerability, but rather in the schools' ability to exercise *in loco parentis* authority over them. *See, e.g.*, *Worth*, 666 F. Supp. 3d at 921–22 (noting this historical fact); *Lara*, 91 F.4th at

144–45 (Restrepo, J., dissenting) (recognizing that Founding-era restrictions by schools on student firearm possession "w[ere] not predicated on or justified by the student's presence at a sensitive location," but rather on the schools' "authority standing *in loco parentis*.").

The problem for Defendants is that historical exercises of *in loco parentis* authority do not support restricting firearm carry by anyone not subject to that sort of authority. Thus, analogies from schools to places where other allegedly vulnerable people gather lack any historical grounding. Even assuming firearm restrictions on campuses could be probative, they are not relevantly similar to broader bans on carry by those not under *in loco parentis* authority. "How" they restricted the right is more limited because they disarmed only students, and "why" they did so was as an exercise of parent-like authority. *See, e.g.*, Kopel & Greenlee, *supra*, at 247–48.

Thus, the proper analysis for schools under *Bruen* is not an automatic *Heller assumption* that schools were sensitive places during the Founding era, instead, despite the fact that schools have playgrounds where children (vulnerable persons) play making playgrounds located internal to parks where children play analogous, the district court should have considered whether in Founding era parks where children internally played (recreated) there was a historical analogue of restricting carrying in those internal areas where vulnerable children recreate. Plainly there is not, and the district court erred in that determination going outside of *Bruen's*

prescription.

### E. Even Applying Reconstruction Era or Later Historical Traditions Appellants Cannot Satisfy Their Burder for Restricting the Carrying of Firearms in Parks and Playgrounds

Even if this Court were to follow the Second Circuit's holding, to interpret *Bruen* allowing for a consideration of Reconstruction era restrictions on carrying parks and playgrounds, the Appellants argument remains unpersuasive given that "the appropriate figure in this instance is not the percentage of the nation's *total* population that was affected by city park firearms restrictions, but rather the percentage of the *urban* population that was governed by city park restrictions." *Antonyuk v. Chiumento*, 89 F.4th 271, 360 (2d Cir. 2023)(emphasis in original). That statement from the Second Circuit finds no support in *Bruen* and is not supported by the facts themselves given that even assuming that restrictions from cities stretching into the 1900s could be probative (they are not), there were more than 10,000 incorporated cities, towns, villages, and boroughs by 1900, *see Census Bulletin No. 65*, U.S. CENSUS BUREAU (June 8, 1901), https://bit.ly/3GkuFnm, so even 100 local laws would have governed less than 1% of cities at the time. *cf. Bruen*, 597 U.S. at 67–68 (refusing to credit territorial laws "enacted nearly a century after the Second Amendment's adoption [and] governed less than 1% of the American population").

Especially, when what does find support in *Bruen* is the Supreme Court's citation to D. Kopel & J. Greenlee, The "Sensitive Places" Doctrine, 13 Charleston L. Rev. 205, 229–236, 244–247 (2018), which does not support the Second Circuit's expansion of parks as an analogue to fairs and markets. Thus, the critical question that the district court has correctly addressed, at least as far as parks are concerned, that the Second Circuit gets wrong, is whether the regulation is consistent with the *Nation's* (presumably the Supreme Court is not indicating some small percentage of the Nation in this test) history and tradition. And in this regard the Second Circuit's decision which is based upon the premise of crowds of people gathering at fairs and markets flies in the face of the statement from the Supreme Court that "[p]ut simply, there is no historical basis for New York to effectively declare the island of Manhattan a "sensitive place" simply because it is crowded and protected generally by the New York City Police Department. *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 31, 142 S. Ct. 2111, 2134, 213 L. Ed. 2d 387 (2022). Rather, the district court in that case performed the Supreme Court's *Bruen* analysis that this Court should follow to be consistent which is a survey of the Nation's (considered as a whole) history and tradition to find that:

> In any event, even if the number and geographical origins of these city laws *326 (when combined with the two state laws previously mentioned) were sufficient to constitute a tradition that was *established*, they do not constitute a tradition that was *representative* of the Nation. As explained earlier in this Decision, as of 1890, the five cities in question (New York City law, Philadelphia law, Chicago law, St. Louis

law, and St. Paul law) comprised about 6.8 percent of the American population. *See* Dept. of Interior, Compendium of Eleventh Census: 1890 (1890). As of 1870, the two states in question (Texas and Missouri) contained only about 6.6 percent of the American population. *See* Dept. of Interior, Compendium of Ninth Census: 1870 (1870). The Court need not go back and recalculate the numbers so that they both come from the same census: it is confident that, under reasoning conduct in *NYSRPA*, the resulting percentage of less than 15 would not suffice to be representative of the Nation.

*Antonyuk v. Hochul*, 639 F. Supp. 3d 232, 325–26 (N.D.N.Y. 2022), *reconsideration denied sub nom. Antonyuk v. Nigrelli*, 2022 WL 19001454 (N.D.N.Y. Dec. 13, 2022), and *aff'd in part, vacated in part, remanded sub nom. Antonyuk v. Chiumento*, 89 F.4th 271 (2d Cir. Dec. 8, 2023). Here, the district court's analysis and logic even considering to some extent the Reconstruction era historical traditions, yield the proper result that the Appellee has met the burden of likelihood of success; and the Appellants could not satisfy their burden in a manner more consistent with *Bruen* than the Second Circuit's inconsistent decision in *Antonyuk*.

