Nos. 23-2192, 23-2194

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

JAMES SPRINGER,

*Plaintiff-Appellee/Cross-Appellant*,

v.

MICHELLE LUJAN GRISHAM, OFFICE OF THE GOVERNOR, PATRICK ALLEN, AND
NEW MEXICO DEPARTMENT OF HEALTH,

*Defendants-Appellants/Cross-Appellees.*

On Appeal from the United States District Court for the District of New Mexico
(No. 1:23-cv-00781-KWR-LF) (Hon. Kea W. Riggs)

**DEFENDANTS-APPELLANTS' RESPONSE AND REPLY BRIEF**

ORAL ARGUMENT REQUESTED

Holly Agajanian
*Chief General Counsel to Gov. Lujan Grisham*
Kyle P. Duffy
*Deputy General Counsel to Gov. Lujan Grisham*
490 Old Santa Fe Trail, Suite 400
Santa Fe, NM 87501

Cody Rogers
Serpe Andrews
2540 El Paseo Road, Suite D
Las Cruces, NM 88001

Janet Carter
William J. Taylor, Jr.
Carina Bentata Gryting
Everytown Law
450 Lexington Ave, P.O. Box 4184
New York, NY 10163
(646) 324-8174
jcarter@everytown.org

Freya Jamison
Everytown Law
P.O. Box 14780
Washington, DC 20044

## CORPORATE DISCLOSURE STATEMENT

Because Defendants-Appellants are all state officers and agencies, no corporate disclosure statement is required under Federal Rule of Appellate Procedure 26.1.

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................1

STATEMENT OF THE ISSUES ........................................................................2

STATEMENT OF THE CASE............................................................................2

SUMMARY OF ARGUMENT............................................................................2

ARGUMENT .......................................................................................................4

   I.  Plaintiff Is Unlikely to Succeed on the Merits of His Second Amendment Claims ..............................................................................................................4

     A.  Methodological Considerations .................................................................4

        i.  The Supreme Court's decision in *United States v. Rahimi* confirms Defendants' approach to Second Amendment analysis .......................4

       ii.  *Rahimi* confirms that Reconstruction-era evidence is a critical part of the historical analysis ..........................................................................6

          1.  *Rahimi* did not resolve whether 1868 or 1791 is the central historical focus and Plaintiff advances no compelling argument for focusing on 1791 .............................................................................8

          2.  Regardless of which period is the central focus, *Rahimi* confirms that 19th-century evidence is critically important ...........................9

     B.  Plaintiff Has Not Established that He Is Likely to Succeed in Showing that the Parks Restriction Is Unconstitutional .........................................12

        i.  Pre-park landscapes do not support Plaintiff's claims.........................15

       ii.  Defendants have identified more than enough historical analogues ..21

      iii.  Plaintiff has no serious response to the principles that guns may be prohibited in locations frequented by children and in public forums and gathering-places .........................................................................25

      iv.  Plaintiff's facial challenge to the Parks Restriction fails .....................28

     C.  Plaintiff Has Not Established that the Playgrounds Restriction is Unconstitutional.....................................................................................30

        i.  The District Court correctly concluded that Plaintiff lacks standing to challenge the Playgrounds Restriction.................................................30

ii.  The Playgrounds Restriction is consistent with the Second
     Amendment ..........................................................................................35

     1.  Playgrounds are sensitive places where the government may
         prohibit firearms because of their close relationship to schools.....36

     2.  The Playgrounds Restriction is consistent with the historical
         tradition of prohibiting guns in playgrounds, parks, and public
         gatherings..........................................................................................40

II.  Plaintiff Did Not Carry His Burden on the Non-Merits Factors ..................43

CONCLUSION...................................................................................................45

# TABLE OF AUTHORITIES

## Cases

*Abbott v. Perez,*
  585 U.S. 579 (2018) ............................................................45

*Antonyuk v. Chiumento,*
  89 F.4th 271 (2d Cir. 2023), *vacated sub nom. Antonyuk v. James,* No. 23-910, 2024
  WL 3259671 (U.S. July 2, 2024)...................................... 13, 14, 17-20, 25, 33, 38

*Antonyuk v. Hochul,*
  639 F. Supp. 3d 232 (N.D.N.Y. 2022), *aff'd in part and vacated in part on other grounds,*
  89 F.4th 271 ............................................................................38

*B&L Prods. v. Newsom,*
  104 F.4th 108 (9th Cir. 2024) ............................................................35

*Barnes v. United States,*
  776 F.3d 1134 (10th Cir. 2015)............................................................26

*Bonidy v. U.S. Postal Service,*
  790 F.3d 1121 (10th Cir. 2015)............................................................26

*Bradford v. U.S. Dep't of Lab.,*
  101 F.4th 707 (10th Cir. 2024) ............................................................32

*Collins v. Daniels,*
  916 F.3d 1302 (10th Cir. 2019)............................................................32

*Colo. Outfitters Ass'n v. Hickenlooper,*
  823 F.3d 537 (10th Cir. 2016)............................................................31, 34

*DaimlerChrysler Corp. v. Cuno,*
  547 U.S. 332 (2006) ............................................................32

*District of Columbia v. Heller,*
  554 U.S. 570 (2008) ............................................4, 7, 10, 15, 22, 26, 39

*Dobbs v. Jackson Women's Health Org.,*
  597 U.S. 215 (2022) ............................................................20

*FDA v. All. For Hippocratic Med.,*
  602 U.S. 367 (2024) ............................................................32

*Fed. Trade Comm'n v. Elite It Partners, Inc.*,
   91 F.4th 1042 (10th Cir. 2024) .......................................................................26

*Hobby Lobby Stores, Inc. v. Sebelius*,
   723 F.3d 1114 (10th Cir. 2013) (en banc), *aff'd on other grounds*, 583 U.S. 682
   (2014) ................................................................................................................30

*Kipke v. Moore*,
   695 F. Supp. 3d 638 (D. Md. 2023) ...........................................................17, 38

*Koons v. Platkin*,
   673 F. Supp. 3d 515 (D.N.J. 2023), *appeals docketed*, Nos. 23-1900 (May 17, 2023),
   23-2043 (3d Cir. June 9, 2023) ..................................................................33, 38

*LaFave v. Cnty. of Fairfax*,
   No. CL2021-01569, 2023 Va. Cir. LEXIS 203 (Fairfax Cnty. Cir. Ct. June 23,
   2023) ..................................................................................................................17

*Lara v. Commissioner Pennsylvania State Police*,
   91 F.4th 122 (3d Cir. 2024)...............................................................................11

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ....................................................................................32, 44

*Malloy v. Hogan*,
   378 U.S. 1 (1964) ...........................................................................................8, 9

*May v. Bonta*,
   No. 8:23-cv-01696, 2023 WL 8946212 (C.D. Cal. Dec. 20, 2023), *appeals docketed*,
   Nos. 23-4354, 23-4356 (9th Cir. Dec. 22, 2023)...............................................39

*McCullen v. Coakley*,
   573 U.S. 464 (2014) ..........................................................................................24

*McDonald v. City of Chicago*,
   561 U.S. 742 (2010) ..........................................................................................15

*Md. Shall Issue v. Montgomery Cnty.*, 680 F. Supp. 3d 567 (D. Md. 2023), *appeal
   docketed*, No. 23-1719 (4th Cir. July 10, 2023) .........................................22, 33

*New York State Rifle & Pistol Ass'n v. Bruen*,
   597 U.S. 1 (2022) ................................1, 3, 5, 7, 9-13, 21-22, 25-27, 35-36, 39, 43

*Nordyke v. King*,
   563 F.3d 439 (9th Cir. 2009), *vacated*, 611 F.3d 1015 (9th Cir. 2010).................37

*Oakland Tactical Supply, LLC v. Howell Twp.*,
103 F.4th 1186 (6th Cir. 2024) ...................................................35

*Paxton v. Dettelbach*,
No. 23-10802, 2024 WL 3082331 (5th Cir. June 21, 2024) ...............................34

*Perlman v. U.S. Dep't of Just.*,
380 F.3d 110 (2d Cir. 2004) ....................................................13

*Planned Parenthood S. Atl. v. Kerr*,
95 F.4th 152 (4th Cir. 2024) ...................................................13

*Raley v. Hyundai Motor Co.*,
642 F.3d 1271 (10th Cir. 2011) ................................................31

*Ramos v. Louisiana*,
590 U.S. 83 (2020) ...........................................................9

*Siegel v. Platkin*,
653 F. Supp. 3d 136 (D.N.J. 2023) ............................................38

*Texas v. United States*,
798 F.3d 1108 (D.C. Cir. 2015) ...............................................13

*Timbs v. Indiana*,
586 U.S. 146 (2019) ..........................................................9

*Tompkins v. U.S. Dep't of Veterans Affs.*,
16 F.4th 733 (10th Cir. 2021) .................................................30

*Tyler v. U.S. Dep't of Educ. Rehab. Servs. Admin.*,
904 F.3d 1167 (10th Cir. 2018) ...............................................32

*United States ex rel. Ramseyer v. Century Healthcare Corp.*,
90 F.3d 1514 (10th Cir. 1996) .................................................31

*United States v. Class*,
930 F.3d 460 (D.C. Cir. 2019) ................................................36

*United States v. Herriott*,
No. 2:23-cr-00037, 2024 WL 3103275 (N.D. Ind. June 24, 2024)...........................14

*United States v. Masciandaro*,
648 F. Supp. 2d 779 (E.D. Va. 2009) ..........................................37

*United States v. Rahimi*,
144 S. Ct. 1889 (2024) ................ 1, 3-6, 8-14, 16, 20-22, 25-26, 28-29, 35-37, 43

*United States v. Salerno*,
 481 U.S. 739 (1987) ............................................................................6, 28

*Valdez v. Lujan Grisham*,
 No. 22-2112, 2024 WL 2319752 (10th Cir. May 22, 2024) ...............................44

*Warner v. Gross*,
 776 F.3d 721 (10th Cir. 2015)...........................................................................43