## VI. The District Court Correctly Determined the Plaintiff Carried His Burden on the Non-Merits Factors

Importantly, contrary to the assertion of the Appellants, it absolutely *can be* disputed that New Mexico will suffer irreparable injury if it is enjoined from engaging what the district court has correctly determined is likely unconstitutional action. This is because this Circuit has been clear on this point regarding the government's assessment of speculative harm to the public stating "the [government's] potential harm must be weighed against [plaintiffs'] actual

[constitutional] injury." *Summum v. Pleasant Grove City*, 483 F.3d 1044, 1056 (10th Cir. 2007) *rvs'd other grounds by* 555 U.S. 460 (2009). And the recent Dissent of Justice Alito, joined by Justices Thomas and Gorsuch, is persuasive in this regard stating:

> the Government offers a series of hypothetical statements that a covered official *might* want to make in the future and that, it thinks, *might* be chilled. Application 36–38.But hypotheticals are just that—speculation that the Government "*may* suffer irreparable harm at some point in the future," not concrete proof. *White*, 458 U.S. at 1302, 103 S.Ct. 1 (emphasis added). And such speculation does not establish irreparable harm. *Nken*, 556 U.S. at 434, 129 S.Ct. 1749; see also *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414, n. 5, 133 S.Ct. 1138, 185 L.Ed.2d 264 (2013)

*Murthy v. Missouri*, 144 S. Ct. 7, 9, 217 L. Ed. 2d 178 (2023). Here, Appellants offer that the irreparable harm of gun violence will occur if they continue to be enjoined from enforcing the Public Health Orders at parks or are also enjoined from enforcing the Orders at playgrounds, that is speculation just as rank as the speculation that enforcing a ban on law-abiding parents carrying firearms to defend their children will make the children less vulnerable to gun violence.

As previously established before the district court, Appellee intends to visit the parks at issue in the future and is prevented from doing so armed by the Orders. His loss of his constitutionally protected freedom is therefore real and present constituting irreparable harm. That is not a real question pending before the district court because the district court has already correctly applied Tenth Circuit precedent

to find "[t]he Tenth Circuit has ruled that violations of individual rights guaranteed under the Constitution constitute irreparable harm. *Aposhian v. Barr*, 958 F.3d 969, 990 (10th Cir. 2020) (collecting cases)." (Aplt App 101)

Moreover, as to public interest the District Court has correctly applied this Circuit's holding in *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009) that "[a]s to the fourth and final factor, 'it's always in the public interest to prevent the violation of a party's constitutional rights.' (Aplt App 102).

## CONCLUSION

This Court should affirm the injunction as to the Parks Restriction and reverse in part to remand for consideration of the Playgrounds Restriction.

## ORAL ARGUMENT STATEMENT

Pursuant to 10th Cir. L.R. 28.2(C)(4), Appellee request oral argument in this matter. Such argument is necessary because the issues involve constitutional questions and Appellee respectfully suggests that the Court may benefit from the interactive conversation that oral argument would provide on these issues. Respectfully submitted this May 16, 2024.

Respectfully submitted,

WESTERN AGRICULTURE, RESOURCE AND BUSINESS ADVOCATES, LLP

*/s/ A. Blair Dunn*
A. Blair Dunn, Esq.
400 Gold Ave SW, Suite 1000

Albuquerque, NM 87102
(505) 750-3060
abdunn@ablairdunn-esq.com


Zach Cook, LLC

*/s/ Zach Cook*
Zach Cook
1202 Sudderth # 425
Ruidoso, NM 88345
(575) 937-7644
zach@zachcook.com

## CERTIFICATE OF COMPLIANCE

Undersigned counsel certifies that the foregoing complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 6,177 words, excluding the parts of the brief exempted by Fed. R. App. P. 32 (a)(7)(B) (iii). This opening brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because the brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2010 in 14-point Times New Roman.

## CERTIFICATE OF DIGITAL SUBMISSION

Pursuant to the 10th Circuit ECF User's Manual, Section II.J, I hereby certify with respect to the foregoing document, that:

1) All required privacy redactions have been made per 10th Cir. R. 25.5;

2) Required hard copies will be filed with the court upon acceptance; and

3) The digital submission has been scanned for viruses with the most recent version of Microsoft Windows Defendant Antivirus Version: 1.263.1943.0 Updated March 15, 2008 and according to this program is free of viruses.

**CERTIFICATE OF SERVICE**

I, <u>A. Blair Dunn</u>, hereby certify that on May 16, 2024, I served a copy of the on the parties of record by electronic means:

<u>*/s/ A. Blair Dunn*</u>
A. Blair Dunn, Esq.
400 Gold Ave. SW, Suite 1000
Albuquerque, NM 87102
(505) 750-3060
abdunn@ablairdunn-esq.com