*We the Patriots, Inc. v. Grisham*,
 No. 1:23-cv-00773, 2023 WL 6622042 (D.N.M. Oct. 11, 2023) ........................39

## Other Authorities

*A Law to Amend the Law Relative to the Park, Battery, and Bowling-Green, Passed April 13, 1818*, The Evening Post (April 17, 1818)............................................................19

*Albuquerque Public Schools Title I Story Time in the Park 2024*, https://perma.cc/3F54-Q9TF ..............................................................................................................29

Allan Greer, *Commons and Enclosure in the Colonization of North America*, 2 Am. Hist. Rev. 365 (2012) ................................................................................................19

Anne Beamish, *Before Parks: Public Landscapes in Seventeenth- and Eighteenth-Century Boston, New York, and Philadelphia*, 40 Landscape J. 1 (2021)............................17, 19

Bernalillo County, New Mexico, U.S. Census Bureau,
 https://tinyurl.com/2s4zz6cm ............................................................................28

*Boston Common*, Nat'l Park Serv., https://www.nps.gov/places/boston-common-ma.htm ..............................................................................................................18

Br. for Indep. Inst. as Amicus Curiae, *New York State Rifle & Pistol Ass'n v. Bruen*, No. 20-843 (filed July 20, 2021) ...............................................................................21

*Bulletin of the Park and Outdoor Art Ass'n* (1901) ...........................................................18

*Census Bulletin No. 65*, U.S. Census Bureau (June 8, 1901)........................................24

Clarence Elmer Rainwater, *The Play Movement in the United States: A Study of Community Recreation* (1921)..................................................................................41

*Compendium of the Enumeration of the Inhabitants and Statistics of the United States* (1841)..............................................................................................................23

D. Kopel & J. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205 (2018) .................................................................................................................21

David Schuyler, *The New Urban Landscape: The Redefinition of City Form in Nineteenth-Century America* (1988) .............................................................................................19

Ethan Margolis, *Locating Historical Gun Laws: The Wild West of Legal History Research*, https://firearmslaw.duke.edu/2024/04/locating-historical-gun-laws-the-wild-west-of-legal-history-research (Apr. 5, 2024) ......................................................24

*Executive Order 2024-004*, Gov. Michelle Lujan Grisham (Feb. 23, 2024)...............37

Henry S. Curtis, *The Play Movement and its Significance* (1917)....................................41

Kate Gannett Wells, *How Boston's Playgrounds Began*, 70 J. of Educ. 146 (1909).......42

Manhattan Borough, New York County, New York, U.S. Census Bureau, https://tinyurl.com/5krzsr9p ...................................................................................28

Margaret Walls, *Parks and Recreation in the U.S.: Local Park Systems*, Resources for the Future (June 2009) ................................................................................................17

Nadav Shoked, *Property Law's Search for a Public*, 97 Wash. U. L. Rev. 1517 (2020).17

NYC Parks, History of Playgrounds in Parks, https://www.nycgovparks.org/about/history/playgrounds ...............................41

*Parks & Recreation: Balloon Fiesta Park*, City of Albuquerque, https://www.cabq.gov/parksandrecreation/parks/balloon-fiesta-park .............28

Paul M. Reeping et al., *Gun-Free Zones and Active Shootings in the United States: A Matched Case-Control Study*, 37 The Lancet Regional Health – Americas, Sept. 2024, https://doi.org/10.1016/j.lana.2024.100837 ...........................................45

Playground & Recreation Ass'n of Am., *A Brief History of the Playground Movement in America*, The Playground, vol. 9, no. 1, Apr. 1915 ...............................................42

*Population of the United States in 1860* (1864) ...............................................................23

*The Seventh Census of the United States: 1850* (1853) ...................................................23

## INTRODUCTION

Governor Michelle Lujan Grisham declared gun violence a statewide public health emergency on September 8, 2023. A subsequent public health order prohibited most individuals from possessing firearms in public parks or playgrounds within the City of Albuquerque or Bernalillo County for the duration of the emergency (hereafter the "Parks Restriction" and the "Playgrounds Restriction," respectively). These narrow, common-sense restrictions are entirely consistent with the Second Amendment. In their Opening Brief, Defendants explained that the Parks Restriction is consistent with this nation's historical tradition of firearms regulation and therefore constitutional under *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022). Its constitutionality is now even clearer after *United States v. Rahimi*, 144 S. Ct. 1889 (2024). There, by a vote of 8 to 1, the Supreme Court made clear that lower courts reading *Bruen* to require a cramped and narrow review of historical laws were mistaken: its precedents "were not meant to suggest a law trapped in amber." *Id.* at 1897. Justice Thomas, the author of *Bruen*, was the lone dissenter.

*Bruen* and *Rahimi* make equally clear that the Playgrounds Restriction is constitutional—and in any event, Plaintiff lacks standing to challenge that restriction. This Court should reverse the district court's decision to enjoin the

Parks Restriction and affirm its denial of an injunction against the Playgrounds Restriction.

## STATEMENT OF THE ISSUES

The issue on Defendants' appeal is whether the district court erred in granting a preliminary injunction against the restriction on firearms in Albuquerque and Bernalillo County public parks. The issue on Plaintiff's cross-appeal is whether the district court erred in denying a preliminary injunction against the restriction on firearms in Albuquerque and Bernalillo County playgrounds.

## STATEMENT OF THE CASE

Defendants respectfully refer the Court to the Statement of the Case in their Opening Brief. *See* Opening Br. 2-9.[1]

## SUMMARY OF ARGUMENT

Plaintiff has not established that he is likely to succeed on the merits of his Second Amendment claim against either the Parks Restriction or the Playgrounds Restriction. Both sit firmly within this nation's historical tradition of firearm regulation and are consistent with the principles that underpin that regulatory

---

[1] Defendants note that Plaintiff has abandoned his First Amendment and due process claims for this appeal. *See* Pl. Br. 6. With respect to the standard of review, Defendants respectfully refer the Court to the statement of that standard in their Opening Brief. *See* Opening Br. 10-11.

tradition. As soon as modern-style parks and playgrounds emerged in the second half of the 19th century, governments prohibited firearms in those locations. And these laws went entirely unchallenged: there is no evidence that any court invalidated any of the well over a hundred historical laws prohibiting guns in parks (and in playgrounds within those parks) under the Second Amendment. Those historical laws are also part of regulatory traditions, stretching back to the founding, of prohibiting firearms in crowded gathering places and in schools.

The district court misapplied *Bruen* in enjoining the Parks Restriction. That conclusion is even clearer after *Rahimi*, which rejected a cramped approach to historical analysis like the one the district court employed, confirmed that Reconstruction-era evidence is critically important, and reiterated the very exacting standard that applies to facial challenges like Plaintiff's. As for the Playgrounds Restriction, the district court was correct to conclude that Plaintiff lacks standing to challenge it, and Plaintiff has waived any standing arguments in this appeal. If this Court reaches the merits, *Bruen* and *Rahimi* confirm that the Playgrounds Restriction is constitutional. In addition, Plaintiff has failed to establish the remaining requirements for a preliminary injunction. Accordingly, this Court should vacate the district court's injunction as to the Parks Restriction and affirm its denial of an injunction as to the Playgrounds Restriction.

**ARGUMENT**

I. **Plaintiff Is Unlikely to Succeed on the Merits of His Second Amendment Claims**

   A. **Methodological Considerations**

      i. **The Supreme Court's decision in *United States v. Rahimi* confirms Defendants' approach to Second Amendment analysis**

On June 21, the Supreme Court decided *United States v. Rahimi*, a Second Amendment challenge to a federal criminal statute disarming individuals subject to domestic violence restraining orders. The Court upheld the law, deeming it a continuation of a national tradition of "disarm[ing] individuals who present a credible threat to the physical safety of others." 144 S. Ct. at 1902. In doing so, the Court reiterated that "the right secured by the Second Amendment is not unlimited," *id*. at 1897 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008)), and emphasized that it "was never thought to sweep indiscriminately." *Id*. *Rahimi* further clarified that courts must account for changed circumstances in assessing potential historical analogues. *See id*. (explaining that law is not "trapped in amber"); *id.* at 1897-98 ("[T]he Second Amendment permits more than just those regulations identical to ones that could be found in 1791.").

*Rahimi* provided guidance to courts applying *Bruen*'s historical analysis. It noted that "some courts have misunderstood the methodology of [its] recent Second Amendment cases" to require overly specific historical analogues to a

challenged statute. *Id*. at 1897; *see also id.* at 1925 (Barrett, J., concurring) (explaining that "a challenged regulation need not be an updated model of a historical counterpart" and that "a test that demands overly specific analogues has serious problems"). Rather than look for a "dead ringer" or "historical twin," it clarified, courts should "consider[] whether the challenged regulation is consistent with the *principles* that underpin our regulatory tradition." *Id*. at 1898 (emphasis added); *see also id.* at 1912 (Kavanaugh, J., concurring) (explaining that a court's task is to ascertain "the principles embodied in the [Second Amendment's] text"); *id*. at 1925 (Barrett, J., concurring) ("'Analogical reasoning' under *Bruen* demands a wider lens: Historical regulations reveal a principle, not a mold."). As Justice Barrett observed in her concurring opinion, one such principle is the "'sensitive places' principle that limits the right to public carry." *Id.* at 1926 (Barrett, J., concurring) (citing *Bruen*, 597 U.S. at 30-31); *see also id.* at 1923 (Kavanaugh, J., concurring) (reiterating *Heller*'s statement that "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings" are "presumptively constitutional"). As explained further below, the challenged Order is "consistent with the principles that underpin our regulatory tradition," *id.* at 1898—both the overarching principle that firearms may be prohibited in sensitive places, and with more granular principles, including the principles that prohibitions

are permissible in crowded public forums and in locations with vulnerable populations, such as children. *See infra* Parts I.B & I.C.ii.

Additionally, *Rahimi* emphasized the very high bar that applies to facial Second Amendment challenges like this one. The Court explained that a facial challenge "is the 'most difficult challenge to mount successfully,' because it requires a [challenger] to 'establish that no set of circumstances exists under which the [law] would be valid.'" *Rahimi*, 144 S. Ct. at 1898 (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). In other words, if a law "is constitutional in *some* of its applications," a facial challenge must fail. *Id.* (emphasis added). The Fifth Circuit had failed to "correctly apply" this standard because it had focused on "hypothetical scenarios" where the challenged law "might raise constitutional concerns" instead of "consider[ing] the circumstances in which [it] was most likely to be constitutional." *Id.* at 1903.

As explained below, because the Parks Restriction and Playgrounds Restrictions are (at the very least) constitutional in at least some of their applications, Plaintiff's facial challenge fails. *See infra* Part I.B.iv.

### ii. *Rahimi* confirms that Reconstruction-era evidence is a critical part of the historical analysis

Defendants explained in their opening brief that the most relevant time period for historical analysis is the Reconstruction era. Because "[c]onstitutional rights are enshrined with the scope they were understood to have when the people

adopted them," *Bruen*, 597 U.S. at 34 (quoting *Heller*, 554 U.S. at 634-35) (emphasis omitted), originalism requires courts to determine the public understanding of the right at the time the Fourteenth Amendment was ratified and incorporated the Second Amendment against the states. *See* Opening Br. 14-20. Defendants also explained that, regardless of whether 1791 or 1868 is the central focus of the historical inquiry, Reconstruction-era evidence is critically important to that inquiry. *See id.* at 19-20, 30-32; *Bruen*, 597 U.S. at 20 ("'[*Heller*] clarified that 'examination of a variety of legal and other sources to determine the public understanding of a legal text in the period after its enactment or ratification' was 'a critical tool of constitutional interpretation.'" (quoting *Heller*, 554 U.S. at 605 (emphasis omitted) (citation omitted)). As explained below, *Rahimi*, like *Bruen*, did not resolve the issue regarding which time period is key to the historical inquiry. Nevertheless, its analysis removes any doubt that Reconstruction-era evidence is critically important regardless of which time period is key. Accordingly, *Rahimi* puts to rest any suggestion that the Second Amendment historical analysis requires a cramped examination of historical laws in the few years surrounding 1791 and confirms that this Court should consider the robust evidence from later decades that Americans considered prohibitions on guns in parks to be entirely consistent with the Second Amendment.

7

1. ***Rahimi* did not resolve whether 1868 or 1791 is the central historical focus and Plaintiff advances no compelling argument for focusing on 1791**

In *Rahimi*, just as it had done in *Bruen*, the Supreme Court expressly left open whether the Reconstruction era or the founding era is the central focus of the historical inquiry. *See Rahimi*, 144 S. Ct. at 1898 n.1 (declining to resolve "whether courts should primarily rely on the prevailing understanding … in 1868" as establishing the scope of the right against both state and federal governments because resolving it was unnecessary to decide the case); *id.* at 1933 n.2 (Thomas, J., dissenting) (agreeing with majority that resolving issue was unnecessary in *Rahimi*). Thus, the status remains as it was before *Rahimi* was decided: for the reasons Defendants set out in their opening brief, if this Court decides to address the time-period question, it should prioritize evidence from the period surrounding 1868. *See* Opening Br. 14-20.

Despite recognizing the "intuitive appeal" of Defendants' argument that originalist principles place the Reconstruction era at the center of the historical analysis, *see* Pl. Br. 14, Plaintiff insists that this Court should prioritize practice at the time of the Second Amendment's ratification, *id.* at 16. The only ground he advances for this assertion, however, is the fact that other individual rights have the same scope when asserted against the federal government as they do against the States. *See* Pl. Br. 15-16 (citing *Malloy v. Hogan*, 378 U.S. 1, 10 (1964), and *Ramos v.*

8

*Louisiana*, 590 U.S. 83, 93 (2020)). This principle is not controversial—it appears in *Bruen* itself. *Bruen*, 597 U.S. at 37. But it is also not helpful in determining which period is most salient. *Bruen* held that "individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government," *id.* (citing *Ramos*, *Malloy*, and *Timbs v. Indiana*, 586 U.S. 146, 149-50 (2019)), and then expressly left open the issue of whether the analysis (for both state and federal laws) should focus on Reconstruction or the founding. *See id.* at 37-38 (recognizing "an ongoing scholarly debate" on the time-period question but declining to address it because, in *Bruen*, "the public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same"); *see also Rahimi*, 144 S. Ct. at 1898 n.1. By leaving the time-period question open at the same time as acknowledging the rule of *Ramos* and *Malloy*, the Supreme Court has established, contrary to Plaintiff's belief, that the answer to that question is not compelled by *Ramos*, *Malloy*, or any other decision.

### 2. Regardless of which period is the central focus, *Rahimi* confirms that 19th-century evidence is critically important

In any event, even without resolving the issue of whether the founding- or Reconstruction-era understanding is more important, the Supreme Court has made clear that nineteenth-century evidence is critically important to

understanding the scope of the Second Amendment right. *Heller* and *Bruen* confirmed that examining post-ratification sources is "a critical tool of constitutional interpretation." *Bruen*, 597 U.S. at 20 (quoting *Heller*, 554 U.S. at 605). *Bruen* also explained that "a regular course of practice" following the enactment of a constitutional provision "can liquidate [and] settle the meaning of disputed or indeterminate terms [and] phrases in the Constitution." *Id.* at 35-36 (cleaned up). Both decisions then extensively canvassed 19th century evidence. *See, e.g.*, *id.* at 21 (recounting that *Heller* had considered, among other things, "'19th-century cases that interpreted the Second Amendment,'" the "'discussion of the Second Amendment in Congress and in public discourse' after the Civil War," and the work of "post-Civil War commentators" (quoting *Heller*, 554 U.S. at 610, 614, 616-19); *id.* at 51-57 (discussing mid-19th century cases and statutes); *id.* at 60 (surveying "public discourse surrounding Reconstruction" as demonstrating "how public carry for self-defense remained a central component of the protection that the Fourteenth Amendment secured for all citizens").

Most significantly, *Rahimi* has now put the importance of 19th-century sources to the Second Amendment analysis beyond any question, by resting its decision *upholding* a challenged law in significant part on laws that were passed between 1836 and 1868. *See* 144 S. Ct. at 1900 (relying on Massachusetts surety statute from 1836); *id.* (invoking similar statutes of nine other jurisdictions by

citation to *Bruen*, 597 U.S. at 56 & n.23); *Bruen*, 597 U.S. at 56 & n.23 (citing 1838 Wisconsin, 1840 Maine, 1846 Michigan, 1847 Virginia, 1851 Minnesota, 1854 Oregon, 1857 District of Columbia, 1860 Pennsylvania, and 1868 West Virginia surety laws). It is impossible to reconcile *Rahimi* with Plaintiff's position that only founding-era historical evidence counts.

Relying on 19th century evidence is therefore entirely consistent with— indeed, compelled by—the Supreme Court's decisions *even if* the founding era were the most important period for analysis.[2] As Justice Kavanaugh put it, "the Framers[] expect[ed] and inten[ded] that post-ratification history would be a proper and important tool to help constitutional interpreters determine the meaning of vague constitutional text." *Rahimi*, 144 S. Ct. at 1917 (Kavanaugh, J., concurring); *see also id.* at 1924 (Barrett, J., concurring) (confirming that "postenactment history can be an important tool," including to "liquidate ambiguous constitutional provisions" and "provide persuasive evidence of the original meaning" (citation omitted)). Where, as here, there is absolutely no contrary evidence—no 18th- or 19th-century cases, treatises, or other legal

---

[2] Even before *Rahimi*, Defendants explained that the approach to the time-period question the Third Circuit took in *Lara v. Commissioner Pennsylvania State Police*, 91 F.4th 122 (3d Cir. 2024), is not persuasive. *See* Opening Br. 17 n.9. *Lara*'s error is even clearer now that *Rahimi* has rested its decision upholding a challenged law in significant part on 19th-century surety statutes. The Supreme Court has extended the state's time to petition for certiorari in *Lara* until July 25, 2024. *See* Order, *Paris v. Lara*, No. 23A980 (U.S. May 6, 2024).

materials maintaining that prohibiting firearms in parks would violate the right to bear arms, and no constitutional decisions from any historical period invalidating such a prohibition—the 19th-century understanding presumptively reflects the 18th-century understanding. *See* Opening Br. 30-31. Accordingly, regardless of which period (founding or Reconstruction) this Court determines to be the most relevant, it should accept that the "practice" thereafter "settle[s]" the meaning of the right and demonstrates that the Parks Restriction and Playgrounds Restriction are constitutional. *See Bruen*, 597 U.S. at 35-36.

### B. Plaintiff Has Not Established that He Is Likely to Succeed in Showing that the Parks Restriction Is Unconstitutional

Defendants have demonstrated a robust historical tradition of regulating firearms in parks and analogous sensitive places. *See* Opening Br. 23-30. This robust tradition reflects the fact that the Parks Restriction is "consistent with the principles that underpin our regulatory tradition." *Rahimi*, 144 S. Ct. at 1898. Specifically, the Parks Restriction is consistent with the "sensitive places principle that limits the right to public carry," *id.* at 1925-26 (Barrett, J., concurring), which stretches back to the founding and beyond, *see, e.g.*, *Bruen*, 597 U.S. at 30. And the tradition that principle reflects includes over one hundred historical restrictions on guns in parks, beginning in the mid-19th century with the emergence of modern parks, putting beyond doubt that parks are sensitive places. *See* Opening Br. 23-24, 35-38; *id.* Attach. B. These historical park restrictions are not only historical

analogues to the Order's Parks Restriction, but are historical *twins*—and thus are even stronger evidence for upholding the Order than *Bruen* and *Rahimi* require. *See Rahimi*, 144 S. Ct. at 1903 (explaining that *Bruen* requires only historical analogues, not historical twins, and faulting both the dissent and Fifth Circuit for mistakenly requiring twins). Moreover, these historical restrictions went unchallenged, indicating that they "were apparently accepted without any constitutional objection by anyone." *Antonyuk v. Chiumento*, 89 F.4th 271, 359 (2d Cir. 2023), *vacated sub nom. Antonyuk v. James*, No. 23-910, 2024 WL 3259671 (U.S. July 2, 2024) (granting certiorari, vacating judgment, and remanding to Second Circuit for further consideration in light of *Rahimi*);[3] *see also Bruen*, 597 U.S. at 30 (finding it "settled"

---

[3] The Supreme Court's grant, vacate, and remand (GVR) order in *Antonyuk* is not a determination on the merits. *See, e.g., Planned Parenthood S. Atl. v. Kerr*, 95 F.4th 152, 164-65 (4th Cir. 2024) (recognizing that "the issuance of a GVR does not speak to the underlying merits of the case"); *Texas v. United States*, 798 F.3d 1108, 1116 (D.C. Cir. 2015) ("[I]t is well-settled that a GVR has no precedential weight and does not dictate how the lower court should rule on remand."). The Second Circuit can (and should) reach the same conclusion it reached in its December 2023 opinion on remand. *See, e.g., Perlman v. U.S. Dep't of Just.*, 380 F.3d 110, 111-12 (2d Cir. 2004) (concluding, after GVR for reconsideration in light of a new decision, that the new decision "does not affect the conclusion we previously reached in this case" and it "need not be disturbed"). Nothing in *Rahimi* undermines *Antonyuk*'s reasons for rejecting the challenge to New York's restriction on guns in parks. To the contrary, the fact that *Rahimi* rested in significant part on 19th-century laws defeats the central criticism Plaintiff leveled at *Antonyuk*—his assertion that only the period surrounding 1791 is relevant. *See* Pl. Br. 7.

Moreover, it appears unlikely that the Supreme Court's reasons for issuing the GVR had anything to do with the Second Circuit's parks analysis, or its sensitive-places analysis more generally. *Rahimi* is not a sensitive-places case. And of the two "Questions Presented" in the *Antonyuk* petition—"1. Whether the proper

that certain locations were "'sensitive places' where arms carrying could be prohibited" because there were "no disputes regarding the lawfulness of [historical] prohibitions").

In addition, the Parks Restriction is "consistent with the principles that underpin our regulatory tradition" and is "'relevantly similar' to laws that our tradition is understood to permit." *Rahimi*, 144 S. Ct. at 1898, because it is similar to, and consistent with, several founding-era traditions. *See* Opening Br. 26-30. First, the Parks Restriction is part of the long, unbroken tradition of restricting firearms in public forums and quintessentially crowded places. *See* Opening Br. 26-28; *id.* Attach. C. And the Parks Restriction is further analogous to longstanding restrictions on the carrying of firearms in schools—which the Supreme Court has

---

historical time period for ascertaining the Second Amendment's original meaning is 1791, rather than 1868; and 2. Whether 'the people' must convince government officials of their 'good moral character' before exercising their Second Amendment right to bear arms in public"—only the first even arguably relates to the Second Circuit's sensitive-places analysis. *See* Pet. for Writ of Cert. at (i), *Antonyk v. James*, No. 23-910 (U.S. filed Feb. 20, 2024). That first question, however, is the issue of the correct temporal focus, which *Rahimi* expressly declined to reach. *See supra* p. 8. It seems, therefore, that the GVR is likely focused on the petitioners' second question, which concerns the Second Circuit's analysis of New York's carry-licensing scheme and has nothing to do with sensitive places.

More generally, because "*Rahimi* can be seen as a softening of the approach to the Second Amendment taken in *Bruen*," *United States v. Herriott*, No. 2:23-cr-00037, 2024 WL 3103275, at *2 n.1 (N.D. Ind. June 24, 2024)—because "[h]ow else does one explain that the author of *Bruen* is the sole dissenter in *Rahimi*?," *id.*—reconsidering *Antonyk* in light of *Rahimi* is more likely to strengthen the Second Circuit's analysis in favor of New York than to undermine it. Thus, the analysis in the Second Circuit's *Antonyk* opinion remains persuasive.

deemed "presumptively lawful," *Heller*, 554 U.S. at 626-27, 627 n.26; *see also McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010)—because it comparably burdens the right to armed self-defense by prohibiting carry only in discrete locations, and is comparably justified on the basis of protecting vulnerable populations, such as children. *See* Opening Br. 29-30.

Plaintiff seeks to challenge the robust record of historical parks laws by arguing *first*, that the Parks Restriction is unconstitutional because some parks existed prior to 1800, and no firearms prohibitions in those places have been located to date, and *second*, that Defendants have identified an insufficient number of historical analogues. Then, with respect to the founding-era traditions of prohibiting guns in crowded public forums and in locations with vulnerable populations, Plaintiff argues that these traditions are contrary to *Bruen*. As explained below, each of these arguments is mistaken.

### i. Pre-park landscapes do not support Plaintiff's claims

Plaintiff asserts that several parks existed before 1800, and that a lack of firearms restriction in those locations trumps the scores of Reconstruction-era parks restrictions Defendants have identified. *See* Pl. Br. 16-18. This argument (1) focuses on the wrong time period, (2) is factually incorrect, and (3) mistakenly attributes an absence of regulation to a belief that regulation was unconstitutional.

15

*First*, Plaintiff's argument erroneously assumes that the founding era is the only relevant time period for the Second Amendment analysis. But as explained above, the Reconstruction era is the most important period for determining the public understanding of the right to keep and bear arms, *see supra* Part I.A.ii; Opening Br. 14-20, and therefore the continuous procession of laws prohibiting guns in parks from the mid- to late-19th century and beyond demonstrates that the public understood those prohibitions to be fully consistent with the right. Furthermore, even without resolving the question of which era should be the central focus of the originalist analysis, *Rahimi* puts beyond doubt that 19th-century history is crucial to determining the scope of the Second Amendment as historically understood. *See supra* pp. 10-12 (explaining that *Rahimi*'s holding rested in significant part on 19th-century surety laws). And even if it were proper for the analysis to focus primarily on the founding era, firearms prohibitions in parks are analogous to, and consistent with, earlier laws prohibiting firearms in public gathering places and in schools. *See* Opening Br. 26-30.

*Second*, while some early green spaces existed before the 19th century, those locations were not parks in the modern sense. As the Second Circuit correctly concluded in *Antonyuk*, "'[t]he modern idea of the park emerged in the nineteenth century,' before which 'open spaces that were not privately owned … consisted of grazing areas open to all,' with Boston Common being the 'most famous example

16

for this kind of [grazing] park space.'" 89 F.4th at 361 (quoting Nadav Shoked, *Property Law's Search for a Public*, 97 Wash. U. L. Rev. 1517, 1556-57 (2020)). *Antonyuk*'s conclusion is consistent with history, *see* Opening Br. 35-38 (collecting sources), and nothing in *Rahimi* impugns that conclusion or suggests that the Second Circuit should reach a different result on remand. Indeed, several trial courts have reached the same conclusion. *See id.* at 37 (citing *Kipke v. Moore*, 695 F. Supp. 3d 638, 654 (D. Md. 2023); *LaFave v. Cnty. of Fairfax*, No. CL2021-01569, 2023 Va. Cir. LEXIS 203, at *17 (Fairfax Cnty. Cir. Ct. June 23, 2023)). And Plaintiff's own sources support the view that modern parks arose in the mid- to late-19th century. *See, e.g.*, Anne Beamish, *Before Parks: Public Landscapes in Seventeenth- and Eighteenth-Century Boston, New York, and Philadelphia*, 40 Landscape J. 1, 1, 13 (2021) (stating that "[p]ublic parks did not appear in the United States until the second half of the nineteenth century," and referring to those earlier green spaces as "prepark landscapes"); Margaret Walls, *Parks and Recreation in the U.S.: Local Park Systems,* Resources for the Future, at 1 (June 2009) (explaining that the "urban park vision centered on providing natural settings in an urban environment" arose in the "mid to late 1800s").

Regarding Boston Common specifically, *Antonyuk* rejected the proposition that the "former use of Boston Common and similar spaces … undermines a tradition of regulating firearms in urban public parks." 89 F.4th at 361 (concluding

17

Boston Common "appears to have gained th[e] distinction [as the Nation's first urban public park] only in retrospect"). Plaintiff's own sources demonstrate that, although there may have been occasional incidents of recreation, the primary, intended functions of Boston Common prior to the mid-19th century were communal grazing and militia training. *See Bulletin of the American Park and Outdoor Art Ass'n* 3 (1901) ("*Bulletin*"), *available at* bit.ly/3NPLSae (explaining Boston Common was "an outgrowth of the English idea of commons," and was originally "laid out by the town for a training field, and … was ever since used for that purpose and the feeding of cattle"); *Boston Common*, Nat'l Park Serv., https://www.nps.gov/places/boston-common-ma.htm (describing 17th- and 18th-century Boston Common as a place for "military training," "public hangings and whippings," and "pasture for cattle from the time of its creation through the early decades of the 1880s," and only noting "indications" of recreational use). Thus, as the president of the American Park and Outdoor Art Association explained in a 1901 address, "there was little if any idea that [Boston Common] would ever be a park," and it was "kept and occupied as a common till a very recent date, and it was not until 1859 that the question was finally settled by a vote of the Legislature and a vote of the city, that Boston Common should be a public park." *Bulletin* at 3; *see Antonyuk*, 89 F.4th at 361 (quoting same).

18

In fact, Plaintiff does not dispute that Boston Common was a site for militia training or that early New England commons consisted primarily of common pastures. Instead, he argues that the militia usage of Boston Common demonstrates that it was "far from a gun-free zone," and that its use for communal grazing is irrelevant. Pl. Br. 16-18 (citing, *inter alia*, Beamish, *supra*, at 3-6; Allan Greer, *Commons and Enclosure in the Colonization of North America*, 2 Am. Hist. Rev. 365, 373 (2012)). But it is precisely these functions that distinguish founding-era commons, such as Boston Common, from modern-day parks, such as those in Albuquerque and Bernalillo County.[4] Thus, as *Antonyuk* explained, "though the history of firearm regulation in the 17th-century Boston Common might tell us about the National tradition of regulating firearms in militia mustering grounds and 'grazing areas open to all,' it tells us little about the history of firearm regulation in the public square." 89 F.4th at 361.[5]

---

[4] Additionally, "the use of the Boston Common for organized and disciplined militia exercises and mustering hardly supports the notion that public recreational parks (to the extent the Common can be so characterized) were considered appropriate places for ordinary citizens to be armed outside the context of such military purposes." *Antonyuk*, 89 F.4th at 361 (emphasis omitted).

[5] Similarly, the early green spaces in New York City were unlike modern parks; they were described by late-18th century parks advocates as "little dooryards of space—mere grassplats of verdure, which form the squares of the city," David Schuyler, *The New Urban Landscape: The Redefinition of City Form in Nineteenth-Century America* 62 (1988). Places such as Bowling Green, the Battery, and City Hall Park even required permission from the mayor to "walk over, stand, or lie upon" the grass. *A Law to Amend the Law Relative to the Park, Battery, and Bowling-Green, Passed April 13, 1818*, The Evening Post (April 17, 1818).

*Third*, and most importantly, even if early commons *were* parks, an absence of firearms prohibitions in those locations does not show that anyone thought those prohibitions were unconstitutional. *See Rahimi*, 144 S. Ct. at 1925 (Barrett, J., concurring) (describing as "flawed" any "assum[ption] that founding-era legislatures maximally exercised their power to regulate, thereby adopting a 'use it or lose it' view of legislative authority"); *id.* at 1905 (Sotomayor, J., concurring) (rejecting dissent's approach, under which "the legislatures of today would be limited not by a distant generation's determination that such a law was unconstitutional, but by a distant generation's failure to consider that such a law might be necessary"); *see also Antonyuk*, 89 F.4th at 301 ("Legislatures past and present have not generally legislated to their constitutional limits."). Instead, "[t]here are many reasons why the historical record may not evince statutory prohibitions on a given practice," *Antonyuk*, 89 F.4th at 301—including, in the case of Boston Common, the fact that it was used for militia training. There is thus no basis to infer unconstitutionality from silence. *See, e.g.*, *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 253 (2022) ("[T]he fact that many States in the late 18th and early 19th century did not criminalize pre-quickening abortions does not mean that anyone thought the States lacked the authority to do so.").

### ii. Defendants have identified more than enough historical analogues

Plaintiff next contends that Defendants have not cited a sufficient number of historical analogues to demonstrate a historical tradition because "there were more than 10,000 incorporated cities, towns, villages, and boroughs by 1900" and so "even 100 local laws would have governed less than 1% of cities" in 1900. Pl. Br. 21. This argument contains several errors.

For one, as explained in Defendants' opening brief, even a small number of historical laws can demonstrate that a modern regulation is consistent with historical tradition. *See* Opening Br. 20-21. *Rahimi* has put that even further beyond doubt by upholding the challenged law without any suggestion that it was engaging in the kind of "census-counting" approach to historical laws that Plaintiff advances. *See Rahimi*, 144 S. Ct. at 1899-1901. *Rahimi*'s approach echoes the fact that *Bruen* recognized the constitutionality of firearms prohibitions in legislative assemblies, courthouses, and polling places based on sources that cited only a small number of such laws. *See Bruen*, 597 U.S. at 30 (citing D. Kopel & J. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 229-36, 244-47 (2018); Br. for Indep. Inst. as Amicus Curiae 11-17, *Bruen*, No. 20-843 (filed July 20, 2021)). With respect to legislative assemblies, for example, the only historical prohibitions cited in the pages *Bruen* referred to were *two* laws from a *single* state. *See* Br. For Indep. Inst. 11-12 (citing 1647 and 1650 Maryland laws); Kopel & Greenlee, 13 Charleston L.

21

Rev. at 235 & nn.113, 114 (stating that "[i]n general, Americans did not seem to mind people coming armed to attend or participate in legislative matters," calling Maryland an "exception," and citing the same two laws from 1647 and 1650). *See generally Md. Shall Issue v. Montgomery Cnty.*, 680 F. Supp. 3d 567, 593 (D. Md. 2023) ("*Bruen* … did not impose any specific requirement that the historical statutes considered must have applied to a certain number of states or a certain percentage of the relevant population."), *appeal docketed*, No. 23-1719 (4th Cir. July 10, 2023).

Plaintiff points to *Bruen*'s rejection of territorial laws that governed "less than 1% of the American population" in support of a quantitative approach. Pl. Br. 21. The district court similarly maintained that "western territorial laws shed little light on the understanding of the Second Amendment when it was adopted." App. 180. *Bruen*, however, rejected territorial laws only because they "'contradict[ted] the overwhelming weight' of other … historical evidence." *Bruen*, 597 U.S. at 67-68 (quoting *Heller*, 554 U.S. at 632). And again, *Rahimi* has now eliminated any doubt that laws governing small populations (including territorial laws) are robust evidence of this nation's historical tradition of firearms regulation whenever, as here, there is not overwhelming contrary evidence. Of the ten 19th-century surety statutes *Rahimi* relied on, three were from territories: Wisconsin (1838), Minnesota (1851), and Oregon (1854). The population of each, as of the closest census, was a miniscule fraction of the U.S. population. In 1840, Wisconsin's population was

30,945 (0.18% of the U.S. population). *See Compendium of the Enumeration of the Inhabitants and Statistics of the United States* 102 (1841), *available at* https://tinyurl.com/ytphhfdv. In 1850, Minnesota's population was 6,077 (0.026%) and Oregon's was 13,294 (0.057%). *See The Seventh Census of the United States: 1850* ix (1853), *available at* https://tinyurl.com/42xnk3s6. The populations of the earliest cities to prohibit guns in parks dwarf these numbers. In 1860, New York's population was 805,658. *See Population of the United States in 1860* 337 (1864), *available at* https://tinyurl.com/525rdj63. In 1870, Philadelphia's population was 674,022,[6] Brooklyn's was 396,099, and Chicago's was 298,977. *See Ninth Census – Volume I: The Statistics of the Population of the United States* 110, 211, 254 (1872), *available at* https://tinyurl.com/vn2ka45y.[7] But ultimately the point is not these population sizes, but rather the fact that *Rahimi* did not engage in census-counting *at all*, and instead simply respected each law as evidencing this nation's tradition of firearms regulation.

---

[6] Moreover, the prohibition on guns in Philadelphia's Fairmount Park was a state law, and the 1870 population of Pennsylvania—then the second-largest state in the country—was 3,521,951. *See Ninth Census – Volume I: The Statistics of the Population of the United States* 3 (1872), *available at* https://tinyurl.com/vn2ka45y.

[7] Prohibitions on guns in national parks—reflecting the view at the *federal* level that such prohibitions were consistent with the Second Amendment right, and thus representing the entire nation—appeared no later than 1882 (Mackinac), 1890 (Sequoia), 1894 (Yellowstone), and 1897 (Yosemite). *See* Opening Br. Attach. B, Tabs 95-98.

In any event, even if a quantitative analysis were appropriate, Plaintiff's approach of comparing the total number of laws Defendants have identified to date to the total number of "incorporated cities, towns, villages, and boroughs" in the United States, *see* Pl. Br. 21, is flawed in multiple ways. For example, it fails to account for how many municipalities had public parks at that time, such that a firearms prohibition in parks could have existed there. *Cf. McCullen v. Coakley*, 573 U.S. 464, 481 (2014) ("States adopt laws to address the problems that confront them[.]"). It also fails to account for inevitable lacunae in the historical record, including the fact that small towns, villages, and boroughs are less likely to have preserved their ordinances historically, or to have digitized any remaining historical materials recently, thus leaving them unavailable or inaccessible to modern researchers.[8] And it glosses over the population sizes of these municipalities and the fact that the most populous cities prohibited guns in their parks.[9] In fact, *Antonyuk*

---

[8] *See* Ethan Margolis, *Locating Historical Gun Laws: The Wild West of Legal History Research*, https://firearmslaw.duke.edu/2024/04/locating-historical-gun-laws-the-wild-west-of-legal-history-research (Apr. 5, 2024) (explaining the "unique challenges associated with locating specific historical firearm regulations within a universe of potential sources that has yet to be fully catalogued, mapped, digitized, or analyzed," and noting that "most municipal laws remain hidden, tucked away in nooks and crannies far from the digital realm").

[9] According to the 1900 census that Plaintiff cites, "more than three-fifths of all the incorporated places" had "less than 1,000 inhabitants." *Census Bulletin No. 65*, U.S. Census Bureau 3 (June 8, 1901), *available at* https://bit.ly/3GkuFnm. Moreover, the census shows that there were only eleven cities with a population over 300,000 in 1900, *id.* at 2, and Defendants have to date identified park firearms restrictions in nine of those cities by 1900, *see* Opening Br., Attach. B (compiling

examined only eight of the over one hundred park restrictions Defendants have presented here and still found them sufficient because, "[b]y 1890, four of the five most populous cities prohibited firearms in their urban parks," meaning "at least 37.7% of the urban population liv[ed] in cities where firearms were prohibited in their parks." 89 F.4th at 360.

### iii. Plaintiff has no serious response to the principles that guns may be prohibited in locations frequented by children and in public forums and gathering-places

Defendants have established that the Parks Restriction is also consistent with "the principles that underpin our regulatory tradition," *Rahimi*, 144 S. Ct. at 1898, in the form of principles, stretching back to the founding era, that guns may be prohibited in (1) schools and similar locations that are heavily used by vulnerable populations, such as children, and (2) crowded public forums. *See* Opening Br. 26-30. Plaintiff has no serious response.

*First*, with respect to schools and similar locations, Plaintiff asserts that "*Bruen* did not in any way endorse schools as sensitive places," and indeed "decline[d]" even "to suggest that schools are sensitive places." Pl. Br. 19. That is not correct. As Defendants have already explained, *see* Opening Br. 29, *Bruen* repeated *Heller*'s statement that "schools" are "sensitive places." *See Bruen*, 597 U.S. at 30

---

regulations from New York, Chicago, Philadelphia, St. Louis, Boston, Buffalo, San Francisco, Cincinnati, and Pittsburgh), and a tenth (Baltimore) as of 1904, *see id.*

(considering "*Heller*'s discussion of 'longstanding' 'laws forbidding the carrying of firearms in sensitive places such as schools and government buildings'" (quoting *Heller*, 554 U.S. at 626)); *id.* at 81 (Kavanaugh, J., concurring); *Heller*, 554 U.S. at 626; *see also Rahimi*, 144 S. Ct. at 1923 (Kavanaugh, J., concurring) (recognizing prohibitions on carrying firearms in schools as among "traditional exceptions to the right"). To claim otherwise is to deny the Supreme Court's plain words. Furthermore, any argument that the Court's recognition of schools as sensitive places was dictum that this Court could disregard would be precluded by *Bonidy v. U.S. Postal Service*, 790 F.3d 1121, 1124-25 (10th Cir. 2015). *See* Opening Br. 40 (explaining that *Bonidy* rejected the argument that this passage could be disregarded as dictum); *see also, e.g.*, *Fed. Trade Comm'n v. Elite It Partners, Inc.*, 91 F.4th 1042, 1051 (10th Cir. 2024) ("Our precedents remain good law unless the Supreme Court has 'indisputably and pellucidly' abrogated them." (citation omitted)); *Barnes v. United States*, 776 F.3d 1134, 1147 (10th Cir. 2015) (similar).

Plaintiff also attempts to deny the plain fact that *Bruen*, like *Heller*, endorsed prohibitions on carrying firearms in schools by saying that *Bruen* "approvingly referenced carry by black Americans at Freedmen's schools before the Fourteenth Amendment's ratification." Pl. Br. 19. But the fact that *Bruen* gave one example of a school where carry was allowed (a Freedmen's school in Maryland that was facing attacks, *see* 597 U.S. at 61) in no way undermines the view it stated in *Heller*, and

26

repeated in *Bruen*, that schools are sensitive places where the Constitution *allows* prohibiting guns. *See* Opening Br. 38-39 (explaining that government's decision not to regulate to constitutional limit does not demonstrate unconstitutionality). Nor can Plaintiff reinvent the historical tradition of prohibiting guns in schools as applying only to students and not to "faculty or visitors." *See* Pl. Br. 19-20. *Heller* and *Bruen* made no such distinction: historical tradition permits prohibiting firearms in schools, *period*—not just possession by the children over whom the school exercised *in loco parentis* authority, but also by teachers, administrators, and visitors, over whom the school obviously does not exercise *in loco parentis* authority.

    *Second*, with respect to the tradition of prohibiting firearms in public forums and gatherings, Plaintiff largely ignores this tradition (and especially its founding-era origins). *Compare* Opening Br. 26-28, *with* Pl. Br. 22. This tradition, and its connection to the Parks Restriction, therefore stands almost completely unrebutted. The only effort Plaintiff makes to address it is his suggestion that the analogy *Antonyuk* drew between historical firearms prohibitions in fairs and markets and modern parks is contrary to *Bruen*'s statement that "there is no historical basis for New York to effectively declare the island of Manhattan a 'sensitive place.'" *See* Pl. Br. 22 (quoting 597 U.S. at 31). That criticism is baseless: unlike an entire city or

county,[10] the parks in Albuquerque and Bernalillo County, just like fairs and markets historically, are specific, discrete locations where people gather—often in very large numbers. *See, e.g.*, Br. for the District of Columbia et al. as Amici Curiae 9, Dkt. 10011019823 (explaining that parks covered by the Order host myriad large gatherings and special events); *Parks & Recreation: Balloon Fiesta Park*, City of Albuquerque, https://www.cabq.gov/parksandrecreation/parks/balloon-fiesta-park (explaining that Balloon Fiesta Park hosts not only the annual Albuquerque International Balloon Fiesta but also weddings, graduation parties, company picnics, concerts, special events, and many more).

### iv.  Plaintiff's facial challenge to the Parks Restriction fails

Finally, and at the very least, Plaintiff's facial challenge must fail because he cannot "establish that no set of circumstances exists under which" the Parks Restriction "would be valid." *Rahimi*, 144 S. Ct. at 1898 (quoting *Salerno*, 481 U.S. at 745). Several of the parks to which the restriction applies are heavily used by children, including for school- and learning-related activities. For example, Albuquerque Public Schools runs "Story Time in the Park" during the summer, in

---

[10] Manhattan is its own county (New York County); its 2020 population of 1,694,251 is 2.5 times the population of Bernalillo County's 676,444. *See* Manhattan Borough, New York County, New York, U.S. Census Bureau, https://tinyurl.com/5krzsr9p; Bernalillo County, New Mexico, U.S. Census Bureau, https://tinyurl.com/2s4zz6cm.

which "certified teachers … host read aloud sessions for children and their families at a number of Summer Lunch Meal Sites in the City of Albuquerque and Bernalillo County." *See APS Title I Story Time in the Park 2024*, https://perma.cc/3F54-Q9TF. These reading events take place four days a week in over 20 parks throughout the city and county, with summer lunches served to children in the same locations five days a week. *See id.*; *see also* Br. of Brady Center to Prevent Gun Violence et al. as Amici Curiae 18, Dkt. 010111019662 (discussing news report on 2023 program). Weeks-long programming for school teachers to read to kids in parks to "prevent[] Summer Learning Loss" establishes the clearest of analogies between the Parks Restriction and historical prohibitions on guns in schools. Similarly, the myriad crowded events that take place throughout the year in Balloon Fiesta Park establishes its close analogy to historical prohibitions on guns in public forums and public gatherings. Accordingly, at the very least, the Parks Restriction "is constitutional in some of its applications," and that is all a government need demonstrate to defeat a facial challenge like Plaintiff's. *Rahimi*, 144 S. Ct. at 1898.

*     *     *

In sum, the Parks Restriction is supported by a well-established tradition of prohibiting firearms in parks, public forums, and schools. The district court erred in concluding that Plaintiff is likely to succeed on his Second Amendment claim.

### C.  Plaintiff Has Not Established that the Playgrounds Restriction is Unconstitutional

Plaintiff's Second Amendment challenge to the Playgrounds Restriction is equally mistaken. For the reasons that follow, the district court did not abuse its discretion in concluding that Plaintiff lacks standing to challenge the Playgrounds Restriction, and that in any event, the Playgrounds Restriction is consistent with the Second Amendment. *See* App. 91, 100.

### i.  The District Court correctly concluded that Plaintiff lacks standing to challenge the Playgrounds Restriction

Plaintiff's challenge to the Playgrounds Restriction fails for lack of standing, both because Plaintiff waived any arguments in favor of standing by failing to raise them, and because there is no indication in the record that Plaintiff has or will suffer an injury-in-fact as a result of the Playgrounds Restriction.

As an initial matter, the question of Plaintiff's standing to challenge the Playgrounds Restriction is not properly before this Court. If a federal court has doubts about standing, it "must investigate it *sua sponte* to ensure there is an Article III case or controversy." *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1126 (10th Cir. 2013) (en banc), *aff'd on other grounds*, 583 U.S. 682 (2014). But the opposite is not true; courts need not manufacture arguments in favor of standing on behalf of plaintiffs who fail to do so. *Tompkins v. U.S. Dep't of Veterans Affs.*, 16 F.4th 733, 735 n.1 (10th Cir. 2021) ("Our duty to consider unargued *obstacles* to

subject matter jurisdiction does not affect our discretion to decline to consider

waived arguments that might have *supported* such jurisdiction." (quoting *United States*

*ex rel. Ramseyer v. Century Healthcare Corp.*, 90 F.3d 1514, 1518 n.2 (10th Cir. 1996))

(cleaned up)); *see also Raley v. Hyundai Motor Co.*, 642 F.3d 1271, 1275 (10th Cir.

2011) ("It is the appellant's burden, not ours, to conjure up possible theories to

invoke our legal authority to hear her appeal."). As such, this Court "consider[s]

only those arguments in favor of standing that the plaintiffs have adequately

briefed." *Colo. Outfitters Ass'n v. Hickenlooper*, 823 F.3d 537, 544 (10th Cir. 2016).

Plaintiff waived any arguments in support of his standing to challenge the

Playgrounds Restriction by failing to raise them in his opening brief. The district

court properly concluded that Plaintiff lacks standing on this claim. *See* App. 91.

Plaintiff acknowledges that holding, Pl. Br. 6 ("Judge Riggs … rejected Plaintiff's

Second Amendment challenge to the Playgrounds Restriction on standing

grounds[.]"), but did not make any arguments in favor of his standing in his

opening brief. Indeed, he mentions standing only in his summary of the district

court's ruling. *See id.* at 6-7. He does not provide the test governing standing,

identify relevant allegations, or explain how his allegations satisfy the requirements

of injury-in-fact. Because Plaintiff failed to adequately address the issue, his

standing to challenge the Playgrounds Restriction is not properly before this Court,

and should be denied for that reason alone. *See, e.g., Tyler v. U.S. Dep't of Educ. Rehab.*

*Servs. Admin.*, 904 F.3d 1167, 1175 n.4 (10th Cir. 2018) (affirming dismissal of due process claim because plaintiff-appellant "fail[ed] to address its standing to bring the due process claim," and thus "waived any argument that it has standing to pursue [that claim]"); *Bradford v. U.S. Dep't of Lab.*, 101 F.4th 707, 717 n.2 (10th Cir. 2024) (deeming standing argument made only "in a perfunctory manner" in a footnote waived).

Even were it properly before this Court, Plaintiff's claim of standing would fail because Plaintiff did not demonstrate (or even allege) that he has been or will be injured by the Playgrounds Restriction. As the party invoking federal jurisdiction, Plaintiff must establish standing—including an injury-in-fact that is "actual or imminent," rather than "conjectural or hypothetical"—for each claim he asserts. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). And, as is necessary for injunctive relief, Plaintiff "must establish a sufficient likelihood of future injury." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024).

Plaintiff's assertions regarding parks cannot establish his standing as to playgrounds. It is hornbook law that a plaintiff "must have standing to seek each form of relief in each claim." *Collins v. Daniels*, 916 F.3d 1302, 1312 (10th Cir. 2019) (citation omitted). Applying this principle in "sensitive places" cases like this one, "courts … have conducted a standing analysis relating to each specific location

category." *Md. Shall Issue, Inc.*, 680 F. Supp. 3d at 578 (collecting cases); *see also, e.g.*, *Antonyuk*, 89 F.4th at 333-80 (assessing standing to challenge sensitive places restrictions location-by-location); *Koons v. Platkin*, 673 F. Supp. 3d 515, 591-98 (D.N.J. 2023) (same), *appeals docketed*, Nos. 23-1900 (May 17, 2023), 23-2043 (3d Cir. June 9, 2023). Allegations regarding one sensitive place cannot support standing to challenge another.

Plaintiff did not carry his burden as to the Playgrounds Restriction because, as the district court recognized, he did not express any intention to bring a firearm to Albuquerque or Bernalillo County playgrounds. App. 91 ("Plaintiff does not assert that he has ever, or intends to, carry firearms in playgrounds."). To the contrary, all of Plaintiff's assertions concern his intention to carry in *parks*. *See* App. 55 (Plaintiff's declaration) ("I have been prohibited by the Second Amended Public Health order from lawfully carrying my firearm … at the parks that I attend for non-scholastic youth sporting events[.]"); App. 42 (verified motion) ("Plaintiff has children that participate in youth sports at the parks at issue … he [has] now been forced to attend several of those parks without the benefit of firearms[.]"). Even in his appellate brief, Plaintiff continues to assert that he only wishes to carry his gun in parks, and not in any playgrounds within those parks. *See* Pl. Br. 3-4 ("[T]he parks that Mr. Springer frequents and intends to continue to visit … contain playgrounds that he can easily stand outside of while remaining in the park

33

carrying his firearm (pursuant to the District Court's appropriately issue[d] preliminary injunction), so that he may observe both his younger child playing on the playground equipment, [and] … his older children participat[ing] in … the surrounding park."). That statement purports to present evidence outside the record, since the affidavit to which it refers in fact is silent as to whether the parks he says he wishes to visit contain playgrounds. *See* App. 55. But even if it were proper, it would not help him establish standing, because it does not say he wishes to carry his gun *into* any playground—and, to the contrary, he "can easily stand outside" the playground. Because Plaintiff does not intend to carry his gun inside playgrounds, in violation of the Playgrounds Restriction, he is not injured by it. *See Colo. Outfitters Ass'n*, 823 F.3d at 549 (denying standing to plaintiffs in Second Amendment challenge to large-capacity magazine restriction based on lack of "any testimony indicating that [they] intended to engage in conduct that might violate [challenged statute]"); *Paxton v. Dettelbach*, No. 23-10802, 2024 WL 3082331, at *3 (5th Cir. June 21, 2024) (holding that plaintiffs "lack standing to bring their pre-enforcement [Second Amendment] challenge" because "they have failed to show that their intended conduct is within the scope of what [the challenged law] prohibits").

### ii.  The Playgrounds Restriction is consistent with the Second Amendment

Plaintiff's challenge to Playgrounds Restriction also fails on the merits. The district court correctly determined that playgrounds are "sensitive places" in which the government may restrict firearms because they are analogous to schools, which are settled as sensitive places. *See* App. 100. Proper application of *Bruen* and *Rahimi* leads inevitably to this result, and it is consistent with a growing consensus among courts across the country. And separately, the historical traditions of regulating firearms in parks and other public-gathering places also support regulating firearms in playgrounds. Either theory provides ample support for affirming the district court's decision not to enjoin the Playgrounds Restriction.[11]

---

[11] As with his challenge to the Parks Restriction, even before reaching the historical inquiry, Plaintiff must establish at *Bruen*'s first step that the Second Amendment's text protects his proposed conduct—carrying guns in playgrounds *specifically*, not just carrying guns in public *generally*. For the same reasons that he has failed to satisfy that burden with respect to the Parks Restriction, *see* Opening Br. 22-23 n.14, he has failed to satisfy it with respect to the Playgrounds Restriction. *See also, e.g.*, *Oakland Tactical Supply, LLC v. Howell Twp.*, 103 F.4th 1186, 1195 (6th Cir. 2024) (holding that "the proposed conduct" examined in the Second Amendment textual inquiry "incorporate[s] the purpose *and location* of the plaintiffs' desired action" (emphasis added)); *B&L Prods. v. Newsom*, 104 F.4th 108, 117 n.17 (9th Cir. 2024) (rejecting argument that plaintiff's proposed conduct is the general "purchase of firearms" because "such a definition is not attuned to the actual activity that the [c]hallenged [s]tatutes regulate: namely, the sale and purchase of firearms and ammunition *on state property*").

35

1. **Playgrounds are sensitive places where the government may prohibit firearms because of their close relationship to schools**

Playgrounds are sensitive places where New Mexico may prohibit firearms because they are analogous to schools, which are unquestionably sensitive places. Plaintiff challenges this conclusion on two fronts: first, he takes the extreme position that schools are not sensitive places, Pl. Br. 19, and second, he challenges the analogy between playgrounds and schools, *id.* at 19-20. Defendants have demonstrated the errors in Plaintiff's first argument above. *See supra* pp. 25-27. The second argument is equally mistaken, for the reasons that follow.

*Bruen* invited lower courts to "use analogies … to determine that modern regulations prohibiting the carry of firearms in *new and analogous* sensitive places are constitutionally permissible." 597 U.S. at 30 (emphasis added). *Rahimi* clarified that courts must ask "whether the challenged regulation is consistent with the principles that underpin our regulatory tradition" and "ascertain whether the new law is *'relevantly similar' to laws that our tradition is understood to permit*." 144 S. Ct. at 1898 (emphasis added).

Applying this analogical approach reveals that playgrounds are sensitive because of their close relationship to schools. A place may be "sensitive" for Second Amendment purposes because of "the people found there or the activities that take place there." *United States v. Class*, 930 F.3d 460, 465 (D.C. Cir. 2019) (quotation

omitted). Schools are sensitive in part because they fall into the first category: The presence of firearms in schools "risks harm to great numbers of defenseless people (e.g., children)." *Nordyke v. King*, 563 F.3d 439, 459 (9th Cir. 2009), *vacated*, 611 F.3d 1015 (9th Cir. 2010) (en banc order vacating and remanding to panel for reconsideration in light of *McDonald*); *see also United States v. Masciandaro*, 648 F. Supp. 2d 779, 790 (E.D. Va. 2009) (concluding that national park area is sensitive place by analogy to "schools and government buildings," as "public properties where large numbers of people, often strangers (and including children), congregate"). Like historical restrictions on firearms in schools, the Playgrounds Restriction protects a vulnerable population—children—who are less capable of defending themselves from an armed attack and more likely to be seriously injured by gunshots. *See Executive Order 2024-004*, Gov. Michelle Lujan Grisham (Feb. 23, 2024), at 1, https://www.governor.state.nm.us/wp-content/uploads/2024/02/Executive-Order-2024-004.pdf (finding that "children are particularly vulnerable to gun violence"). And the Playgrounds Restriction burdens the Second Amendment right in a similar manner as school restrictions, because both restrict the right to bear arms only in limited and well-defined locations. Put in *Rahimi*'s terms, "our tradition is understood to permit" prohibitions on guns in schools, and the Playgrounds Restriction is "relevantly similar" to those prohibitions. *See Rahimi*, 144 S. Ct. at 1898.

For these reasons, the district court and courts across the country—including some that broadly invalidated other location-based firearm restrictions—have almost uniformly rejected challenges to restrictions on carrying firearms in playgrounds. *See* App. 100 ("[P]laygrounds are analogous to schools. Therefore, playgrounds are 'sensitive places' where firearms may be restricted."); *Kipke*, 695 F. Supp. 3d at 660 (finding prohibition on firearms on school grounds, including playgrounds, "comparably justified" to school restrictions due to shared goals of protecting vulnerable populations and enhancing public safety); *Siegel v. Platkin*, 653 F. Supp. 3d 136, 152 (D.N.J. 2023) (upholding playgrounds restriction because "schools and playgrounds intersect, that is, playgrounds fall within the sphere of schools"); *Koons*, 673 F. Supp. 3d at 639 (reaffirming *Siegel*); *Antonyuk v. Hochul*, 639 F. Supp. 3d 232, 324 (N.D.N.Y. 2022) (ruling that playgrounds restrictions "find[] support in those historical analogues prohibiting firearms in schools given that, by their very nature, both places often contain children" and adults generally "do not frequent playgrounds as much as children do"), *aff'd in part and vacated in part on other grounds*, 89 F.4th 271.[12] And although two district courts in this Circuit reached different results as to the Parks Restriction, both declined to enjoin the Playgrounds Restriction. *Compare* App. 100, *with We the Patriots, Inc. v. Grisham*, No. 1:23-cv-

---

[12] Plaintiffs in *Antonyuk* did not appeal their loss on the playground issue to the Second Circuit.

00773, 2023 WL 6622042, at *10 (D.N.M. Oct. 11, 2023) ("[P]laygrounds are 'sensitive places' and are excepted from the Second Amendment's commands. As other courts have noted, playgrounds are often associated with schools and therefore the inference that they are sensitive places under *Bruen* is appropriate."). The one district court that has enjoined a playgrounds restriction, *May v. Bonta*, No. 8:23-cv-01696, 2023 WL 8946212, at *11 (C.D. Cal. Dec. 20, 2023), *appeals docketed*, Nos. 23-4354, 23-4356 (9th Cir. Dec. 22, 2023) , is not only an extreme outlier, but also appears to have based its rationale on a comprehensive-security theory, which Plaintiff does not invoke here and which is mistaken for the reasons discussed in Defendants' opening brief. *See* Opening Br. 39-42. Because the Playgrounds Restriction burdens the Second Amendment right to a similar extent and for similar reasons as well-accepted restrictions on firearms in schools, it is constitutional under *Bruen*.

Plaintiff's sole argument that schools are not an apt analogy for playgrounds is that restrictions on firearms in schools "were rooted not in students' vulnerability, but rather in the schools' ability to exercise *in loco parentis* authority over them," authority Defendants do not have over visitors to their playgrounds. Pl. Br. 19-20. As already explained, *Heller* and *Bruen* foreclose this argument because they approved laws prohibiting possessing firearms in schools, period—not just possession by the children over whom the school exercises *in loco parentis* authority,

but also by adults (teachers, administrators, and visitors). *See supra* pp. 25-27. Given the overwhelming similarities between schools and playgrounds, the Playgrounds Restriction should be upheld by analogy to constitutionally-sound restrictions on firearms in schools.

### 2. The Playgrounds Restriction is consistent with the historical tradition of prohibiting guns in playgrounds, parks, and public gatherings

In addition to being constitutional based on its close connection to firearms prohibitions in schools, the Playgrounds Restriction is also constitutional in light of the long history of prohibiting firearms in playgrounds themselves; by analogy to prohibitions in parks; and by analogy to prohibitions in public-gathering places.

For as long as public playgrounds have existed in the United States, governments have regulated firearms within them. Like public parks, public playgrounds did not exist at the founding (making nonsensical Plaintiff's insistence that the district court should have demanded examples of restrictions on firearms in parks containing playgrounds from the founding period, *see* Pl. Br. 20).[13] Public playgrounds began to appear in the United States in the late-19th and early-20th centuries. Modeled after German sand gardens, the first American playgrounds

---

[13] *See also supra* Part I.A.ii (explaining that originalist principles require a historical analysis centered on the Reconstruction era and that 19th-century history is critically important regardless of which period is the central focus); Opening Br. 14-20.

appeared in cities including Boston, New York, Chicago, Providence, and Philadelphia starting in 1885. *See* Clarence Elmer Rainwater, *The Play Movement in the United States: A Study of Community Recreation* 20-22 (1921), *available at* https://tinyurl.com/ywwxpjxw. By the turn of the century, additional playgrounds appeared in Baltimore, Brooklyn, Cleveland, Denver, Milwaukee, Minneapolis, and Pittsburgh. *See id*. Playgrounds began to proliferate in parks and on school grounds throughout the country after the formation of the Playground and Recreation Association of America in 1906. *See* Henry S. Curtis, *The Play Movement and its Significance* 12-13 (1917), *available at* https://tinyurl.com/3afhpwaf ("At the time the Playground Association of America was started in 1906, there were some twenty cities that were maintaining playgrounds .... [By 1917 there were] over five hundred cities [with playgrounds].").

Because, as Plaintiff recognizes, playgrounds are often internal features of parks, *see* Pl. Br. 18-19, firearms were prohibited in many of the nation's first public playgrounds by concurrent or preexisting restrictions on firearms in parks. In New York, for instance, "the first permanent municipally-built playground in the country opened in Seward Park" in 1903—the same year New York passed a general firearms prohibition in city parks. *See* NYC Parks, History of Playgrounds in Parks, https://www.nycgovparks.org/about/history/playgrounds; Opening Br. Attach. B, Tab 48. Similarly, playground equipment was placed in Boston's

Charlesbank Park in 1889 (for boys) and 1891 (for girls); firearms were prohibited in all of Boston's public parks as early as 1886. *See* Kate Gannett Wells, *How Boston's Playgrounds Began*, 70 J. of Educ. 146, 147 (1909), *available at* https://tinyurl.com/4m4pm9n6; Opening Br. Attach. B, Tab 15. And a playground opened in Chicago's Washington Park in 1876, approximately three years after the city prohibited firearms in its public parks. *See* Playground & Recreation Ass'n of Am., *A Brief History of the Playground Movement in America*, The Playground, vol. 9, no. 1, Apr. 1915, at 2, 3, available at http://archive.org/details/playground09playrich; Opening Br. Attach. B, Tab 6. These are just a few examples of firearms restrictions encompassing the nation's earliest public playgrounds, and directly support the constitutionality of the Playgrounds Restriction.

The Playgrounds Restriction is also historically supported by analogy to the tradition of prohibiting firearms in parks, *see supra* Part I.B; Opening Br. 23-25, which itself has roots in an earlier tradition of restricting guns in crowded public-gathering places, *see supra* Part I.B.iii; Opening Br. 26-28. This tradition includes over one hundred historical firearm prohibitions from all levels of government in all parts of the county. *See generally* Opening Br., Attach. B (compiling historical parks restrictions). Plaintiff himself contends that "the correct analogue to

playgrounds [a]re parks, where … playground equipment existed internally." Pl. Br. 4.

The Playgrounds Restriction is "relevantly similar" to this well-established tradition of regulating firearms in parks and gathering-places because it burdens citizens' right to armed self-defense for similar reasons and by similar means. *See Bruen*, 597 U.S. at 29; *Rahimi*, 144 S. Ct. at 1898 ("Why and how the regulation burdens the right are central to this inquiry."). Each limits the right to bear arms only in discrete locations to protect against the physical harms and intimidating effects of gun violence. In sum, even accepting Plaintiff's contention that parks are a better historical comparator to playgrounds than schools, the Playgrounds Restriction is justified by the enduring historical tradition of firearms regulation.

## II.    Plaintiff Did Not Carry His Burden on the Non-Merits Factors

The remaining preliminary injunction factors also strongly weigh in Defendants' favor. Plaintiff's assertion that any harm he suffers outweighs Defendants' interests in enforcing their lifesaving regulations rests on the faulty premise that the challenged restrictions are unconstitutional. *See* Pl. Br. 23-24. Because the Parks Restriction and the Playgrounds Restriction are consistent with the Second Amendment, *see supra* Parts I.B & I.C; Opening Br. pp. 22-42, Plaintiff has suffered no injury, and the Court's inquiry can end there. *See Warner v. Gross*, 776 F.3d 721, 736 (10th Cir. 2015) (deeming it "unnecessary" to reach non-merits

factors when challenger failed to establish likely success on the merits). In addition, there is no basis in the record for finding that Plaintiff will suffer harm in the future. Defendants have already noted that Plaintiff—who does not live in a county subject to the Public Health Order—has not articulated which parks or playgrounds he has visited or whether he intends to visit them again in the future. Opening Br. 44-45 & n.33. His response offers no clarification, and in fact reveals no intent to carry his gun into playgrounds at all. *See* Pl. Br. 3-4 (explaining that Plaintiff intends only to "stand outside of" playgrounds). Plaintiff's vague allegations fall short of the showing of an injury necessary to seek prospective relief, let alone the irreparable injury necessary to support the extraordinary remedy of a preliminary injunction. *See* Opening Br. 44-45 n.33; *cf. Valdez v. Lujan Grisham*, No. 22-2112, 2024 WL 2319752, at *4 n.4 (10th Cir. May 22, 2024) (concluding that intention to "some day" apply for a position subject to a public health order vaccine requirement was insufficient to demonstrate standing since the plaintiff "would not have an 'actual or imminent' injury because she lacks 'any description of concrete plans, or indeed even any specification of when the some day will be'" (quoting *Lujan*, 504 U.S. at 565).

By contrast, the irreparable injury to New Mexico that would result from a preliminary injunction is not speculative. *See* Opening Br. 43-44. Defendants take exception to Plaintiff's scurrilous accusation that the Governor "wants to make

children more vulnerable to violence." Pl. Br. 2. Common-sense gun safety laws like the Order reduce gun violence. *See* Opening Br. 43-45 & n.30.[14] Defendants have the constitutional authority to regulate to keep Albuquerque and Bernalillo County parks and playgrounds safe from gun violence, and their current "inability to enforce [their] duly enacted plans clearly inflicts irreparable harm on the State." *Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018).[15]

## CONCLUSION

This Court should reverse in part and affirm in part, vacating the injunction of the Parks Restriction and affirming the denial of an injunction of the Playgrounds Restriction.

---

[14] *See also, e.g.*, Paul M. Reeping et al., *Gun-Free Zones and Active Shootings in the United States: A Matched Case-Control Study*, 37 The Lancet Regional Health – Americas, Sept. 2024, at 2, 5-6, https://doi.org/10.1016/j.lana.2024.100837 (finding that "active shootings were 62.5% less likely to occur in gun-free establishments than in gun-allowing establishments," and that the results "suggest that gun-free zones do not attract active shooters, and instead may prevent active shootings").

[15] Plaintiff's citation to language in the dissent from the grant of an application for a stay pending appeal in *Murthy v. Missouri*, 144 S. Ct. 7, 9 (2023), does nothing to change this analysis. Among other reasons, as a dissent, it is obviously not controlling. On certiorari review, the Supreme Court has since reversed the Fifth Circuit's judgment and the grant of a preliminary injunction on standing grounds, with the same three Justices again in dissent. 144 S. Ct. 1972 (2024).

July 17, 2024                          Respectfully submitted,

                                       /s/ Janet Carter
                                       Janet Carter
                                       William J. Taylor, Jr.
                                       Carina Bentata Gryting
                                       Everytown Law
                                       450 Lexington Ave, P.O. Box 4184
                                       New York, NY 10163
                                       (646) 324-8174
                                       jcarter@everytown.org

                                       Freya Jamison
                                       Everytown Law
                                       P.O. Box 14780
                                       Washington, DC 20044

                                       Holly Agajanian
                                       *Chief General Counsel to Gov. Lujan Grisham*
                                       Kyle P. Duffy
                                       *Deputy General Counsel to Gov. Lujan Grisham*
                                       490 Old Santa Fe Trail, Suite 400
                                       Santa Fe, NM 87501

                                       Cody Rogers
                                       Serpe Andrews
                                       2540 El Paseo Road, Suite D
                                       Las Cruces, NM 88001

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS**

This brief complies with the word limit of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), it contains 10,981 words.

This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (fourteen-point Baskerville font) using Microsoft Word.

Respectfully submitted,

/s/ Janet Carter
Janet Carter

47

## CERTIFICATE OF SERVICE

I hereby certify that on July 17, 2024, I filed the foregoing via the CM/ECF

filing system, which caused all counsel of record to be served by electronic means.

Respectfully submitted,

/s/ Janet Carter
Janet Carter